UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                  :

  UNITED STATES OF AMERICA          :

                                  :

           - *v.* -             :               S1 18 Cr. 328 (KPF)

                                  :

  ANILESH AHUJA, a/k/a "Neil," and  :
  JEREMY SHOR,                    :

                                  :

          Defendants.         :

                                  :

                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


## THE GOVERNMENT'S MOTIONS *IN LIMINE*


AUDREY STRAUSS
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515

Andrea M. Griswold
Joshua A. Naftalis
Max Nicholas
Assistant United States Attorneys
   - *Of Counsel –*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................... 2

DISCUSSION ...................................................................................... 4

   I.    The Court Should Preclude Proof or Argument Concerning Noncriminal Acts .............. 4

   II.    The Court Should Preclude Reference to the Outcomes of Other Trials or Prosecutions 8

   III.   The Court Should Limit References to Pending Civil Litigation Between Investor-1 and the Defendants to Questions or Argument Relating to Bias ........................................... 9

   IV.   The Court Should Admit Evidence of the Defendants' Compensation ........................ 12

   V.    The Court Should Preclude Shor from Offering Evidence Related to Secret Recordings He Made During the Fraud Scheme ............................................................. 14

   VI.

   VII.  Ahuja's Statement Regarding an SEC Investigation Is Admissible against Ahuja ....... 21

CONCLUSION ..................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Davis v. Alaska*, 415 U.S. 308 (1974) ........................................................................ 10

*Palatkevich v. Choupak*, 152 F. Supp.3d 201 (S.D.N.Y. 2016) .................................. 16

*Shakur v. United States*, 32 F. Supp. 2d 651 (S.D.N.Y. 1999) .................................... 6

*Stevenson v. Hearst Consol Publications*, 214 F.2d 902 (2d Cir. 1954) ..................... 10

*United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978) ........................................... 6

*United States v. Blaszczak*, 17 Cr. 357 (LAK) ........................................................... 13

*United States v. Boykoff*, 67 F. App'x 15 (2d Cir. 2003) .............................................. 7

*United States v. Brown*, No. 07 Cr. 874, 2009 WL 497606 (E.D.N.Y. 2009) ............ 10

*United States v. Bulgin*, 563 F. App'x 843 (2d Cir. 2014) .......................................... 13

*United States v. Chan*, 185 F. Supp. 2d 305 (S.D.N.Y. 2002) .................................... 19

*United States v. Chaparro*, 181 F. Supp. 2d 323 (S.D.N.Y. 2002) ............................ 20

*United States v. De La Rosa*, 171 F.3d 215 (5th Cir. 1999) .......................................... 8

*United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997) ..................................................... 6

*United States v. Ferguson*, 3:06CR137 (CFD), 2007 WL 4240782 (D. Conn. Nov. 30, 2007) ... 13

*United States v. Fernandez*, 839 F.2d 639 (9th Cir. 1987) .......................................... 15

*United States v. Gambino*, 815 F. Supp. 536 (E.D.N.Y. 1993) ..................................... 8

*United States v. Gomez,* 210 F. Supp. 2d 465 (S.D.N.Y. 2002) .................................. 21

*United States v. Logan*, 250 F.3d 350 (6th Cir. 2001) ................................................. 12

*United States v. Lumiere*, 16 Cr. 483-01 (JSR) .......................................................... 17

*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) ............................................. 15, 16

*United States v. Mezzanatto*, 513 U.S. 196 (1995) ..................................................... 21

*United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978) ................................................ 5

*United States v. Oluwanisola*, 605 F.3d 124 (2d Cir. 2010) .................................................... 20

*United States v. Parra*, 302 F. Supp. 2d 226 (S.D.N.Y. 2004) ................................................. 19

*United States v. Perez*, 2011 WL 1431985 (S.D.N.Y. Apr. 12, 2011) .......................................... 7

*United States v. Peters*, 543 F. App'x 5 (2d Cir. 2013) ...................................................... 13

*United States v. Pilarinos*, 864 F.2d 253 (2d Cir. 1988) ................................................... 11

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) ................................................ 12, 13, 14

*United States v. Rea,* 958 F.2d 1206 (2d Cir. 1992) ........................................................ 15

*United States v. Roland-Zapata*, 916 F.2d 795 (2d Cir. 1990) ................................................ 22

*United States v. Rosemond*, 841 F.3d 95 (2d Cir. 2016) ..................................................... 20

*United States v. Scarpa*, 913 F. 2d 993 (2d Cir. 1990) .................................................... 5, 7

*United States v. Shapiro*, 15 Cr. 155 (D.Conn.) ............................................................ 8

*United States v. Velez*, 354 F.3d 190 (2d Cir. 2004) ..................................................... 19, 20

*United States v. Walker*, 191 F.3d 326 (2d Cir. 1999) ....................................................... 7

*United States v. Weiss*, 914 F.2d 1514 (2d Cir. 1990) ..................................................... 12

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000) ...................................................... 6

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ...................................................... 15

*United States v. Zemlyansky*, 12 Cr. 171 (JPO) (S.D.N.Y.) ................................................... 9

## PRELIMINARY STATEMENT

The Government respectfully makes the following motions *in limine* in advance of the trial of Anilesh Ahuja ("Ahuja") and Jeremy Shor ("Shor"), which is scheduled to begin on June 3, 2019.  Specifically, the Government seeks:

1.   An order precluding the defendants from offering evidence or argument that would purport to establish innocence through proof of the absence of criminal acts on specific occasions.

2.   An order precluding the defendants from making reference to the outcome or result of previous prosecutions and trials.

3.   An order limiting the defendants' references to pending civil litigation, between a Premium Point Investments L.P. ("Premium Point" or "PPI") investor and the defendants, to good faith cross-examination questions or jury arguments relating to a witness's purported bias.

4.   An order permitting the Government to introduce evidence of the defendants' compensation during the time period of the charged scheme.

5.   An order precluding defendant Shor from offering surreptitious recordings he made while at PPI, and from offering evidence of the fact that he made the recordings or subsequently provided them to the United States Securities and Exchange Commission (the "SEC") after being made aware of an SEC investigation.

7.   An order permitting the Government to offer, against Ahuja, evidence of an inculpatory statement that Ahuja made to a cooperating witness regarding his awareness of the SEC investigation into PPI.

## BACKGROUND

The defendants are charged in Indictment S1 18 Cr. 328 (KPF) for their participation in a scheme, between approximately 2014 and 2016, to mismark certain securities held in hedge funds that Premium Point managed, thus fraudulently inflating the net asset value ("NAV") of those funds as reported to investors and potential investors. For their alleged participation in the scheme, Ahuja and Shor were each charged in four counts with: conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371 (Count One); conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count Two); securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5 (Count Three); and wire fraud, in violation of Title 18, United States Code, Section 1343 (Count Four).

The Government expects the evidence at trial to prove the following, in substance and in part and as relevant to the motions made herein.

Defendant Anilesh Ahuja founded PPI in 2008 and thereafter served as its Chief Executive Officer and Chief Investment Officer. Among other investment funds that it managed, PPI managed a mortgage credit fund (the "Hedge Fund"), a segregated ERISA fund that held substantially the same positions as the Hedge Fund (the "ERISA Fund"), and a fund strategy that purchased and securitized pools of mortgages that were not issued or guaranteed by a government agency (the "New Issue Fund"). PPI enjoyed early success, gaining a reputation as one of the premier firms in the residential mortgage-backed securities ("RMBS") hedge fund industry and posting double-digit annualized returns. The firm managed more than $5 billion in assets at its peak. PPI earned fees based on the amount of assets under management and its performance.

During the relevant time, PPI's largest single investor was an institutional investor referred to in the Indictment at Investor-1.

Defendant Jeremy Shor joined PPI in early 2014 and primarily worked as a trader of non-agency RMBS in the Hedge Fund.  Amin Majidi, a cooperating defendant who is expected to testify at trial, worked as the Chief Risk Officer at the firm from approximately November 2008 until approximately March 2014 and then became a portfolio manager of the Hedge Fund.  Ashish Dole, another cooperating defendant who is expected to testify at trial, worked as a junior trader at the firm and assisted Jeremy Shor.  James Nimberg, a witness expected to testify at trial, primarily worked as a portfolio manager and trader of agency RMBS in the Hedge Fund.

From at least in or about January 2014 through at least in or about April 2016, Ahuja, Shor, and others at PPI participated in the scheme to defraud investors in the Hedge Fund, its mirror ERISA Fund, and the New Issue Fund by deceptively mismarking each month the value of certain securities held in those funds, and thus fraudulently inflating the NAV of those funds as reported to investors and potential investors.

The defendants mismarked securities in two ways.  First, the defendants secured fraudulently inflated monthly price quotes for particular securities from corrupt brokers, often from Frank Dinucci, a cooperating defendant who is expected to testify at trial.  Second, the defendants fraudulently calculated a so-called "imputed mid" price for securities by improperly adding a so-called "sector spread" to a bid price, and used inflated sector spreads in order to maximize the impact on the NAV.  The mismarking scheme was intended to keep investors in PPI's funds and forestall redemptions, as well as to attract new investors and also earn higher management and performance fees.

The Government presently expects to elicit testimony by one or more percipient witnesses about the mismarking of 28 specific securities, and summary witness testimony about the mismarking of an additional 93 specific securities (collectively, the "121 Securities").  The Government will also present evidence at trial establishing the means and methods of the conspiracy as they were broadly applied to the Hedge Fund, its mirror ERISA Fund, and the New Issue Fund.  The Government expects the evidence to show that the mismarking of securities in these funds was systemic due to practices that the defendants and their co-conspirators put in place for securing inflated monthly price quotes for securities from corrupt brokers and for exploiting sector spreads to transform bid prices for securities into "imputed mid" prices that were inflated. The evidence establishing the existence and functioning of the mismarking scheme, and the defendants' participation in it, will not be limited solely to testimony and documents regarding the 121 Securities.  However, the Government will not elicit testimony about any specific security other than the 121 Securities.

## DISCUSSION

### I.   The Court Should Preclude Proof or Argument Concerning Noncriminal Acts

The Government moves to preclude either defendant from offering evidence or argument that would purport to establish innocence through proof of the absence of criminal acts on specific occasions.  The Government anticipates that, in a case charging the overvaluation of securities in different funds over the course of two years, the defendants may seek to offer evidence of discrete moments in which each of them acted innocently.  The defendants may argue (incorrectly) that such evidence could shed light on their state of mind and cast doubt on their ultimate guilt for participation in a scheme to inflate the NAV of certain PPI funds.  Under controlling law, such evidence is impermissible and should be excluded.

4

It is black-letter law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 913 F. 2d 993, 1011 (2d Cir. 1990).  In *Scarpa*, the defendants were charged with various racketeering offenses arising out of their extensive narcotics distribution activities.  *Id.* at 997-98. The Government alleged that the defendants frequently congregated with each other and other co-conspirators at a location known as the "Wimpy Boys Social Club."  *Id.* at 1010.  In the course of the prosecution, the Government learned that state law enforcement authorities had installed an eavesdropping device in the Social Club for a period of time, but had intercepted only "innocuous" conversations or conversations relating to other uncharged criminal conduct.  *Id.*  The defense sought to obtain these "innocuous" tapes from the Government in order to introduce them into evidence, arguing that "the very innocuousness of the [defendants'] statements renders them relevant as they are probative of the defendants' innocence."  *Id.*

The Second Circuit not only held that the tapes did not constitute *Brady* material, but it also affirmed the District Court's decision to exclude evidence, "by way of testimony or stipulation, of the evidence of the bug and the absence of relevant intercepted conversations by the defendants."  *Id.* at 1011.  Quoting the District Court's order, the Second Circuit held that defendants in criminal cases "cannot hope to use a process of elimination to defend themselves by presenting evidence of their noncriminal activities."  *Id.*  "[P]roof of the absence of criminal acts on specific occasions" is inadmissible.  *Id.*

*Scarpa* arose in the context of a narcotics case involving a continuing criminal enterprise, but the legal principle articulated therein has been followed in other genres of criminal cases as well.  For example, *United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978), is in accord. In *O'Connor*, the defendant was a meat inspector employed by the United States Department of

Agriculture. He was charged with accepting bribes from certain meat packing companies in connection with his official duties. As part of his defense at trial, he sought to introduce "FBI reports of interviews with still other meat packers who stated that they had not paid [the defendant] any bribes." *Id.* at 43. Although the District Court "curtail[ed] examination" of certain witnesses whom the defendant called to establish this defense, it let in some testimony along these lines "in general terms." *Id.* After the defendant's conviction was reversed on appeal because of an unrelated evidentiary error, the Second Circuit went out of its way to admonish the District Court for failing to "exclude[]" such evidence "in the first instance" and directed that any evidence about the defendant's "non-receipt of bribes" on other occasions not charged in the Indictment be excluded in the retrial. *Id.*

In the Second Circuit's words, "such testimony would in effect be an attempt to demonstrate [the defendant's] good character by proof of specific good acts," which is inadmissible under the Rules of Evidence. *Id. See also United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (holding that evidence that defendant "had not taken bribes" on other occasions, purportedly offered to show that the defendant was therefore "unlikely to have taken the alleged bribes" charged in the indictment, was "improperly" admitted); *United States v. Doyle*, 130 F.3d 523, 541-42 (2d Cir. 1997) (proof of the defendant's "specific good deeds" contrary to the alleged criminal conduct not admissible to prove good character or to disprove knowledge or intent); *Shakur v. United States*, 32 F. Supp. 2d 651, 670 (S.D.N.Y. 1999) (evidence that the defendant did not engage in violent conduct on other occasions is inadmissible to prove his "good character"; "such proof of an assertion by a negative is inadmissible").

The above-stated legal principles were reaffirmed by the Second Circuit in *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) ("We reject [the defendant's] assertion that the

evidence of innocent travel was necessary to rebut the government's allegation that [the defendant] had been involved in other cocaine importations from Jamaica.  Although the government did argue that [the defendant] had been involved in other importations, it did not allege that [the defendant] had engaged in drug activity during these particular trips.").

Nor could a defendant circumvent the evidentiary restriction discussed above by simply recasting his argument as one of lack of intent or proof of the defendant's state of mind. For example, in *United States v. Perez*, 2011 WL 1431985, at \*1 (S.D.N.Y. Apr. 12, 2011), the defendant "sought to introduce evidence that he had prepared truthful asylum applications as a means of disproving his alleged fraudulent intent."  However, citing the Second Circuit's decision in *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999), the District Court excluded evidence about other uncharged conduct (the other, truthful asylum applications) as entirely irrelevant to the defendant's state of mind with respect to the charged crime (the allegedly fraudulent asylum applications).  Under the *Scarpa* line of cases, the District Court reasoned, "whether the defendant 'had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent.'"  *Perez*, 2011 WL 1431985, at \*1 (citing *Walker*, 191 F.3d at 336) (quoting *United States v. Boykoff*, 67 F. App'x 15, 20-21 (2d Cir. 2003) ("evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant")).

Under the above-cited authorities, the defendants should be precluded from introducing evidence or making arguments that purport to prove that on a particular occasion during the time period of the charged conspiracy, they undertook to properly value or did properly value a specific bond that is not one of the 121 Securities.

## II.      The Court Should Preclude Reference to the Outcomes of Other Trials or Prosecutions

One of the Government's cooperating witnesses, Frank Dinucci, testified for the United States Attorney's Office in the District of Connecticut at an unrelated 2017 securities fraud trial.  *See United States v. Shapiro*, 15 Cr. 155 (RNC) (D.Conn.).  Two of the defendants at the *Shapiro* trial were acquitted. While the third defendant at the *Shapiro* trial was found guilty on one count and acquitted of the other charges, the District Court granted that defendant's post-trial motion and dismissed the one count of conviction.  *Shapiro* was one of the so-called *Litvak* cases brought in the District of Connecticut, which have generally not resulted in successful prosecutions or convictions.

The Government respectfully requests that the defendants be precluded from informing the jury of the outcome of the *Shapiro* trial or any *Litvak*-related trial or prosecution. The outcomes of unrelated trials and prosecutions — including the fact that (a) Dinucci testified at a prior trial that result in acquittals, (b) other related trials resulted in acquittals, and (c) courts have dismissed or reversed convictions — have no probative value.  *See* Fed. R. Evid. 401(a) ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence").  Moreover, allowing the defense to inform the jury of the outcome of these prior trials and prosecutions would be unduly prejudicial to the Government, confuse the issues, and mislead the jury.  *See* Fed. R. Evid. 403; *United States v. Gambino*, 815 F. Supp. 536, 539 (E.D.N.Y. 1993) (precluding reference of prior acquittal); *United States v. De La Rosa*, 171 F.3d 215, 219 (5th Cir. 1999) ("[A]s a general matter, a trial court does not abuse its discretion in excluding evidence of a prior acquittal on a related charge. . . . Evidence of a prior acquittal is not relevant because it does not prove innocence but rather merely indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime.")

(quotation marks and brackets omitted); Dec. 10, 2014 Tr. 21, *United States v. Zemlyansky*, 12 Cr. 171 (JPO) (S.D.N.Y.) (precluding reference to any acquittals; requiring reference to a "prior trial" to be limited to a "prior proceeding").

Accordingly, the defendants should not be permitted to inform the jury of the outcome of the *Shapiro* trial or any *Litvak*-related trial or prosecution.

### III. The Court Should Limit References to Pending Civil Litigation between Investor-1 and the Defendants to Questions Relating to Bias

Investor-1 was an institutional investor in PPI during the time period of the charged mismarking scheme. During that period, Investor-1 was the largest single investor in PPI's main hedge fund. In June 2018, Investor-1 filed a civil lawsuit (the "Civil Lawsuit") in New York State Supreme Court, naming as individual defendants Anilesh Ahuja and Jeremy Shor, as well as Amin Majidi, Ashish Dole, and Frank Dinucci. The Civil Lawsuit also names as defendants PPI, PPI's administrator U.S. Bancorp Fund Services ("U.S. Bank"), and Frank Dinucci's former employers AOC Securities, LLC and Auriga USA, LLC. The allegations in the Civil Lawsuit, briefly stated, are that Investor-1 was lied to about the value of its positions in PPI and the method in which that value was being calculated. The Civil Lawsuit also contains causes of action for negligence, breach of fiduciary duty, and promissory estoppel. Several defendants in the Civil Lawsuit have filed a motion to dismiss based on the pleadings, and those motions are currently pending. Fact discovery in the case is stayed pending the conclusion of this criminal trial. The civil complaint is attached for the Court's ease of reference as Exhibit A.

The Government's current list of witnesses includes two individuals who at all relevant times have been employed by Investor-1 (the "Investor-1 Witnesses"), as well as two individuals who at all relevant times have been employed by U.S. Bank (the "U.S. Bank

Witnesses").  The Government's witness list also includes Majidi, Dole, and Dinucci, each of whom are individual defendants in the Civil Lawsuit.

The Government does not seek to preclude the defendants from eliciting on cross-examination a witness's awareness of the Civil Lawsuit and any other facts concerning the Civil Lawsuit that are actually necessary to develop a good faith argument of bias.  *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (defense counsel should be permitted on cross-examination to expose the jury to facts from which the jury could infer that the witness was biased).  For example, the Government does not seek to preclude the defendants from asking one of the Investor-1 Witnesses on cross examination whether, to that witness's understanding, it would benefit Investor-1 in the Civil Lawsuit for the defendants to be convicted in this case.  However, the Government does move to preclude the defendants from eliciting any information about the Civil Lawsuit, either on cross examination or otherwise, that goes beyond what is necessary to develop a good faith argument as to bias.

The allegations in a complaint are inadmissible hearsay and therefore cannot be offered to prove the truth of its contents.  *See, e.g.*, *Stevenson v. Hearst Consol Publications*, 214 F.2d 902, 907 (2d Cir. 1954).  Thus, the defendants cannot elicit the substance of any allegations in the Civil Lawsuit or the motions to dismiss the Civil Lawsuit for the truth of the matters asserted therein.  Nor should the defendants be permitted to elicit from a particular witness whether he is aware that another person, or entity, is or is not named as a defendant in the Civil Lawsuit.  That is because Investor-1's decision to sue, or not to sue, a person or entity is irrelevant to the issues in dispute in this case, and would plainly create a high risk of the jury being misled about the import of decisions made in the Civil Lawsuit.  *See, e.g.*, Fed. R. Evid. 401 & 403; *United States v. Brown*, No. 07 Cr. 874, 2009 WL 497606, at *7 (E.D.N.Y. 2009) (collecting cases) (holding

that decision by District Attorney not to charge defendants as a result of their arrest was not relevant to jury's determination in federal case of whether defendants committed the charged conduct, and precluding, under Federal Rules of Evidence 401 and 403, defendants from offering evidence that the District Attorney decided not to prosecute them).  Thus, for example, the defendants should not be permitted to elicit from the Investor-1 Witnesses or from the witnesses who were formerly employed by PPI whether they are aware that U.S. Bank is named as a defendant in the Civil Lawsuit, as this would mislead the jury to believe that Investor-1's choices in connection with a civil litigation somehow bear on conclusions that should be drawn in a criminal case.

In addition, the defendants should not be permitted to use statements made in the Civil Lawsuit pleadings – which do not contain any factual affidavits by the Investor-1 Witnesses – to impeach testimony by either of the Investor-1 Witnesses.  Neither of the Investor-1 Witnesses is a plaintiff in the Civil Lawsuit or responsible for directing the content of the Civil Lawsuit pleadings.  The Investor-1 Witnesses did not draft or personally subscribe to the pleadings in the Civil Lawsuit, and the pleadings are not attributable to them on an agency or other theory.  *Cf. United States v. Pilarinos*, 864 F.2d 253, 257 (2d Cir. 1988) (noting, in the context of evaluating whether a statement can be offered as an admission by a party opponent, that attributing a statement to someone on an agency theory requires the proponent of the statement to establish the existence of an agency relationship, that the statement was made during the course of the relationship, and that the statement relates to a matter within the scope of the agency).  Allowing the defendants to seek to impeach testimony by the Investor-1 Witnesses through the use of statements that were made by Investor-1 through counsel in the Civil Lawsuit would generate tremendous confusion, as it would create the misimpression that, to the extent the Civil Lawsuit pleadings differ in any

11

detail from the testimony of the Investor-1 Witnesses, the Investor-1 Witnesses must have changed their story. Compounding the confusion is that fact that the pleading requirements for a civil lawsuit are different from the rules and circumstances governing sworn witness testimony at a criminal trial. Accordingly, efforts to impeach the Investor-1 Witnesses through references to pleadings in the Civil Lawsuit should be precluded under Rule 403.[1]

### IV.    The Court Should Admit Evidence of the Defendants' Compensation

The Government moves that it be permitted to offer evidence of Ahuja's and Shor's compensation during the time period of the conspiracy. Specifically, the Government seeks to offer evidence that PPI paid Ahuja tens of millions of dollars, including profit participation, and that PPI paid Shor more than one million dollars, including salary and bonus.

Evidence of the defendants' compensation is directly relevant to show the defendants' motive to perpetrate the various crimes with which they are charged, to establish the defendants' role in those offenses, and to show what they stood to lose if the crimes stopped or were revealed. Courts routinely admit such evidence. *See, e.g.*, *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (evidence of Quattrone's substantial wealth and compensation — over $200 million in two years — properly admitted, including because it was "relevant to Quattrone's motive to protect his reputation and that of CSFB's Tech group") (collecting cases); *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) (evidence of defendants' income "relevant to demonstrate that financial gain was the motive for the crime charged" where they "stood to lose" this source of income if crimes were discovered) (cited in *Quattrone*); *United States*

---

[1] For the same reasons, U.S. Bank's pleadings in the Civil Lawsuit should not be used to impeach the U.S. Bank witnesses, who are not directing the civil litigation or the principals of U.S. Bank, and Auriga's pleadings in the Civil Lawsuit should not be used to impeach statements made at trial by Dinucci, who no longer works at Auriga and had ceased working there by the time the Civil Lawsuit was filed.

*v. Weiss*, 914 F.2d 1514, 1523-24 (2d Cir. 1990) (evidence of defendant's wealth was not prejudicial when Government argued that it showed defendant's motive to commit Medicare fraud) (cited in *Quattrone*); *United States v. Bulgin*, 563 F. App'x 843, 846 (2d Cir. 2014) ("we have upheld a district court's decision to allow evidence of monetary gain when a defendant is on trial for a crime in which pecuniary gain is the usual motive") (internal quotation marks omitted); *United States v. Peters*, 543 F. App'x 5, 10 (2d Cir. 2013) ("The record shows . . . that the district court appropriately limited the prosecution's references to the defendant's lifestyle, and that some evidence of the defendant's wealth was relevant to the question of motive."); *United States v. Ferguson*, 3:06CR137(CFD), 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007) ("The evidence concerning Milton's deferred compensation plan . . . is relevant to proving motive, because AIG's performance affected Milton's benefits under the plan.  Evidence that links a defendant's financial compensation to his possible motives for participating in an alleged fraud is relevant to proving the fraud. . . .  In light of Milton's financial interest in AIG's performance, evidence of the deferred compensation plan  is  relevant  to  Milton's motive  to  manipulate  AIG's  financial statements to maintain AIG's stock price."); Mar. 26, 2019 Tr. 17-18, *United States v. Blaszczak*, 17 Cr. 357 (LAK) (finding that hedge fund defendants' compensation was relevant and admissible evidence because "it goes to motive.").

Here, the Government expects the evidence at trial to show that the defendants carried out the charged mismarking scheme in order to keep investors in PPI's funds (and to attract new investors) and thus continue to earn management and performance fees.  Evidence of the defendants' compensation is directly relevant to establishing that motive.  Indeed, the Government expects there to be evidence that, among other things, Ahuja made specific references to the importance of keeping investors in the fund and the desire to earn performance fees, and Shor

affirmatively raised the subject of his compensation.  Accordingly, evidence of the defendants'

compensation is properly admitted.[2]

### V.     The Court Should Preclude Shor from Offering Evidence Related to Secret Recordings He Made During the Fraud Scheme

Between July 2015 and March 2016, Shor secretly recorded approximately two

dozen conversations in which he participated, along with employees and partners at PPI, including

some with Ahuja, Majidi and/or Dole.  After being contacted by the SEC in 2016 and made aware

of an investigation relating to PPI, Shor, through counsel, produced the recordings in response to

a request for the voluntary production of information.  The SEC thereafter provided the recordings

to the Government.[3]  These recordings include both self-serving exculpatory statements and

admissions of guilt.

The Government seeks to preclude Shor from offering any statements that were

made in the recordings for their truth, as these would be inadmissible hearsay if offered by Shor.[4]

In addition, the Government seeks to preclude Shor from offering the following specific categories

of statements from the recordings, whether or not they are offered for their truth: (1) self-serving

---

[2]   The Government is also amenable to a limiting instruction to the extent the defendants request one.  *See Quattrone*, 441 F.3d at 187 (rejecting defense argument that such "evidence was irrelevant and unduly prejudicial because it invited the jury to engage in class-based bias against him"; "[w]hile evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations, that evidence may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth").

[3]  Even had Shor not provided the recordings to the Government, it is the Government's understanding that PPI's auditor recovered them from the firm's computer server.

[4]  The Government has not yet made a final determination as to which recordings or portions of recordings, if any, it will introduce at trial, although it has reduced the list of recordings it may seek to introduce to seven.  The Government therefore does not address here the extent to which the defendants may be able to introduce parts of recordings that the Government offers under Federal Rule of Evidence 106 (the Rule of Completeness).

exculpatory statements that he made on the recordings, and (2) statements on the recordings that are offered in order to show that others at PPI were on notice that Shor's portfolio was overvalued. Finally, the Government moves to preclude Shor from introducing evidence of the fact that he made recordings, or that he provided them to the SEC.   Each of these categories of evidence should be precluded because they constitute hearsay, are irrelevant, or their admission would confuse the issues relevant to the jury's determination of Shor's guilt.[5]

Pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence, a defendant's out-of-court statement is not hearsay when offered by the Government.  Fed. R. Evid. 801(d)(2)(A) ("A statement is not hearsay if . . . [it] is offered against a party and is [] the party's own statement."); *see also, e.g.*, *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("[U]nder Rule 801(d)(2)(A)," a defendant's statement offered by the Government "is not hearsay, because it is simply a statement of the opposing party.").  A defendant, however, does not have a parallel ability to offer his own statements into evidence without subjecting himself to cross-examination.  "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *Marin*, 669 F.2d at 84; *see also United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (holding that defendant "could have testified to everything asserted in his statement, [but] he could not offer the document itself for the truth of the matter asserted"); *United States v. Rea,* 958 F.2d 1206, 1225 (2d Cir. 1992) (same); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1987) ("[D]efense counsel wished to place [the defendant's] statement before the jury without subjecting [the defendant] to cross-examination, precisely what the hearsay

---

[5] Because the Government has not yet received Shor's exhibit list, the Government addresses in this section only those of Shor's prior statements that were captured on the recordings that he made.  To the extent that Shor seeks to introduce other hearsay exculpatory statements that he made, the Government intends to seek to preclude those as well.

rule forbids.").  Based on this well-established authority, Shor should be precluded from offering any statements made in the recordings for their truth.  This would include self-serving exculpatory statements that Shor made on the recordings.  Shor cannot credibly argue that a statement he made, while knowingly recording himself, in which he effectively proclaims his innocence, would be offered for anything other than the truth of the matter asserted.

Nor should Shor be permitted to introduce the fact that he made recordings and later produced those recordings to the SEC after learning of the investigation.  Neither act is relevant without admissible testimony about Shor's motivation for taking those acts.  *See Marin*, 669 F.2d at 84 ("When the defendant offers his own statement simply to show that it was made, rather than to establish the truth of the matter asserted, the fact that the statement was made must be relevant to the issues in the lawsuit.").[6] As Judge Rakoff noted in considering whether securities fraud defendant Stephan Lumiere should be permitted to introduce evidence of the mere fact that he made contact with the FBI to offer to cooperate:

> It's really in the form of a -- although it's an act, in the way you've just stated it, it's really an act that's intended to convey a statement. It's really a way of saying, I am innocent and I'm going to prove it by making myself available to you, which is an out-of-court statement offered for its truth and inadmissible hearsay. That's what it really amounts to, when you unpack it.
>
> But putting aside even the hearsay problem, I don't see how a jury is in a position to evaluate his action in that regard without his taking the stand and being subject to cross-examination about what his motives were in doing that. I mean, his motives could be, well, I thought I could talk my way out of it thought I could talk my way out of it, or his motive could be, I didn't think my prior attorney had the right strategy. Usually, I see that on the 2255. And I could go on endlessly.  So I think it's both confusing and of very limited probative value that's more than outweighed by the possibilities of

---

[6] The exception is the rare case when the mere fact that the statement was made is itself relevant to an issue in dispute.  *See Palatkevich v. Choupak*, 152 F. Supp.3d 201 (S.D.N.Y. 2016) (recognizing that a statement itself may be relevant under Rule 801(c) in a prosecution for slander).

> confusion under 403, and I think it's really, when you analyze it down, although offered as an act, it's really a form of communication offered as a hearsay, out-of-court statements; so I'm not going to allow it.

*United States v. Lumiere*, 16 Cr. 483-01 (JSR).

Allowing Shor to introduce the fact that he made the recordings, or that he produced them to the SEC, would convert those acts into impermissible hearsay statements, and would invite the jury to speculate as to Shor's motivation for taking those acts without a proper basis to do so. Accordingly, unless Shor takes the stand and subjects himself to cross-examination regarding his motives, the evidence should be precluded.

Shor also should not be permitted to offer portions of the recordings in order to argue that because he informed others at PPI that his portfolio was over-marked, he lacked the requisite intent to participate in the charged scheme. Shor's sharing with co-conspirators or others that his portfolio was over-marked does not form the basis of a valid defense, and would risk misleading the jury as to the requirements for participation in, and withdrawal from, a conspiracy. Indeed, throughout 2015 while Shor was making these recordings, he was the person at PPI with the primary relationship with Frank Dinucci, the broker who most frequently provided PPI with the inflated quotes used to inflate valuations and mislead investors. Shor was not acting at the direction of law enforcement while he made the recordings, and he continued to participate in the over-marking of securities during the period of time that he made them.









### VII.   Ahuja's Inculpatory Statement Regarding the SEC Investigation into PPI Is Admissible against Ahuja

Finally, the Government seeks a ruling that it be permitted to offer, against Ahuja, a self-incriminating statement by Ahuja in the spring of 2016 regarding the SEC's investigation into PPI.  The Government would be amenable to a limiting instruction with respect to the fact that no inference may be drawn from the existence of the SEC investigation in 2016, and also that the statement is offered only against Ahuja, and not Shor.

The Government expects that a cooperating witness will testify, in substance and in part, that in or about the spring of 2016, while the cooperating witness was still employed at PPI, he asked Ahuja whether the SEC was investigating PPI.[8]  The Government expects that the cooperating witness will testify that Ahuja responded, in sum and substance, that so long as the cooperating witness had not put anything "stupid" into an email, Ahuja would protect him.  The Government seeks to offer Ahuja's statement against Ahuja, as it is probative of his consciousness of guilt.  The statement supports an inference that Ahuja was aware that unlawful conduct had taken place at PPI and was anxious over the possibility that it had been discussed over email – *i.e.*, in a way that would be discoverable to investigators.  It also supports an inference that Ahuja was personally aware of the cooperating witness's participation in unlawful conduct, such that the cooperating witness would need protection.  The statement also corroborates other testimony that the Government expects to elicit that, as a general matter, Ahuja instructed certain employees at PPI not to discuss sensitive topics over email.  This evidence is relevant both with respect to showing Ahuja's fraudulent intent, and also with respect to providing context for why the charged conspiracy was not frequently discussed over email.

The reference to an SEC investigation does not create a risk of prejudice that would substantially outweigh the probative value of the evidence of Ahuja's conversation with the cooperating witness.  *See* Fed. R. Evid. 403.  Even assuming that the fact of the SEC investigation has not already been elicited at trial in a defense cross-examination of a cooperating witness or otherwise, its mention, without reference to its outcome,[9] would not be inflammatory in the context of a criminal trial.  *See, e.g.*, *United States v. Roland-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)

---

[8] The cooperating witness had recently developed an impression from others that there was an SEC investigation into the firm.

[9] Indeed, the SEC case is currently stayed.

(rejecting argument to exclude under Rule 403 evidence of conduct that was not "any more sensational or disturbing" than the charged crimes).  Moreover, the Government would be amenable to a limiting instruction, if proposed by the defense, to the effect that no inference may be drawn from the existence of an SEC investigation.  Such an instruction would be sufficient to alleviate any concern that Ahuja would otherwise have about the mention of the SEC investigation somehow causing a risk of undue prejudice.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should grant the Government's Motions *in limine*.

Dated: New York, New York
       May 10, 2019

Respectfully submitted,

AUDREY STRAUSS
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515

By:     /s/_____
        Andrea M. Griswold
        Joshua A. Naftalis
        Max Nicholas
        Assistant United States Attorneys
        (212) 637-1205/2310/1565

23