

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 18, 2019

<u>BY ECF</u>

The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    <u>United States</u> v. <u>Anilesh Ahuja, et al.</u>
             S1 18 Cr. 328 (KPF)

Dear Judge Failla:

        The Government respectfully submits this letter in opposition to the June 17, 2019 letter motion filed by defendant Jeremy Shor asking that the Court deliver a curative instruction concerning certain testimony of James Nimberg, a witness immunized by the Government who is currently on cross-examination. This motion should be denied. There has been no constructive amendment to the indictment. Nimberg's testimony was consistent with the core of criminality charged in the indictment – that the defendants, along with others including Amin Majidi, Ashish Dole and Nimberg, agreed to mislead investors by inflating the values of securities held in PPI's funds. At most, Mr. Nimberg's testimony about the particular methods he used (or refused to use) to achieve the shared objective is a non-prejudicial variance given that the defendants were made aware of Nimberg's anticipated testimony at least a month prior to trial.

**Relevant Background**

        The Superseding Indictment (the "Indictment") alleges that from in or about 2014 through in or about 2016, defendant Ahuja, along with defendant Jeremy Shor and others, participated in a mismarking scheme the objective of which was to mislead and defraud investors and potential investors in certain hedge funds managed by Premium Point Investments ("PPI") about the true value of investments held by those funds. The Indictment alleges that this objective was carried out through "deceptively mismarking each month the value of certain securities held in these funds, and thus fraudulently inflating the NAV of those funds, and thus fraudulently inflating the NAV reported to investors." (Indictment ¶ 17.) The Indictment does go on to outline two ways in which individuals at PPI carried out this deceptive mismarking, specifically obtaining inflated quotes from corrupt brokers and fraudulently calculating an "imputed mid" using a sector spread that worked to inflate the price of particular securities. (Indictment ¶ 18.) In providing additional details on the scheme, the Indictment references the so-called "challenge" process by which traders were allegedly instructed to push pricing sources for higher marks. (Indictment ¶

22.)  In so doing, the Indictment makes clear that a legitimate challenge involves presenting a case for why mark should be higher *or* lower.  (*Id.*)  The Indictment also alleges that the challenge process "evolve[d]" into "fraudulent mismarking."  (Indictment Header before Indictment ¶ 23.)

Mr. Nimberg worked as a portfolio manager in PPI's Mortgage Credit Fund ("MCF") between in or about 2013 and July 2015 when he resigned after being demoted by defendant Ahuja.  On direct examination, Mr. Nimberg testified, in substance and in part, that he participated in the scheme to inflate the marks of securities held in PPI funds for the purpose of misleading investors about how the PPI funds were actually doing.  When asked how Mr. Nimberg personally inflated the agency securities he was responsible for marking, and for the purpose of inflating the performance numbers provided to investors, Mr. Nimberg testified, in substance and in part, as follows:

> So the way that I did it was I did it by challenging – using the challenge process or manipulating the challenge process really to challenge low marks higher.  So, for example, suppose you have a bond, one bond, and you receive four different marks from that bond. Most of the time, there's going to be some difference. And half the time, a couple of the marks will be too high, and a few of the marks will be too low.  If everything is working out well, the average mark, when you take all four together, would be okay. If that's the case, you move on. But if you're trying to inflate the marks, what you will do is you will examine your four marks, and you'll notice that two are too high and two are too low.  And what I would have done, what I had done, is I found the cases where there were marks that were too low, and I challenged those only. So I'd say, hey, dealer A, B, or C, you made a mistake on this mark. It should be higher. But I left the two marks which were too high -- I left those alone.  So as a result, low marks were brought up. The high marks stayed high. It caused the average price, the average mark, to be too high which then caused the NAV to be too high which caused the returns to be inflated. That was what I had done.

(Tr. 1560.)

Mr. Nimberg also testified about discussions he had with another witness about the possibility of a "pre-challenge" process whereby individuals at PPI might speak with brokers before they provided marks.  Mr. Nimberg stated, in substance and in part, that he did not engage in this practice and thought that doing so would be improper.  (Tr. 1570.)

Both Mr. Nimberg's methodology for inflating his own securities, as well as his view of the validity of a pre-challenge process, were disclosed to the defendants through Mr. Nimberg's 3500 material, which was created and produced on or about April 26, 2019, following a meeting with Mr. Nimberg.  (3525-09 (Nimberg "challenged up bonds that were undermarked and left overmarked.") (3525-09 (Nimberg "did not think appropriate to tell dealers how to mark book.  [I]nappropriate b/c marks are supposed to be indep derived."))  These facts are also

discussed in marked Government exhibits which were also provided more than a month before trial.  *See* GX 870-H) (Nimberg raising problems with suggested pre-challenge process); GX 850-G (Dole and Majidi discussing attempting to stop Nimberg from challenging down).

**Discussion**

"To prevail on a constructive amendment claim, a defendant must demonstrate that the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2012) (internal quotation marks omitted).  In determining whether the Government has modified the crime charged so as to constitute a constructive amendment, the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice of the core criminality* to be proven at trial." *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (emphasis in *Rigas*) (internal quotation marks omitted).  "Although constructive amendment is viewed as a *per se* violation of the Grand Jury Clause, sufficient to secure relief without any showing of prejudice, [the Second Circuit] has proceeded cautiously in identifying such error, consistently permitting significant flexibility in proof.  *United States v. Agrawal*, 726 F.3d 235, 259–60 (2d Cir. 2013) (internal quotation marks omitted).  Where the Second Circuit has found a constructive amendment, it has been because "the differences between the indictment and proof were extreme."  *D'Amelio*, 683 F.3d at 421 (distinguishing *Stirone v. United States*, 361 U.S. 212 (1960).

Here, the core of the charged criminality has always been that the defendants and others improperly inflated marks on securities held by PPI funds for the purpose of inflating investor returns, thereby deceiving investors into remaining with and paying fees to PPI.  This remains the case.  Mr. Nimberg's testimony concerning the methods by which he achieved the object of the scheme did not alter the essence of the charged crime.  In *D'Amelio*, the Second Circuit specifically held that "the particulars of *how a defendant effected the crime* falls outside that purview" of the core criminality.  *D'Amelio*, 683 F.3d at 418 (emphasis added); *see also United States v. Browne*, 621 F. App'x 44, 47 (2d Cir. 2015) (holding that while the government may have proven additional facets of a mortgage fraud scheme, including the manipulation of certain individuals as straw buyers, there was no constructive amendment because the facets arose from the same criminal scheme charged).  In other words, proof of an additional method of carrying out an offense that is nonetheless consistent with the core criminality of the offense is not a constructive amendment.  Moreover, while Mr. Nimberg's testimony did identify a methodology for mismarking that is distinguishable from those outlined in the indictment, his method involved the same people, time period, and objective as the methods outlined in the indictment, and cannot be considered the sort of "extreme" differences between the indictment and proof that have constituted a constructive amendment.

Shor's reliance on *United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005), for the proposition that Mr. Nimberg's testimony provided a "[b]roadening of the possible bases for conviction from that which appeared in the indictment," and thus constitutes a constructive amendment, is also misplaced.  In *Milstein,* the Second Circuit found that there was *no* constructive amendment of a conspiracy charge that the defendant had misbranded drugs despite the

introduction of proof of a different theory of misbranding than was charged in the indictment because of the "well-established rule of this and other circuits that the overt act element of a conspiracy charge may be satisfied by an overt act not specified in the indictment, at least so long as there is no prejudice to the defendant."  401 F.3d at 70-71.  Likewise here, evidence that Mr. Nimberg, an identified co-conspirator, manipulated the challenge process, is an overt act admissible to prove the conspiracy charged in Count One even if not articulated in the Indictment.  To be clear, the court in *Milstein* did hold that a single substantive misbranding charge which specified *one of twenty* possible statutory bases for misbranding was constructively amended when proof in support of that charge was limited to a different statutory basis identified nowhere in the indictment, but this type of statutory divergence is not implicated by the circumstances here.  The fraud charged here is the inflation of the net asset value in order to deceive investors; that is what the Indictment alleged and that is also what Mr. Nimberg discussed in his testimony, in relevant part.  There has been no constructive amendment of the Indictment.

In contrast to a constructive amendment, "[a] *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment."  *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir. 1998) (emphasis in original).  While a constructive amendment is a violation of the Grand Jury clause, a variance requires corrective action only where the defendant has been prejudiced.  *D'amelio*, 683 F.3d at 417.  Prejudice has not occurred when a defendant is on sufficient notice of the trial proof.  *See Milstein*, 401 F.3d at 71.  Here, the Government does not believe that Mr. Nimberg's testimony presented facts "materially different" from those alleged in the Indictment such that a variance occurred, but even in the event that the Court were to conclude that a variance occurred, it would be a variance that involved no prejudice and therefore requires no corrective action.  The testimony from Mr. Nimberg at issue was, in essence, that he exploited the challenge process to manipulate the apparent value of the securities in his portfolio, during the time period of the charged offenses.  The fact that the challenge process had a significant function in the charged fraud is alleged in the Indictment.  Mr. Nimberg's testimony about a proposed pre-challenge process, whereby brokers could be primed in advance to provide certain prices suggested by individuals at Premium Point, is on all fours with the specific allegation in the indictment that the defendants and their co-conspirators agreed to obtain inflated quotes from corrupt brokers.  Mr. Nimberg's testimony about selecting which challenges to bring, and not to bring, in such a way as to inflate the net asset value of the fund, is not exactly the same as the two explications of the fraudulent scheme in the Indictment, but nor does it differ materially from them.  Mr. Nimberg described corrupting the challenge process to achieve a net asset value that was higher than he understood was justified by the actual performance of the investments.  This is a slight, but not material, departure from bringing challenges to corrupt brokers in order to achieve the same objective.  In any event, even if a variance is found, it has caused no prejudice because Mr. Nimberg's 3500 material produced on or about April 26, 2019, as well as Government exhibits, as referenced above, identified the methodologies about which he testified at trial.

The Government respectfully asks that Shor's motion be denied.

Respectfully submitted,

AUDREY STRAUSS
Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515

By: ____/s/_____
    Andrea M. Griswold
    Joshua A. Naftalis
    Max Nicholas
    Assistant United States Attorneys
    (212) 637-1205/2310/1565