**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 11, 2019

**VIA EMAIL**

Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

> Re:     ***United States v. Jeremy Shor***,
>            **S1 18 Cr. 328 (KPF)**

Dear Judge Failla:

The Government respectfully submits this letter in connection with the November 18, 2019 sentencing of defendant Jeremy Shor.  The Government and the United States Probation Office calculate the applicable sentencing range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") to be 168 to 210 months' imprisonment.  In light of the particular circumstances of this case, the Government does not oppose a sentence that includes a term of imprisonment below the Guidelines range. The Government, however, believes that a substantial period of incarceration is warranted in light of the Section 3553(a) factors discussed below.

## FACTUAL BACKGROUND

### A.     Procedural History

On May 9, 2018, Jeremy Shor, Anilesh Ahuja, and Amin Majidi were arrested on a four-count Indictment charging them with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5; and wire fraud, in violation of 18 U.S.C. § 1343.  On April 22, 2019, a Superseding Indictment was returned charging Shor and Ahuja with these same offenses; prior to the return of the Superseding Indictment Majidi had pleaded guilty pursuant to a cooperation agreement.

On June 3, 2019, trial commenced against Shor and Ahuja.  On July 11, 2019, the jury found both defendants guilty on all counts.

**B.     The Offense Conduct[1]**

From early 2014 through March 2016, Shor was employed as a trader at Premium Point Investment LP ("Premium Point," "PPI," or the "Firm"), a New York-based investment firm that managed hedge funds focused primarily on structured credit products.  PSR ¶¶ 14, 18.  During Shor's tenure at Premium Point, the Firm mismarked the securities held in certain of its hedge funds in two ways.  First, the Firm secured fraudulently inflated quotes for particular securities from corrupt brokers, primarily Frank Dinucci.  Second, the Firm fraudulently calculated a so-called "imputed mid" price for particular securities by improperly adding a so-called "sector spread" to a bid price.  By using this valuation process, the Firm also fraudulently inflated the price of particular securities.  PSR ¶ 31.  The effect of the mismarking scheme was to materially overstate the reported net asset value ("NAV") of certain of the Firm's funds, at times by more than $100 million across the funds managed by the Firm.  PSR ¶ 32.  As a result of the fraud, investors were left with the impression that their investments were performing better than they actually were, and the Firm was in a position to charge higher management and performance fees than would otherwise have been possible.

The mismarking scheme evolved as a result of demands by Anilesh Ahuja and Amin Majidi that Premium Point's funds appear competitive with peer funds and not reveal the full extent of losses.  In the 2014 period, the goal of the scheme was to develop an edge against competitors and to exaggerate the level of success that the Firm was enjoying.  Trial Transcript ("Tr.") 2157 (Majidi); *see also* Defense Exhibit ("DX") 6759 (Majidi to Shor and Ashish Dole in December 2014: "You guys are shooting for titles in 2015.").  Over time, as financial markets worsened, the degree of mismarking at Premium Point increased and the purpose of the mismarking shifted to concealing from investors the degree of the funds' losses.  *See, e.g.*, Government Exhibit ("GX") 840-Y ("The reason the book is over marked is because [Ahuja] would lie to Troy [Gayeski].");  Tr. 2108 (Majidi: "In 2015, it became about hiding losses and preventing redemptions.").

Shor played an instrumental role in inflating the NAV of Premium Point's Mortgage Credit Fund (the "MCF").  Although he argues to the contrary in his sentencing submission (Shor Sentencing Memorandum ("Shor Mem.") at 1), he was a driver of Premium Point's efforts to mismark securities in the MCF.  Most notably, Shor was Premium Point's main point of contact with Dinucci, the Firm's primary corrupt broker.  PSR ¶ 39; *see also, e.g.*, Tr. 1230 (Dole testifying that Ahuja used the phrase "Shor's boys" to refer to corrupt brokers); GX 858-B (Shor instructing Dole to "[g]ive [F]rank orders for day at your marks but tell him you can't trade till 1pm.").  Indeed, Shor was the person who introduced Dinucci into the month-end pricing process at Premium Point.  GX 2507.  Shor used Dinucci to subvert the integrity of Premium Point's valuation process by essentially instructing him on what marks were needed to give the appearance that Shor's book was performing adequately.  Tr. 3335 (Dinucci); Tr. 253 (Dole: "We could tell Frank to give us the prices that we want and get to that target."); Tr. 271 (Dole: "Once everything else had been received, we could calculate how much further we were from the target and exactly what prices Mr. Dinucci needed to provide for us to reach the target.").  Dinucci provided Shor and Ashish

---

[1] The information provided in the offense conduct section herein is reflected in paragraphs 14 to 67 of the Presentence Investigation Report ("PSR"), and is also derived from testimony and exhibits admitted at the trial.

Dole with their desired marks in exchange for their using him to execute trades, thus allowing him to earn commissions. *See, e.g.*, GX 880-Z (Dinucci: "Tell Ashish dog to chuck me a dam trade if I keep marking up all his bonds."). Shor well understood that this *quid pro quo* method of obtaining marks completely undermined the premise, on which investors relied, that the valuations being reported to investors were driven by PPI's actual estimation of those investors' holdings. *See, e.g.*, Tr. 246-47 (Dole: "[Shor] said that depending on the values that we need for the securities, if you want higher values, we could go to these brokers and get the values in exchange for giving them some trades, in exchange for trading with them."). His attitude about deceiving investors regarding the value of their holdings by obtaining those values through a *quid pro quo* was cavalier, as reflected by the familiar manner in which he constantly discussed this approach internally at Premium Point (*see, e.g.*, GX 840-C; GX 855-E; GX 840-C; GX 858-T; GX 852-H; GX 853-B) and by the consistency with which he engaged in this approach during his tenure at Premium Point. Shor was not, as he puts it, a "reluctant participant" in this scheme. (Shor Mem. at 1.)

By mid- to late-2015, the mismarking that Shor was engineering in the Mortgage Credit Fund was extreme. *See, e.g.*, GX 129; Tr. 324-25 (Dole: "In this case, the bid-offer spread is almost as much as the price of the security itself, which makes no sense."). One of the two means of mismarking that Shor used – the application of an inflated sector spread to a bid price in order to arrive at an imputed mid price – was sufficiently bizarre on its face that Shor concealed it from even Dinucci, who was providing sector spreads that were being exploited for this purpose. Tr. 3428-30 (Dinucci: "[Shor] said [the sector spreads] were strictly being used for internal reports. Nothing else."). Shor exacerbated the distorting effect that inflated sector spreads had on prices by having another broker, Performance Trust, label its mid prices as bid prices, thereby enabling Premium Point to add sector spreads to prices that were really mid prices, not bid prices. Tr. 359-61 (Dole); GX 1315.

Shor's purpose in mismarking his book was to maximize his own standing at Premium Point, where he played a pivotal part in the valuation process, and ultimately to make money. Shor was rewarded with a million dollar bonus in 2014 (of which he took home $750,000 and deferred the remainder), the year that Premium Point inflated its marks in order to gain a competitive edge. Tr. 345 (Dole). He wanted a similar bonus in 2015, the year that Premium Point was mismarking its books in order to obscure from investors the depths of their losses. Tr. 346 (Dole); *see also* Tr. 2136 (Majidi testifying that Shor wanted a $500,000 bonus in 2015); GX 840-S (Shor to Majidi: "Amin 2015 bonus needs to change. I've told you what I think the correct number should be."). Shor went so far as to write down the internal (but not investor-facing) marks on bonds in his book in late October 2015 in order to "give the management . . . a taste of what would happen if he was unhappy and he left." Tr. 347 (Dole).[2] He also made a furtive tape recording of Premium Point's own compliance officer in an effort to gain leverage over the Firm's management, Tr. 438-43

---

[2] Shor's argument that Dole "fabricat[ed]" his testimony about Shor's conduct in October 2015 (Shor Mem. at 15) is unfounded. The jury credited Dole; Dole's testimony was consistent with, and corroborated by, the other evidence in the case; and Dole had no reason to lie. Dole's testimony about Shor's purpose in effecting an internal markdown of the October 2015 prices is also consistent with Daniel Osman and Majidi reacting poorly to the markdown. (Shor Mem. at 16.)

(Dole), an action that he seeks to count in his favor (Shor Mem. at 13), and even in that secret tape he failed to acknowledge that he had been engaging in fraud (Shor Mem. at 17 (noting that Shor told Evan Jay that Premium Point's prices had been "pushed to a 'gray area'")).  Shor's actions did not reflect a good faith effort to repair "weaknesses and failures" in Premium Point's valuation policy (Shor Mem. at 1, 14); the problem with Premium Point's valuation process was not weakness, but deliberate fraud, and Shor was a critical part of driving the fraud forward, not stemming it.

Shor resigned from Premium Point in March 2016, in a conversation with Ahuja that he again covertly recorded.  Premium Point ultimately restated its NAV for the time period September 2015 through March 2016.  The restatement reflected that the Firm had overstated the NAV in the funds affected by the fraud by between 13% and 15%.  The restatement precipitated the collapse of Premium Point.  PSR ¶ 62.

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  *United States v. Booker*, 543 U.S. 220, 252 (2005).  Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).

## DISCUSSION

As discussed below, the Government respectfully submits that after applying the sentencing factors set forth in Section 3553(a) to Shor's conduct, a sentence that includes a substantial term of imprisonment is reasonable and appropriate.

### A.    Application of the Sentencing Guidelines

#### 1.  The PSR's Calculation

The Government agrees with the Guidelines calculation set forth in the PSR.  Pursuant to Section 3D1.2(b) of the Guidelines, Counts One through Four are grouped together.  PSR ¶ 73. Because the offense of conviction is fraud related, Section 2B1.1 of the Guidelines determines the applicable offense level.

As set forth in more detail below, under Section 2B1.1, the PSR calculates Shor's offense level as follows:

- The base offense level is seven (§ 2B1.1(a)(1));

- Because a conservative estimate of the loss based on the information available to the Government at the time of sentencing exceeded $25,000,000 but did not exceed $65,000,000, the base offense level is increased by 22 levels.  (§ 2B1.1(b)(2));

- Because the offense involved 10 or more victims, the base offense level is increased by two levels (§ 2B1.1(b)(2));

- Because the offense involved a violation of securities law and, at the time of the offense, Shor was an investment adviser, or a person associated with an investment adviser, the offense is increased four levels (§ 2B1.1(b)(20)(A)(iii)).

Accordingly, Shor's total offense level is 35.  PSR ¶¶ 72-81.  Shor has no prior criminal convictions and is thus in Criminal History Category I.  PSR ¶ 87.  His Guidelines sentencing range is therefore 168 to 210 months' imprisonment.

The Probation Office recommends that Shor be sentenced to 36 months' imprisonment.

#### 2.  Shor's Objections to the PSR

Shor objects to Probation's calculation of a $51 million loss amount, and to various other facts in the PSR.  Shor's objections should be overruled.

### a. Loss amount

Shor argues that the Court should undertake a Guidelines calculation assuming that the fraud involved "a zero loss." (Shor Mem. at 39). An assumption that the mismarking scheme resulted in zero loss would be counterfactual and inappropriate here.[3]

"For purposes of calculating the offense level associated with theft and fraud offenses, the court need only make a reasonable estimate of the loss resulting from the defendant's crime." *United States v. Borker*, 17 Cr. 391 (PGG), 2019 WL 1790054, at *14 (S.D.N.Y. April 24, 2019) (quoting *United States v. Abiodun*, 536 F.3d 162, 167 (2d Cir. 2008)) (internal quotation marks omitted); *see also* U.S.S.G. § 2B1.1, cmt. n.3(C) ("The court need only make a reasonable estimate of the loss."). *See also, e.g.*, *United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997) (Sentencing Guidelines "do not require that the sentencing court calculate the amount of loss with certainty or precision"); *United States v. Ebbers*, 458 F.3d 110, 126 (2d Cir. 2006) (same). Here, there are a number of ways to arrive at a reasonable estimate of the loss resulting from the mismarking scheme. One method that would be reasonable would be to calculate the amount that investors lost in the Premium Point funds that were mismarked. This would be reasonable because when investors gave their money to Premium Point, they relied upon an understanding that Premium Point was not falsifying returns. *See, e.g.*, Tr. 3009 (Gayeski: "[W]hen you subscribe, you obviously want to get a fair price close to where the market is trading and you want to be assured that when you're taking your capital back, you get a price where the market is trading."); Tr. 3010 (Gayeski: "[Y]ou want . . . an accurate price for the securities."); Tr. 3011 (Gayeski testifying that in conducting due diligence on Premium Point in the context of deciding whether to invest, Skybridge relied upon the information Premium Point provided as being accurate); Tr. 3018-19 (Gayeski testifying that in deciding whether and when to make redemptions, it was important to Skybridge that the NAV of the funds it was invested in was accurate). At least with respect to investors Skybridge and Gapstow, there is proof that had Premium Point disclosed that its month-end pricing process was dishonest, those parties would not have invested or maintained their investments in Premium Point and would not have been subject to the losses they ultimately incurred. Tr. 1280-81 (Kenneth McDonald testifying that during Skybridge's ongoing due diligence concerning Premium Point for the duration of their investment relationship, had Skybridge known that Premium Point was making misrepresentations to Skybridge, Skybridge would not have invested); Tr. 2022-23 (Michael Yannell testifying that Gapstow would not have maintained investments with Premium Point had it understood that quotes Premium Point was obtaining from brokers were not independent).

Based on the Government's understanding of Skybridge's subscriptions and redemptions in Premium Point funds, Skybridge alone lost at least approximately $60 million in its Premium Point investments. *See also* Tr. 3002 (Gayeski testifying that Skybridge had approximately $390 million in subscriptions in Premium Point and ultimately received approximately $320 million in redemptions). Based on the Government's understanding of Gapstow's subscriptions and redemptions in Premium Point funds, Gapstow lost approximately $11.56 million in its Premium

---

[3] It is the Government's understanding from conversations with counsel for Ahuja that Ahuja's position will be that loss cannot reasonably be calculated.

Point investments on a money-in, money out basis.  Adding together Skybridge's and Gapstow's losses in Premium Point funds would yield a loss amount of approximately $71 million.

On September 26, 2019, the Government met with counsel for Ahuja regarding the calculation of loss amount for Guidelines purposes.  At that meeting counsel for Ahuja raised the point that PPI had in fact put its investors' money toward RMBS securities, and that the RMBS market declined in at least mid- to late 2015 irrespective of any fraud.  Following the meeting, the Government sought a means of calculating a more conservative estimate of loss taking into account surrounding economic conditions, notwithstanding its view that the money-in, money-out calculation of $71 million – limited to the investors with respect to which there was trial testimony and as to which the Government has the most information – would be reasonable for purposes of Section 2B1.1.  *Cf. United States v. Stitsky*, 536 Fed Appx. 98, 112 (2d Cir. 2013) ("[T]he district court reasonably determined that no offset was warranted for losses from changed economic circumstances because . . . investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first instance.").  The Government engaged an expert firm, the Brattle Group, to calculate, with respect to Skybridge only, the difference in the restated returns to Premium Point's funds relative to a selected set of benchmark funds over the Restatement period.  *See United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) ("Normally, expert opinion and some consideration of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of loss caused by a defendant's fraud.").  The Government limited this exercise to Skybridge because at the time the Government asked Brattle to make the calculation, only as to Skybridge did the Government possess all of the relevant underlying documents reflecting the actual subscriptions and redemptions.  The purpose of the exercise was to incorporate into the reasonable estimate of loss amount the fact that had Skybridge not been invested in Premium Point during the period of the fraud, it might have invested in other vehicles that would have lost money due to market conditions, thus arguably reducing the loss that should be attributed to the mismarking scheme. Brattle composed an index of peer funds based on Skybridge's other investments during the relevant time period, including peer funds reflected in Skybridge's due diligence materials.  (*E,g.*, GX 342 at 15).  Brattle then compared the restated Premium Point returns to the returns in the peer funds.  Brattle found a difference of $51.8 million with respect to the Skybridge entities listed as investors in Government Exhibit 391: Skybridge G II Fund LLC, Skybridge Multi-Adviser Hedge Fund Portfolios LLC – Series G, and Skybridge Opportunity Fund LP.[4]

The $51.8 million figure is a reasonable, and in fact conservative, estimate of loss due to the fraud in this case.  The figure is conservative in two ways: (1) it does not incorporate the losses incurred by other investors in Premium Point or in the New Issue Fund; and (2) it assumes that had Skybridge not been invested in Premium Point during the relevant time period, it would have been invested in peer funds that would have been subject to substantially the same market conditions that defense counsel for both defendants argued during trial were hostile beginning at least as early as mid-2015.

---

[4] The spreadsheet from Brattle that was provided to counsel for Shor is enclosed herewith, together with all of the trial exhibits cited in this memorandum.  The spreadsheet was also provided to counsel for Ahuja.

Shor argues that because "the representations for which Mr. Shor was convicted did not affect the value of the securities at issue, the Government's comparison of the value of the securities held by other funds with the value of the securities held by [Premium Point] does not demonstrate the losses caused by the charged conduct." (Shor Mem. at 38). The premise of this argument is misplaced, as the core of the fraud was lying about the values of the securities in the Premium Point funds. But in any event, Shor cites no case law in support of this argument, and the Government does not believe that it provides any basis for the Court to make a finding of zero loss. The trial record supports the inference that investors, including as relevant for Guidelines purposes Skybridge, maintained investments in Premium Point funds on the basis of their understanding that Premium Point was marking its book properly, and that they would not have maintained investments in Premium Point had they been told that Premium Point was lying about the NAV of its funds (and thus the value of the shares in PPI managed funds). Tr. 1280-81 (Kenneth McDonald testifying that during Skybridge's ongoing due diligence concerning Premium Point for the duration of their investment relationship, had Skybridge known that Premium Point was making misrepresentations to Skybridge, Skybridge would not have invested); Tr. 2022-23 (Michael Yannell testifying that Gapstow would not have maintained investments with Premium Point had it understood that quotes Premium Point was obtaining from brokers were not independent). .Perhaps realizing this, Shor tries to recast the issue as whether Skybridge would have redeemed its investments in Premium Point had Premium Point "reported lower returns." (Shor Mem. at 38.) But that is not the issue. The issue is whether the fraud caused losses, and it plainly did. The fraud is what resulted in a cataclysmic Restatement and the collapse of Premium Point, and the sell-off of its assets at liquidation value. Investors had a right to protect their money from a company that was, unbeknownst to them, fudging its returns and putting the investors' money at risk of being lost once the scheme was discovered – which is substantially what happened here.

Shor's reliance on *United States v. Block*, 16 Cr. 595 (JPO), as a precedent for finding zero loss in a fraud case is unpersuasive. (Shor Mem. at 39.) *Block* is discussed in more detail below, but in short, Judge Oetken found that a corrective disclosure that said investors should not rely on six quarters of filings was essentially about a problematic accounting method that was not part of the charged fraud. *Block* Sentencing Tr. at 38-39. Thus the Court concluded that it was not able to attribute losses to the fraud as opposed to the uncharged accounting issue. No such problem exists in this case. There is no analog here to the problematic accounting method that informed Judge Oetken's analysis. The only issue in play in this matter is the criminal mismarking scheme. Nor can there be a plausible contention based on the trial record that general market conditions caused the severe losses reflected in the Restatement. In any event, the $51.8 million figure takes the precaution of accounting for the way market conditions affected the returns of peer funds.

In proposing the $51.8 million loss figure, the Government is attempting to steer a conservative course. The Government is not proposing a loss figure tantamount to the full amount of Skybridge's or other victims' investments, as was applied in *United States v. Balboa*, 129 Cr. 196 (PAC), and approved by the Second Circuit, 622 F. App'x 31, 32 (2d Cir. 2015), where investors received nothing of value in return for their investment. Nor is the Government even proposing a loss amount equal to the difference between Skybridge's or other investors'

subscriptions and redemptions in funds as to which fraud occurred, even though that would safely qualify as a reasonable estimate.  In response and in sharp contrast to the Government's efforts, Shor has put forward no alternative other than zero loss.  *Cf. Ebbers*, 438 F.3d at 127 ("The loss to investors who hold during the period of an ongoing fraud is not easily quantifiable because we cannot accurately assess what their conduct would have been had they known the truth.  However, some estimate must be made for Guidelines' purposes, or perpetrators of fraud would get a windfall.").  In light of the trial record, this is simply not a case where it is possible to say that the fraud caused zero loss or that it is impossible to arrive at a reasonable estimate of the loss.  In asking for a finding of zero loss, Shor seeks the kind of windfall that *Ebbers* condemns.  His objection to the loss amount in the PSR should be overruled.[5]

### b.  Other defense objections to the PSR

Shor argues that the mismarking scheme began in September 2015, rather than January 2014.  (Shor Mem. at 43.)  Shor's argument echoes his oral application prior to summations that the Government had not proven that the mismarking scheme extended into 2014.  However, there was ample evidence that the scheme extended into early 2014 and that Shor began participating in the scheme at or around its inception, including text messages between Shor and Dole discussing their relationship with Dinucci; Dinucci's trial testimony that he engaged in a scheme to provide inflated marks to Premium Point from 2014 on; and James Nimberg's trial testimony that the mismarking scheme was going on in 2014.  Shor acknowledges these parts of the record but disputes that "the say-so of a cooperator [Dinucci] and an immunized witness [Nimberg] can[] undo the findings of" the Firm's auditor, which did not make a finding of overvaluation prior to September 2015.  (Shor Mem. at 44.)  This argument is not a basis to find that the mismarking scheme did not begin until September 2015.  At best, the argument supports an inference that, as Majidi testified, prior to September 2015 the mismarking was not sufficiently severe to generate overvaluations that were extreme.  Furthermore, E&Y did not examine every security in Premium Point's portfolio, and E&Y was not privy to the communications between and among Shor, Dole, Dinucci and others in 2014 and early 2015 that the jury observed at trial and that proved the existence of the mismarking scheme well prior to September 2015.  Shor's objection to the timeframe of the conspiracy should be overruled.

Shor argues that the PSR should reflect that sector spreads were not used by Premium Point to inflate the NAV until the second half of 2015, and that they were not used to materially inflate the NAV until September 2015.  (Shor Mem. at 44.)  The Government disagrees.  The evidence at trial showed that the sector spread methodology began to be used to inflate the NAV earlier than the second half of 2015.  For example, Government Exhibit 850-H reflects that in

---

[5] The Government's proposed method of estimating the loss amount here also finds support in U.S.S.G. § 2B1.1, cmt. n.3(F), which concerns the analogous context of fraudulent inflation or deflation in the value of a publicly traded security.  That note states that a court in determining loss may use any method that is appropriate and practical under the circumstances.  The note also proposes a method whereby the loss would be estimated as the difference between the average price of the security during the period that the fraud occurred and the average price of the security during the 90-day period after the fraud was disclosed to the market, multiplied by the number of shares outstanding.

March 2015 Dole discussed with Majidi that "we widen bid ask every month to get money in the io book which this true up reflects." And Government Exhibit 870-HH is a text exchange between Majidi and Nimberg dated April 7, 2015 in which Nimberg writes, "we're already using fucked bid/ask."

Shor argues that the reference to a *quid pro quo* between Shor and Dinucci should be stricken from the PSR. (Shor Mem. at 45 (referencing PSR ¶ 42.).) The Government disagrees. Dinucci testified that he provided inflated month-end marks to Premium Point in exchange for increased trade flow. Dole also testified explicitly about a "quid pro quo" arrangement with Dinucci. Tr. at 276. In any event, having presided over the trial, the Court is extremely familiar with the relationship between Premium Point and Dinucci, and the phrase "quid pro quo" is ultimately a characterization of facts that were established at trial. The phrase does not need to be stricken from the PSR.

Shor argues that the portion of paragraph 47 of the PSR that refers to the use of sector spreads to calculate imputed mids as being contrary to the Firm's Valuation Policy should be stricken. (Shor Mem. at 46.) The Government disagrees. In 2011, Skybridge, PPI's largest investor, specifically told PPI to remove the sector spread process from the Valuation Policy — *i.e.*, *not* to use sector spreads — which PPI agreed to do. PPI never told Skybridge that it nonetheless intended to, and did, use sector spreads. Tr. 1363-68, 1412. Majidi testified that PPI's Valuation Policy made no explicit reference to the use of a sector spread for pricing purposes, and he further testified that after the reference to a sector spread was removed from the Valuation Policy, he never told anyone at Skybridge that PPI was using a sector spread for pricing purposes; nor did Majidi ever observe anybody (after 2011) tell Skybridge that PPI was using a sector spread for pricing. Majidi further testified that he never told, or observed anyone tell, anyone at Gapstow that PPI was using a sector spread for pricing purposes. Tr. 2224-25. In addition, Nimberg testified that had PPI's general counsel been informed that PPI was using inflated sector spreads to push up the value of bonds, "it would have been Armageddon." Tr. 1638.

Shor argues that the reference in Paragraph 63 of the PSR to the mismarking in the Mortgage Credit Fund being more significant than what was indicated in the Restatement, and having taken place over a longer time period than indicated in the Restatement, should be stricken. (Shor Mem. 48.) But as discussed above, the evidence at trial established that the mismarking scheme was going on in 2014 – further back than the Restatement Period. There is no basis for striking this portion of the PSR.

## B.     The Section 3553(a) Factors

As noted above, while the Government does not oppose a sentence that includes a term of imprisonment below the Guidelines range, the Government does believe that a substantial term of incarceration is necessary to achieve the objectives of Section 3553(a) in this case.

### 1.  Nature and Circumstances of the Offense

The nature and circumstances of the offense counsel in favor of a substantial sentence. The mismarking scheme that Shor perpetuated was by no means a victimless crime, or even a crime where the harm was abstract in any way.  Investors in Premium Point's funds lost millions of dollars as a result of the fraud.  Skybridge alone lost a staggering $51 million over an approximately two-year period.  Moreover, while the investors largely included sophisticated institutions, those institutions were in some cases investing in Premium Point on behalf of pensions, municipalities, and endowments.  Tr. 1279 (McDonald).  At bottom, the people who entrusted their money to Premium Point had no idea that the Firm was cooking its books.  Those investors were stripped of their ability to make a clear-sighted decision about where to put their money, to their significant detriment.

As discussed in the summary of relevant facts above, Shor's particular conduct was instrumental to this fraud.  He was Premium Point's contact with Dinucci and Performance Trust, and he was on the front line of month-end pricing for the Mortgage Credit Fund.  Nor was Shor simply along for the ride; rather, he repeatedly took the initiative in propelling the fraud forward.  It was Shor who brought Dinucci into Premium Point's month-end pricing process; who instructed Performance Trust to label mid-level prices as bid-level prices; who gave trades to Dinucci to keep up Premium Point's end of the *quid pro quo*; and who in part trained Dole, who began as a junior trader, on the corrupt valuation in the Mortgage Credit Fund.  The evidence of his repeated use of a *quid pro quo* arrangement with Dinucci dating back to 2014 contradicts his contention that from March 2014 through at least June 2015 he believed Premium Point's valuations were fair and reasonable (Shor Mem. at 11); it is not plausible that Shor believed that asking Dinucci to give higher valuations in exchange for increased commissions was a recipe for accurate marks.  Shor was also in the thick of Premium Point's abuse of inflated sector spreads in 2015 for month-end pricing purposes, and his argument that during a time period that was largely prior to his working at Premium Point, sector spreads were used for pricing purposes without inflating values (Shor Mem. at 10) is not mitigating.  At least with respect to the Mortgage Credit Fund, Shor was largely responsible for making the fraud work.

Shor's argument that his actions were in part the product of a "difficult environment" and "abusive boss" (Shor Mem. at 1), and that he was bullied into committed fraud (Shor Mem. at 19) are undermined by the fact that he was actually the propeller for key aspects of the fraud. His self-characterization as a relatively passive victim of Amin Majidi's efforts to reach performance targets (Shor Mem. at 8) is simply inconsistent with the evidence at trial of the active and creative steps he took to inflate the value of the securities in his book.

In addition to the direct harm that Shor's conduct caused to investors by generating fake returns that contributed to their staying invested in Premium Point, mismarking schemes like the one Shor engaged in undermine the integrity of the financial system.  Mismarking schemes project the impression that the financial markets are rigged and that investors do not really have transparency into the value of their investments or a means of cabining what financial professionals are doing with their money once it has been entrusted to them.  This message can chill investment and investor confidence.  It is a serious harm independent of the direct harm that was caused to investors here.

Shor's motivations in committing fraud are not mitigating.  He committed fraud for money.  Shor's offense was not a crime of poverty; in 2014 he made a million dollar bonus of which he took home three-quarters, and yet felt the need in 2015 to inflate returns to an even greater degree.  Even in the weeks immediately preceding his departure, in the twilight of the fraud, Shor was asking Majidi for a higher bonus.  Shor's conduct in pursuit of higher compensation, even toward others at Premium Point, was also manipulative.  His secretive tape recording of Premium Point's unwitting and new compliance officer, Evan Jay, was a cynical tactic to gain leverage over Premium Point in determining his 2015 bonus.  But beyond that, it was deceitful with respect to a person (Jay) who had absolutely nothing to do with the misconduct at Premium Point.  The Government respectfully submits that Shor's suggestion that this furtive conduct is to his credit is misguided.  Nor should Shor receive credit for his short-lived attempt to mark down Premium Point's internal valuations at the end of October 2015.  This was another tactic to gain leverage over Premium Point in terms of his compensation.  What the "markdown" in October 2015 and the subsequent tape recording of Evan Jay really show is that Shor knew exactly how illicit the month-end valuation process at Premium Point  was, and that rather than try to reverse it, he sought to use it to his advantage.

## 2. History and Characteristics of the Defendant

Shor's history and characteristics also support a substantial term of imprisonment.  To be clear, Shor has no criminal history.  But his personal circumstances made it acutely unnecessary for him to commit a crime of this scope.  Shor is a 48-year old with a PhD in mathematics from Columbia University.  PSR ¶ 119.  He is eminently employable without the need to commit fraud, and in light of his age and education there is no plausible argument that he did not understand the seriousness of his crime or the importance of following the law.  Indeed, Shor used his sophistication to further the fraud in this case, including by reverse engineering the price quotes that Premium Point wanted to obtain from Dinucci and by arranging for mid prices from Performance Trust to be labeled as bid prices.  Shor's history and characteristics put him in a position to fully appreciate the risks involved in committing fraud and the damage that this type of fraud was liable to cause.

Nor is there merit to Shor's contention that he deserves credit for "essentially [giving] the Government its roadmap for trying its case." (Shor Mem. at 2.)  Shor participated in a single proffer with the U.S. Attorney's Office.  He was given the opportunity to continue proffering with the aim of accepting responsibility for his criminal conduct and cooperating with the Government's case.  He declined.  Accordingly, he should not receive credit at sentencing for assisting the Government in any way.

## 3. Need to Afford Adequate Deterrence

The need to afford adequate deterrence weighs heavily in favor of a sentence that includes a substantial term of imprisonment.  The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'"  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 382, 3259); *see also United States v.*

*Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").  The Second Circuit has noted the appropriateness of significant sentences in the context of financial crimes for defendants who make the calculation that white collar crime is "a game worth playing."  *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quote district court and affirming sentence of 66 months' imprisonment for insider trading offense); *see also United States v. Johnson*, 2018 WL 1997975, at *5 (E.D.N.Y. April 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime.") (imposing sentence of 24 months' imprisonment where Guidelines range was 87-108 months).  As the *Martin* Court noted: "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment.  Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *Martin*, 455 F.3d at 1240 (citation omitted); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation marks and citation omitted).

It is essential for the functioning of the financial markets and the protection of investor interests that professionals in situations similar to Shor's know that they cannot lie about the value of investors' holdings without facing serious consequences.  Without a sentence that carries a substantial term of imprisonment there is a great risk that mismarking fraud will in fact be regarded as a "game worth playing."  The financial upside to committing fraud, in the form here of appearing valuable to one's firm and seeking a large bonus, requires the counterweight of significant punishment for corrupting the integrity of the investment process.  The interest in deterrence is strong in this case.

Shor argues that were he to receive a sentence of 18 months' imprisonment or greater, this would result in an unwarranted sentencing disparity between and among similarly situated defendants in light of the 18-month sentences imposed on the defendants in two cases: *United States v. Lumiere*, 16 Cr. 483 (JSR), and *United States v. Block*, 16 Cr. 595 (JPO).  This argument is unpersuasive.  As a threshold matter, a deviation from only two other financial fraud cases would not constitute an unwarranted sentencing disparity.  But in any event, the two cases relied upon by Shor are distinguishable.  In *Lumiere*, Judge Rakoff made explicit that his sentence was informed by certain psychological vulnerabilities that made the defendant particularly susceptible to hardship in prison.  *Lumiere* Sentencing Tr. at 29.  The amount of money that investors lost in *Lumiere* was also significantly below the conservative calculation of $51 million in this case – by the Government's calculation in *Lumiere*, investors lost between $9.5 million and $25 million.  *Id.* at 4.  *Lumiere* was thus a far smaller fraud than was present here.

*Block* is similarly distinguishable.  In *Block*, Judge Oetken found that the analog in that case to the Restatement in this case – a corrective disclosure that said investors should not rely on six quarters of filings – was essentially about a problematic accounting method that was not part of the charged fraud.  *Block* Sentencing Tr. at 38-39.  Here, there is no question that the Restatement was a product of the fraud.  Just as significantly, in *Block* Judge Oetken found that the offense did not fundamentally involve conduct that occurred over a period of years or even a period of many months.  Rather, he found that the conduct occurred "late one night." *Id.* at 69-

70.  This is a dramatic difference from the fraud that Shor participated in at Premium Point, which he perpetuated for a period of approximately two years.  Shor's offense conduct was longstanding and calculated.  Finally, Judge Oetken found that the *Block* defendant's culpability may be diminished by the ambiguous regulatory environment that applied to the circumstances of that case.  *Id.* at 70.  No such allowance is warranted here.  There is nothing ambiguous about asking a corrupt broker to provide a higher value for a security in exchange for more commissions, or in misapplying an inflated sector spread in the pricing context.  Shor used a dishonest process to achieve fictitious returns.

## C.    Restitution and Forfeiture

The Government received from counsel for Ahuja on September 11, 2019 a list of investors in the funds that were at issue at trial during the period of the charged fraud.  On October 8, 2019, the Government received from counsel the contact information for most of those investors.  As of October 21, 2019, pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), the Government has now contacted all potential victims of which it is aware by letter or email, in order to notify them of their possible right to obtain restitution and to inform them of how to submit any claims in writing they may wish to make to the Government, for forwarding to the Probation Department.  The Government has been contacted by several potential victims about whether they wish to make a claim for restitution and is still in the process of being contacted by others.  The Government has begun receiving letters from victims who will make claims of restitution and anticipates that it will receive more such letters.  The Government intends to provide these letters in aggregate, or in several batches, to Probation.

As reflected at PSR ¶ 150, because victims' losses will not have been ascertainable by the date of sentencing, the Government is seeking an extension of 90 days for the final determination of restitution.  The Government anticipates being in a position to have collected, and forwarded, all claims by any potential victims to Probation or directly to the Court by December 1, 2019.  The Government expects the victims' written submissions to include the bases for their claims, and the Government believes that forwarding all claims to Probation by December 1 will allow time for all parties from whom restitution may be sought, and the Government, to be heard on the appropriateness and amount of restitution.

The Government is not pursuing a claim of forfeiture against Shor.

## D.    Surrender Date

The Government has no objection to Shor's request for a surrender date of January 6, 2020.

## CONCLUSION

For the reasons discussed above, the Government respectfully submits that a sentence that includes a substantial term of imprisonment is warranted in this case.

Respectfully submitted,

AUDREY STRAUSS
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515

_____/s/_____
Andrea M. Griswold
Joshua A. Naftalis
Max Nicholas
Assistant United States Attorneys
(212) 637-1205/2247/1565