UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

UNITED STATES OF AMERICA                         :

                                                                          :        18 Cr. 328 (KPF)

                                         v.                              :

ANILESH AHUJA, a/k/a "Neil,"                      :
and JEREMY SHOR,                                     :

                                  Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - --   X

**<u>SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT JEREMY SHOR</u>**

PATTERSON BELKNAP WEBB & TYLER LLP
Daniel S. Ruzumna
Clinton W. Morrison
Jeffrey Hughes
1133 Avenue of the Americas
New York, NY 10036

*Counsel for Defendant Jeremy Shor*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ........................................................................................................3

    A.    Personal Life ...............................................................................................4

    B.    Professional Life .........................................................................................5

    C.    Work at PPI .................................................................................................7

        1.    2014 and Early 2015:  Strong Performance, Fair Valuations, But an Imperfect Valuation Process .................................................7

            a.    PPI's Use of Sector Spreads .........................................................8

            b.    Majidi's Performance Targets.....................................................11

        2.    Starting in July 2015, Mr. Shor Takes Increasingly Proactive Steps to Report Pricing Concerns before Quitting ..................................13

    D.    Testimonials to Mr. Shor's Character................................................21

        1.    Mr. Shor's Character Generally....................................................21

        2.    The "Glue" of his Nuclear Family: Mr. Shor as a Devoted Parent...........22

        3.    The "Rock" of his Extended Family: Mr. Shor's Selfless and Repeated Efforts to Care for Those in Need........................................24

        4.    Not the Stereotypical Wall Street Type ....................................27

        5.    Mr. Shor Works to Overcome Adversity in His Personal Life .................28

LEGAL CONSIDERATIONS IN IMPOSING A SENTENCE....................................30

    A.    Applicable Legal Standard.........................................................................30

    B.    Application of the § 3553(a) Factors .......................................................31

        1.    Nature and Circumstances of the Offense and History and Characteristics of the Defendant...........................................31

        2.    The Need for the Sentence Imposed ........................................33

        3.    The Kinds of Sentences Available ............................................35

        4.    Application of the Sentencing Guidelines ................................35

        5.    Need to Avoid Unwarranted Sentence Disparities ...................39

        6.    Restitution.....................................................................................42

    C.    Unresolved PSR Objections......................................................................43

    D.    Other Matters for the Court's Consideration .........................................48

CONCLUSION.........................................................................................................48

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007)......................................................................................................31

*Rita v. United States*,
    551 U.S. 338 (2007)....................................................................................................31

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006).......................................................................35

*United States v. Block*,
    16 Cr. 595 (JPO) (S.D.N.Y.)............................................................................ 36, 39-42

*United States v. Cuti*, 2011 U.S. Dist. LEXIS 84791 (S.D.N.Y. July 29, 2011) ........................39

*United States v. Deutsch*,
    987 F.2d 878 (2d Cir. 1993).......................................................................................37

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)........................................................................36

*United States v. Johnson*,
    16 Cr. 457 (NGG), 2018 U.S. Dist. LEXIS 71257 (E.D.N.Y. Apr. 26, 2018
    2012), *aff'd*, 939 F.3d 82 (2d Cir. 2019)...................................................................36

*United States v. Kent*,
    821 F.3d 362 (2d Cir. 2016).......................................................................................36

*United States v. Lumiere*,
    16 Cr. 483 (JSR) (S.D.N.Y.).......................................................................................40

*United States v. Samas*,
    561 F.3d 108 (2d Cir. 2009).......................................................................................30

**Statutes**

18 U.S.C. § 3553(a) ............................................................................................. *passim*

18 U.S.C. 3664(h) ...........................................................................................................43

U.S.S.G. § 2B1.1(b)(1) n.3(A)(i) ...............................................................................36, 37

**Other Authorities**

Amanda Cantrell, "Hedge Fund Execs Convicted of Fraud," *Bloomberg News*
  (June 5, 2019), https://www.bloomberg.com/news/articles/2019-06-05/-greed-
  and-lies-on-wall-street-is-opening-in-bond-marking-trial (last visited Nov. 4,
  2019) ................................................................................................................................. 37

Chris Dolmetch, "'Greed and Lies on Wall Street' is Opening Argument in Bond-
  Marking Trial," *Institutional Investor* (July 12, 2019),
  https://www.institutionalinvestor.com/article/b1g7p8c04t65r1/Hedge-Fund-
  Execs-Convicted-of-Fraud (last visited Nov. 4, 2019) .......................................................... 37

Defendant Jeremy Shor respectfully submits this Sentencing Memorandum in connection with his upcoming sentencing hearing, which is scheduled for November 18, 2019. For all the reasons set forth below, Mr. Shor submits that the Court should sentence him to a minimal term of incarceration.

## PRELIMINARY STATEMENT

Jeremy Shor is a forty-eight year-old husband and father of three.  He is a first-time offender, and other than the conduct charged in this case, has led a law-abiding life marked by love for his family, honesty, and integrity.  Mr. Shor stands convicted after trial of the charges in the Superseding Indictment, and recognizes the seriousness of those charges and respects the jury's verdict.  At the same time, the evidence at trial showed that Mr. Shor was not the driver of any efforts to mismark the residential mortgage-backed securities ("RMBS") he traded at Premium Point Investments, L.P. ("PPI"), nor did he originate PPI's valuation practices.  To the contrary, Mr. Shor took repeated steps to address what he considered to be the weaknesses and failures of PPI's valuation policies and practices.  Even if those steps did not result in an acquittal, they show that when prices of securities started to become overly aggressive, Mr. Shor was, at worst, a reluctant participant in a scheme originated by, driven by, and primarily benefitting others.  We submit that Mr. Shor's efforts while working in the difficult environment of PPI and under the supervision of an abusive boss should be taken into account when determining an appropriate sentence.

As the evidence demonstrated at trial, although Ernst & Young's ("E&Y") comprehensive audit of the portfolio's valuation did not result in any restatement prior to September 2015, as early as July 2015, Mr. Shor began to report concerns to PPI's management—first, his direct supervisor and then others—that he was trading bonds at levels below that which the firm was marking its bonds at month end.  He relayed similar concerns

1

about PPI's month-end valuations to firm leadership in August 2015 and on multiple occasions

in October 2015, as the September prices were being finalized.  Because PPI's aggressive (and in

his mind, unjustifiable) pricing was not being addressed by management, Mr. Shor took action

on his own.  On October 30, 2015, Mr. Shor marked down his portfolio of bonds against the

direct orders of his boss, Amin Majidi; on December 15, 2015, he offered a detailed explanation

of his concerns to the firm's Chief Compliance Officer; and ultimately, on March 14, 2016, he

resigned his position, giving up roughly $200,000 in deferred compensation, as well as a

$250,000 salary without a new job lined up.  After leaving PPI, Mr. Shor retained all of his

electronic records, including personally damaging WhatsApp messages exchanged with Frank

Dinucci; sat for proffers with the U.S. Attorney's Office and the staff of the Securities and

Exchange Commission ("SEC"); and essentially gave the Government its roadmap for trying its

case.

       Throughout this proceeding, the Government has presented Mr. Shor as the

embodiment of Wall Street greed—as someone motivated by an unabashed desire to earn more

money or obtain a higher bonus.  Recognizing that the jury convicted Mr. Shor of the charged

offenses, we submit that the Government's portrayal of Mr. Shor bears no resemblance to reality.

As the letters submitted by those who know him best attest, Mr. Shor is a grounded, family-

oriented individual who was happy to pursue a career in academia before he entered the

securities industry.  The letters describe a non-confrontational person who struggled in certain

social environments and whose interpersonal skills do not always match his substantial

quantitative and analytical skills.  That combination proved tragic at PPI and resulted in Mr. Shor

being found guilty of participating in a scheme to inflate bond prices and to defraud investors

when his superiors, namely PPI partner and portfolio manager Amin Majidi, demanded that he

and others mark bonds at levels necessary to reach increasingly unrealistic performance targets. And, despite the Government's claims that Mr. Shor raised concerns, saved evidence, and made recordings as part of a plan to obtain a larger bonus, by extortion if necessary, as it turned out, Mr. Shor never took any steps consistent with such an alleged plan.  To the contrary, he walked away from his job at PPI, made no extortionate threats, and received a bonus in 2015 that was only 10% of his 2014 bonus. We respectfully submit that Mr. Shor's conduct was not driven by greed and does not warrant a substantial custodial sentence.

The letters submitted on Mr. Shor's behalf depict a man who is utterly devoted to his three young children—someone who delights in raising them and whose primary goal in life is to support, love, and teach them.  They reveal someone who has repeatedly put his own needs aside to care for ailing relatives, often at great personal expense to himself.  The letters describe a grounded person who did not seek out the glamor of Wall Street life but who was proud of his achievements.  By all accounts, Mr. Shor's involvement in the charged offense was an aberration in an otherwise law-abiding and exemplary life.   Title 18, United States Code, Section 3553(a) directs the Court to impose a sentence that is sufficient, but not greater than necessary to meet the goals of sentencing.  Here, we respectfully submit that the Court should impose a minimal custodial sentence.

## BACKGROUND

With the exception of the conduct at issue in this case, Mr. Shor's life has been characterized by integrity, perseverance, and an unwavering commitment to his children and extended family.  The letters submitted on Mr. Shor's behalf reflect a fundamentally kind and gentle man with strong values who has lived an honorable and generally law-abiding life.  In the face of an extremely difficult situation at PPI, where he faced heavy pressure from a demanding

boss to hit increasingly aggressive performance targets, Mr. Shor tried, unsuccessfully, to right the ship.  The trial evidence shows that Mr. Shor was extremely disturbed by what Majidi was asking of him, that he complained to others in positions of authority, and that ultimately he resigned rather than seek or obtain financial benefits for himself as a result of any participation in the marking scheme.  Mr. Shor and his family have suffered tremendously over the past three-plus years under the cloud of the Government's and SEC's investigations and then under the scrutiny of trial.  Mr. Shor will never again risk violating the law and hurting his family.

### A.     Personal Life

Mr. Shor was born in 1971 in Washington, D.C.   He grew up in Great Neck, Long Island as the oldest of two.  From a young age, Mr. Shor was drawn to mathematics, both because he excelled at it and because other subjects came less naturally to him due to a learning disability that went undiagnosed until he was a teenager.  As his mother explains in her letter to the Court, Mr. Shor "persisted with diligent efforts developing his reading skills," despite having dyslexia, and even after his diagnosis he "did not want to request any support programs from the school" because he "did not seek to gain advantages or play the system."  (Ex. 1 at 2.)   Mr. Shor's sister, too, recounts how she "saw firsthand how hard [Mr. Shor] had to work to compensate for his diagnosed learning disabilities."  (Ex. 2 at 3.)

Mr. Shor's "placement on the neurodiversity spectrum" has been "present since childhood."  (Ex. 2 at 3.)   His sister relates one telling vignette from his early years:  on his eighth birthday, Mr. Shor became "overwhelmed by the commotion at [his family's] house during the party" and "rode his bike to [his] grandmother's house for a quiet lunch."  (*Id.*)  The birthday party episode was emblematic of a larger pattern in Mr. Shor's life that would continue through his adult years:  "just as his math gifts glossed over his learning disabilities, his innate

kindness glossed over his diminished ability to function as effectively as he would like in the face of extreme social stress." (*Id*.)

Notwithstanding his diagnosed learning disability and his placement on the neurodiversity spectrum, Mr. Shor excelled academically and made good on his skills as a "gifted mathematician." (Ex. 2 at 3). In 1993, Mr. Shor graduated with a Bachelor of Science degree in Mathematics from Vassar College. In 1999, Mr. Shor successfully completed his graduate studies, obtaining a PhD in Mathematics from Columbia University.

Mr. Shor is the proud father of three children: an eleven-year-old son and two daughters, ages eight and four. As discussed in greater detail below, Mr. Shor's children are the focal point of his life. In 2011, Mr. Shor and his first wife, who is the mother of his son and his eldest daughter, separated, and they finalized their divorce in 2014. In 2015, Mr. Shor married Jennifer Pomeranz, who is the mother of his youngest child.

### B.     Professional Life

Mr. Shor came to Wall Street as part of a career change. After graduate school, Mr. Shor went into academia, taking a job as a Visiting Assistant Professor of Mathematics at U.C. Santa Barbara. As his mother observes, Mr. Shor's "personality and aspirations were well suited for" academia. (Ex. 1 at 3.) He "delighted in teaching" and received a Distinguished Teacher Award. (*Id*.)

Yet Mr. Shor was engaged to a woman who lived in New York, and he felt called to move back east to pursue a career with greater financial security for himself and his future family. To that end, in 2001, nearly a decade out of college, Mr. Shor decided to pursue career opportunities in the financial services industry. He moved back to his native New York and took his first job on Wall Street, putting his math skills to work as a Quantitative Analyst at Brown Brothers Harriman. (PSR ¶ 130.) Over the next several years, Mr. Shor held a variety of

positions at banks, hedge funds, and related entities as he steadily gained industry experience and built his professional reputation.

In 2003, Mr. Shor left Brown Brothers Harriman to take another quantitative analytics position at a firm called Fiduciary Trust Company.  (PSR  ¶ 129.)  In 2006, Mr. Shor returned to Brown Brothers Harriman, this time working in the firm's structured products division, a position which he held for approximately a year.  In 2007, Mr. Shor broke into the trading side of the business, becoming a trader at a firm called Plainfield Asset Management. (*Id*. ¶ 127.)  Three years later, in 2010, Mr. Shor took a job as Director and Head of Structured Products at a small investment firm called Pamli Capital, where he stayed for another three years.  (*Id.* ¶ 126.)  Aside from nine months spent seeking further employment after PPI and the weeks of this trial, Mr. Shor has been employed or has been consulting from 1999 until now.

Several of Mr. Shor's professional friends and colleagues who have known him for years and worked closely with him in positions over the course of his time on Wall Street submitted letters on his behalf.  They describe a man with integrity who never engaged in anything remotely close to the alleged misconduct at issue in this case.  Max Holmes, Mr. Shor's employer at Plainfield Asset Management, calls Mr. Shor "a fundamentally honest and law-abiding individual," and notes that "[d]uring the three years he worked for [Mr. Holmes'] firm, he never once suggested mis-marking, obtaining improper broker quotes, or any other legal or ethical violation or even shortcut."  (Ex. 3 at 1.)  In fact, Javed Ashraf, a colleague of Mr. Shor's at Pamli Capital Management, notes that Mr. Shor "adhered to rigorous mathematical justification" in his decision-making.  (Ex. 4 at 1.)  And Chip Wheeler, a professional contemporary of Mr. Shor's who has known him "personally and professionally for around 20 years" laments that it is "bewildering . . . that Jeremy has found himself in his current situation."

(Ex. 5 at 1.)  Mr. Wheeler notes that he "had several trading and sales roles in [his] career where Jeremy was a client" and that Mr. Wheeler "never had reason to believe [Mr. Shor] would do anything questionable in a trade."  (*Id.*)  Mr. Wheeler adds that Mr. Shor "NEVER asked [him] to manipulate or provide a questionable mark or valuation for a security" both "before" and "during his employment at Premium Point."  (*Id.*)

### C. Work at PPI

In the spring of 2014, Mr. Shor got what he thought was his big break.  He began a new job as a trader with a well-respected investment fund—PPI.  To Mr. Shor, PPI represented a potentially career-altering opportunity.  Mr. Shor was in graduate school and then working his way up the corporate ladder during the boom years for hedge funds and Wall Street traders in the early-to-mid 2000s.  In joining PPI, Mr. Shor was not only joining a larger and more respected investment fund with more capital under management, he was also joining the ranks of some of the most respected and successful players in the industry.  Chief among those success stories was PPI's founder and Chief Investment Officer, Anilesh Ahuja, the former head of Deutsche Bank's Global RMBS Trading Desk.  And Mr. Shor would not simply sit on the sidelines; he would be tasked with using his trading acumen, quantitative skills, and experience in the subprime RMBS sector to grow PPI's non-agency portfolio.  This new role was a major challenge but carried with it substantial opportunities for career growth and advancement.

### 1. 2014 and Early 2015:  Strong Performance, Fair Valuations, But an Imperfect Valuation Process

The first year of Mr. Shor's time at PPI was from all outward appearances a financial success.  The firm's 2014 portfolio was up roughly 10% over year-end 2013, and Mr. Shor's non-agency book of bonds was the primary reason for that strong performance.  (Trial Tr. 2688-89.)  Mr. Shor's efforts yielded a return of roughly $80 million for investors, which

translated to $16 million in performance fees for PPI.  (*Id.*; DX 6761.)  As a reward for his strong

performance, Mr. Shor received a $1 million bonus, one-quarter of which was held back as

deferred compensation.  (Trial Tr. 2688.)  The remainder went to PPI's management, including

$3.5 million to Mr. Majidi.  (Trial Tr. 2689-90.)

    To be sure, the valuation practice at PPI in 2014 was not typical of the funds at

which Mr. Shor had worked previously and proved to be subject to Majidi's efforts to reach

targets.  First, the firm used sector spreads as part of the month-end valuation process to generate

"mid" level prices.  Second, the month-end estimates that Majidi communicated to the traders

began to transform from genuine estimates to performance targets.  But the valuations that Mr.

Majidi, as portfolio manager, estimated for PPI's portfolio of bonds (and which PPI's Valuation

Committee approved) during 2014 and the first half of 2015 were within what Mr. Shor believed

(and E&Y found) to be an acceptable range of fair values, and the process seemed capable of

achieving fair valuations.

### a.  PPI's Use of Sector Spreads

    When Mr. Shor joined PPI, he had to adjust to a pricing technique that he had not

encountered before but that the firm had been using for years:  the use of sector-wide "bid-ask"

spreads as part of its pricing inputs.  Because PPI priced its portfolio at the "mid" price, *i.e.*, the

mid-point between the "bid" price at which a willing buyer would buy a security and the "ask"

price at which a willing seller would sell a given security, PPI added half of the bid-ask spread

for the relevant "sector" of the bond market to bid prices it received from certain third party

pricing sources to convert those bid prices to mid prices.  While this process was unfamiliar to

Mr. Shor upon his arrival at PPI in March 2014, PPI had been using sector-wide bid-ask spreads

as part of its month-end pricing process for at least five years before he started at the firm (Trial

Tr. 1416-17), and, at least to Mr. Shor's knowledge, PPI's use of sector spreads was known to

everyone at the firm, including its compliance officer at the time he joined, and its external

auditor and its fund administrator (U.S. Bank).  (*See* DX 1414-25 (U.S. Bank spreadsheets

tracking sector spreads PPI applied for specific month-end marking periods); Trial Tr. at 2930-31

(E&Y witness testifying as to document showing "an example where E&Y was confirming in its

audit that the bid-ask spread for this particular security was properly applied to compute the

month-end pricing").)

              To be clear, there is nothing inherently wrong with the use of sector spreads.

Despite the Government's initial argument that this practice was "per se illegal" (Jan. 17, 2019

Hr'g Tr. at 28:6-7 ("we think sector spreads are per se illegal"); *id.* at 35:6-7 ("we're saying [the

use of sector spreads] is per se not allowed")), as it subsequently acknowledged, the use of sector

spreads is not inherently problematic.  (May 28, 2019 Hr'g Tr. at 26-27.)  Indeed, because PPI

priced its portfolio at the mid price, which was not unusual in the industry, and because some of

the prices PPI received from third parties were at the bid price, it was necessary to use a

mechanism of some sort to convert bid prices to mid prices at which PPI marked its portfolio.

The mechanism PPI used both before and during Mr. Shor's time at PPI was to add one-half of a

sector-wide bid-ask spread to a bid price in order to arrive at an imputed mid price.  (*E.g.*, Trial

Tr. 2207.)  Though the initial Indictment charged that applying a sector spread *always* resulted in

a higher spread being applied than if a security-specific spread were applied, the grand jury

returned the Superseding Indictment shortly before trial that essentially acknowledged the

Government's mistaken understanding of sector spreads.  (*Compare* D.I. 2 ¶ 32 ("Because a

sector spread reflected the difference between the cheapest and most expensive securities within

an entire sector, it would be at least as large (and almost certainly significantly larger) than the

spread for a given bond in that sector.") *with* D.I. 121 ¶ 32 ("A sector spread could therefore be

substantially wider than the bid-ask spread for a specific security.").)  Applying half of a sector spread to a bid price could increase the price too much or too little depending on whether the average spread for a sector was greater or less than the bid-ask spread for the specific security to which the sector spread was applied.

From Mr. Shor's perspective, the application of sector spreads to bid level prices in 2014 and early 2015 was not inconsistent with PPI's offering materials, did not violate federal or state law, and did not result in unreasonable or inflated values of PPI's portfolio.  PPI's private placement memorandum indicated that the firm priced its portfolio at mid level prices, and as stated above, its auditor, E&Y and its administrator, U.S. Bank, were at all relevant times aware that PPI used this mechanism to price its book.  Not a single witness testified that use of sector spreads violated PPI's valuation policy, and there can be no reasonable dispute (based on the Government's Jencks Act disclosures) that U.S. Bank believed that PPI's use of sector spreads "███████████████████████████."  (Ex. 37 at 9.)  Even if reasonable minds could differ on the appropriateness of imputing mid level prices in this manner, there is no evidence to suggest that Mr. Shor viewed the use of sector spreads in 2014 or early 2015 as problematic.

Nonetheless, as the second half of 2015 demonstrated, sector spreads could be a relatively blunt instrument; a slight increase in the spread could dramatically increase the price of a low value security within a sector.  While this feature of spreads did not cause PPI's securities to be inflated in 2014 or even in the first half of 2015, Mr. Shor later realized it was a structural weakness in the month-end pricing process, and one that he later made known to the Chief Compliance Officer.  (Trial Tr. at 3861-62.)

10

### b.    Majidi's Performance Targets

The second aspect of PPI's pricing process that was flawed but did not result in inflated values during the 2014/early 2015 period was the emphasis on achieving values to match or closely approximate the month-end estimates provided by Mr. Majidi and approved by PPI's Valuation Committee.  As far as Mr. Shor understood, his direct supervisor, Amin Majidi—a Partner and Portfolio Manager with two decades of experience in the industry—arrived at estimates of PPI's funds' values within a few business days after month end.  One thing is certain, however, and that is that Mr. Shor played no part in setting the month-end estimates.  (*E.g.*, Trial Tr. 2614.)  After communicating the month-end performance estimate to the traders, Mr. Majidi, by his own admission, pressured the traders, including Mr. Shor, to reach the estimates, effectively turning them into performance targets.  (Trial Tr. 2617.)  Mr. Majidi would then approve the final month-end valuations that resulted from the traders' efforts to reach those targets, and PPI's Valuation Committee—of which Mr. Shor was never a member—would then give final approval for the valuations to be sent to investors.  (Trial Tr. 2658-61; DX 104-127 (Majidi monthly approval emails); DX 844.)

For the first sixteen months of his time at PPI—from March 2014 through at least June 2015—Mr. Shor believed that the valuations resulting from this process were fair and reasonable.  While the Government introduced evidence that the final month end valuations were reverse-engineered to meet the estimates or performance targets, no evidence suggests that Mr. Shor did not believe that the estimates were within reasonable ranges of value, or that the estimates were arrived at in anything other than good faith by those above him.  He was told that failing to meet estimates could make PPI's management look uninformed about its portfolio and therefore it was important to meet the estimates.  But critically, he understood the goal and result of the process was ultimately to achieve fair values for investors, as determined in good faith by

11

Majidi and approved by the Valuation Committee.  In other words, regardless of whether or not it was appropriate for traders to take steps to reach a "target" set by Majidi, if fair values were being estimated and ultimately presented to investors, the practice was not viewed by Mr. Shor as part of a scheme to defraud or mislead investors.  Mr. Shor also took steps to ensure that the prices he requested from Frank Dinucci, with whom he had worked previously and had developed a friendship were in fact fair and reasonable.  (*See, e.g.*, GX 858-E, at 2 (Shor text to Dole asking for an "updated [month-end pricing] sheet with everything and your take on prices from frank *which I can then adjust relative to where I think correct mark should be*" (emphasis added)); DX 965A-A1 (analysis showing marks from Dinucci while at Auriga were generally in line with marks from non "friendly" sources); DX 965A-A2 (same); DX 5 (same); DX 6 (same); DX 973-AA (same).)

   And as the record in the case bore out, Mr. Shor's beliefs were well-founded.  The month-end valuations over the course of 2014 and into early 2015 *were* fair and reasonable.  E&Y, one of the largest and most reputable auditing firms, signed off on PPI's 2014 financials and deemed the portfolio to be valued within a reasonable range.  (*See* Trial Tr. 2946-2954; GX504 at 6, 8; GX508 at 3.)  Jonathan Ansbacher, the E&Y professional who worked on PPI's audits, testified that "with respect to all of [PPI's] bonds that were sampled as part of the 2014 audit, E&Y found that the bonds' prices assigned by Premium Point at the end of '14 were within E&Y's calculated range or . . . had supporting evidence for the price that E&Y deemed reasonable." (Trial Tr. 2946.)  And E&Y "determined [that there was] no need to restate any of PPI's valuations" prior to September 2015, leaving in place the valuations that PPI had assigned to its funds through August 2015.  (Trial Tr. 2978-2979.)  Even Mr. Majidi, a Government cooperator and an architect of PPI's month-end pricing process, took pains to note that PPI's

marks did not "become out of whack" in relation to their "fair value" until "July to September" of 2015. (Trial. Tr. 2718.) The latter end of that timeframe aligns with the period determined by E&Y. It also aligns with the timing of Mr. Shor's initial efforts to bring PPI's valuation back to where he thought fair and accurate.

> ###       2.       Starting in July 2015, Mr. Shor Takes Increasingly Proactive Steps to Report Pricing Concerns before Quitting

Things began to change in the second half of 2015 when trading activity in the legacy RMBS market decreased and bid-ask spreads widened. PPI's performance deteriorated, and the monthly performance targets that Majidi communicated to Mr. Shor and others became more aggressive and increasingly difficult to justify in light of the realities of the market. At the same time, Mr. Shor's efforts to document his concerns and complaints increased: he began recording conversations with others, he reported his concerns to the Chief Compliance Officer, and ultimately he resigned. At trial, Dinucci testified that he provided inflated month end marks "[i]n exchange for" increased trading activity (Trial Tr. 3280), a description different from how Dinucci had characterized the relationship in previous testimony and in his allocution. But Mr. Shor's trading with Dinucci in the second half of 2015 and early 2016 was very light, undermining the assertion that Mr. Shor and Dinucci had a quid pro quo agreement. (Trial Tr. 3379-80 (Dinucci testifying that as of late 2015 he was "saying our trade blotter looked empty" and "I didn't think we were doing any trades").) But Mr. Shor acknowledges, as he informed PPI's Chief Compliance Officer in December 2015, that Dinucci's firm was a "smaller broker" who, by late 2015, provided favorable pricing because he "want[ed] to be helpful" to PPI. (GX 886-R at 13.)

When PPI's month-end pricing started to deviate from what he viewed as fair and reasonable, Mr. Shor took steps promptly to voice his concerns. In fact, Mr. Shor noted what he

perceived as a discrepancy with true market conditions two months before E&Y found that PPI's month-end valuations strayed from reasonable ranges of value.  On July 30, 2015, Mr. Shor reported to Majidi that "[t]he market is probably like a point and a half, two back on bids"—a relatively minor deviation in what witnesses at trial testified was a highly volatile market.  D.I. 199 at 2; Trial Tr. 3182-83 (Gayeski noting that "[t]ypically when markets are falling and there's less liquidity, marks have a wider spread between broker-dealers, yes," and agreeing that "in late 2015 and early 2016, the RMBS market was in fact volatile.").  On August 20, 2015, Mr. Shor again told Majidi and others that PPI's bonds were generally marked "two to three percent" above "the sale market value" for the bonds.  D.I. 199 at 2.  Mr. Shor was early to report these concerns.  Moreover, both of these conversations occurred during a period in which E&Y later determined that PPI's marks were still within reasonable ranges.

As PPI's valuations became increasingly disconnected with market reality in the fall of 2015, Mr. Shor was greatly troubled by what was going on and attempted, in his way, to rectify the mismarking.  Mr. Shor regularly grappled with the decision of whether to leave the firm or to stay and try to fix the practices that troubled him.  With three young children to support, he "agonized" over the decision but decided to provide his best estimates to his boss where the market was trading and, when his thoughts were ignored, to raise red flags about PPI's valuations.  (Ex. 3 at 2.)  His efforts to fix the process from within were genuine, and for Mr. Shor, taking the steps he did was not easy.  Initially, he tried to address his concerns by conveying to PPI senior management that he was trading bonds lower than where PPI was marking them.  When that failed to have any effect, he took stronger actions.

By mid-October, as the September month-end process was being finalized, Mr. Shor recognized that the gap between sales and marks was growing to unacceptable levels, a

sentiment E&Y later reinforced when it selected September 2015 as the beginning of the restatement period.  Mr. Shor continued to voice his concerns.  On October 15, 2015, Mr. Shor told Majidi and PPI's Chief Risk Officer, Sriram Kannan that PPI had "high marks" in relation to market trading levels.  D.I. 199 at 2-3.  That same day, Mr. Shor reported to Anilesh Ahuja, Majidi, and Dan Osman, PPI's Head of Investor Relations, that the difference between trading values and where PPI was marking its bonds was approaching "mid-high, single digits," or around "seven, eight" percent.  *Id*. at 3.  Again, Mr. Shor's complaints did not lead to a reduction in the portfolio's pricing.

On October 30, 2015, Mr. Shor unilaterally marked down his portfolio of non-agency bonds by $16 million in the firm's daily profit-and-loss tracking software program—a write down that resulted in the Mortgage Credit Fund alone showing a $28.5 million loss for the month and a $14 million loss for the year.  (GX 1279.)  The markdown was against Majidi's specific instruction to keep the marks unchanged from the prior day's levels.  (DX 6756.)  At trial, the Government offered testimony from Ashish Dole that Mr. Shor wrote down his book to pressure Majidi into giving him a bigger bonus, as Dole claimed Mr. Shor explained to him in a bar that night.  (Trial Tr. 346-47.)  Respectfully, Dole's story, revealed on the eve of trial, was a fabrication—as acknowledged on cross-examination, the account at trial is inconsistent with what he had previously told FBI agents, SEC lawyers, and the U.S. Attorney's Office.  (Trial Tr. 1159-62.)  Previously, Dole had said that Mr. Shor told him about the reasons for the markdown the following morning, and contemporaneous text messages exchanged between Mr. Shor and Dole, as well as those between Mr. Shor and Dinucci, demonstrate that Mr. Shor marked down his book because he was selling bonds at prices below his marks.  (DX 5422; GX 880-P; *see* Trial Tr. 1160-61.)  In any event, Mr. Shor never sought to use this markdown, or any of his

other documented concerns, to seek a higher bonus, and the Government presented no evidence that he did. In fact, Mr. Shor walked away from roughly $200,000 in deferred compensation when he resigned from PPI.

Despite the Government's efforts to downplay the significance of the October 30, 2015 markdown, contemporaneous documentary evidence shows the gravity of Mr. Shor's actions that evening. Majidi and others at PPI were in a state of panic in the wake of Mr. Shor's markdown. Almost immediately after the email reflecting the markdown was circulated, Majidi replied to the entire firm, falsely claiming: "This is incorrect." (DX 3022.) Osman forwarded the firmwide email to Majidi, writing: "Not ringing alarm bells but???," and would later admit he was "freaked out" by Mr. Shor's actions. (DX 6508; DX 6768.) Majidi panicked to Dole: "I mean dude! Wtf?" (DX 2302.) Majidi tried frantically to reach Mr. Shor throughout that evening and over the ensuing weekend in an effort to compel him to reverse his markdown and return the prices to their prior levels. (*See, e.g.*, DX 6765.) The October 30 markdown reverberated throughout the firm because Majidi and others saw it for what it was—a red flag planted before everyone at PPI revealing that its non-agency trader believed the securities in his portfolio were being marked at inflated levels. This was not an easy thing for Mr. Shor to do; he was acting in direct contravention of Majidi's express instruction to leave the marks unchanged from their prior levels. (DX 6756.) As his wife recounts, Mr. Shor "thought he would be fired that Monday" because of his Friday evening markdown and his attempt "to do the right thing." (Ex. 13 at 2.) Despite Majidi overriding the October 30, 2015 markdown, Mr. Shor expected that his action necessarily would prompt greater attention to PPI's valuation process. The following month, however, showed no improvement to PPI's month-end pricing process.

Mr. Shor then elevated matters further, reporting his concerns to PPI's newly-hired Chief Compliance Officer, Evan Jay. (*See* GX 885-R; GX 886-R.) Mr. Shor was the only person at PPI to go to Compliance over the firm's pricing practices—a step so drastic and with such dire consequences that former PPI portfolio manager James Nimberg likened it to "Armageddon." (Trial Tr. 1638.) In his conversation with Jay, Mr. Shor reported that traders were under "pressure for performance" and PPI's prices had been pushed to a "gray area." (GX 886-R at 8, 9.) He explained that Majidi was "targeting a number" as part of the month-end pricing process, and "tick[ing] up the [price of] other [bonds] to" mask the effect on the NAV of selling a bond at a price below where it had been marked. (*Id*. at 15.) Mr. Shor reported further that the bid-ask spread was used as a "lever[]" to "[f]udge the process," and sketched out how, as a result of this practice, "the market is going down yet your valuation is going up." (*Id*. at 10, 12.) Mr. Shor also reported that PPI was increasingly relying on "smaller broker dealer[s]," including Dinucci's firm, Angel Oak Capital, that "want[ed] to be helpful" in providing favorable pricing. (*Id*. at 13.) Mr. Shor reported that these practices could result in "exposure of the fund" and expressed a desire to implement firm-wide "checks and balances" to corral these practices and alleviate his concerns. (*Id*. at 17, 18.) Jay pledged to "revisit the valuation process" at PPI. (*Id*. at 19.) Again, the Government belittled these efforts, but Majidi's reaction demonstrates the seriousness with which he took this major step: "Jeremy f----ed me with compliance." (DX 6777.)

Mr. Shor followed up his Compliance meeting by sending his own analyses of the pricing discrepancies to PPI's Chief Risk Officer and its Head of Operations, both of whom were working with Jay to address the issues with PPI's pricing policies that Mr. Shor had identified. (*See* Trial Tr. 3889-90.) With no perceptible change in the valuation process, on March 14,

2016, before PPI finalized its February month-end prices, Mr. Shor resigned from the firm, giving up an impressive salary and forfeiting approximately $200,000 in deferred compensation, without any job lined up, and needing to financially support his three young children.  (*See* Trial Tr. 4262, 2820-21, 4264-65.)  He regrets that he was not strong enough to stop the pricing practices that tormented him and that he did not listen to his instincts and leave sooner.  But for someone in Mr. Shor's position, speaking up at PPI was not easy, and it came with a serious price.

         Mr. Shor was ridiculed and called names behind his back by Majidi and others who were involved in the mismarking.  As Mr. Shor began to vocalize his concerns about pricing, Majidi took to calling him "Rainman" or "Fuckboy"; Osman, in communications with Majidi, referred to Mr. Shor as "Asperger's Boy."  (DX 6776 (Majidi: "I do not need another rogue like Nimberg or Rainman under my nose."), DX 6763 (Majidi: "From beginning I said rain man is a card counter and nothing more. . . ."), DX 6773 (Majidi: "Adam is a big upgrde.  I hope he's not a fuckup like Rainman"), DX 6774 (Majidi: "Remember how we felt about Rainman exactly one year ago this time."), DX 6792 (Majidi: "He's a salesman. Very sharp with numbers but like rainman. His judgement [sic] is terrible." . . . . Osman: "Do think he is holding accountable for asperger boy"); DX 6790 (Majidi: "Did you see what the fuck boy did to pnl today?").)  Though the names were not said out loud in Mr. Shor's presence, his boss's scorn and resentment were obvious—the more he complained, the more abuse he received.  The timing of the name-calling was no coincidence.  In 2014, Majidi referred to Mr. Shor glowingly and praised him and told him that promotions were forthcoming.  (DX 6759 (December 19, 2014 text from Majidi telling Shor and Dole they were "shooting for [promotional] titles in 2015").)  But as the market deteriorated and Mr. Shor voiced disagreement with prices or concerns, the sheen

surrounding Mr. Shor faded fast.  The name-calling started in October 2015, and the names were offensive and crude.  Mr. Shor did not fit in at PPI, making it even harder to break with this generally non-confrontational manner.  Letters from those who know Mr. Shor best provide important context to predicament he was in.

His sister, Elizabeth Shor, expresses her "belie[f]" that Mr. Shor's "inability to successfully negotiate the fraught landscape at his office was in part due to his placement on the neurodiversity spectrum."  (Ex. 2 at 3.)  Max Holmes, Mr. Shor's former employer, reports that Mr. Shor is "a brilliant mathematician, and . . . an excellent trader" but that "like many people with his gifts, his E.Q. does not match his I.Q."  (Ex. 3 at 1.)  To Mr. Holmes, who attended "several days of the trial . . . including the cross examination of Frank Dinucci," the gap between Mr. Shor's "E.Q." and "I.Q." "was eviden[t] in his friendship with, and confiding in, someone like Frank Dinucci."  (*Id*.)  David Church, Mr. Shor's stepfather, remarks on his "extremely non-confrontational" nature.  (Ex. 6 at 3.)

Mr. Shor struggled to do more in the face of bullying from colleagues like Majidi, who had far more experience and success in the industry and far more power within PPI.  Chip Wheeler, a longtime friend of Mr. Shor's who has worked in the finance industry, notes that Mr. Shor "is the type of person who looks for the good in others" and laments that this quality "may have made him susceptible to being taken advantage of by those with bad intentions."  (Ex. 5 at 1.)  Likewise, Mr. Holmes, Mr. Shor's former boss, observes that some of Mr. Shor's defining "strengths" as an employee—being "eager to please" and a "perfectionist"—"were turned to bad ends" in "the milieu of Premium Point, where senior people in the firm were demanding unattainable performance numbers."  (Ex. 3 at 2.)   He recalls how Mr. Shor "agonized over what

to do about the situation he found himself in" and how he saw Mr. Shor as "a tortured person who was struggling to 'do the right thing.'"  (*Id.*)

Mr. Shor realizes that he should have left his job sooner than he did.  Quitting what he thought would be an ideal job was a very difficult decision, particularly given his hope that he could rectify the valuation processes at PPI.  He initially justified (to himself) his participation in the pricing processes by focusing on the opacity and subjectivity in the non-agency RMBS market.  But he knew that he had to voice his concerns and ultimately leave PPI. His friend, Mr. Wheeler, who also works in this field, notes that "it would [have been] a challenging decision for anyone in [Mr. Shor's] position to leave without any prospects for employment" given that he was "the father of 3 young children and [that] there are not many opportunities for employment in [a] role like he had."  (Ex. 5 at 2.)  Similarly, Mr. Holmes observes that because "[t]here are a finite number of these types of Wall Street jobs available, and there are many more qualified individuals than there are 'seats' . . . . it is not in the least surprising . . . that Jeremy would agonize and take some time, before quitting the third such job he had been able to find, with no assurance that he would ever find another one."  (Ex. 3 at 2.)

To Mr. Wheeler, Mr. Shor's efforts "to address his concerns internally and fix the problem so that his job could continue," were consistent with Mr. Shor's tendency to be a "problem solver," even though those efforts did not succeed.  (Ex. 5 at 2.)  And to Mr. Holmes, Mr. Shor did more than most traders in a similar position would have done:  "9 traders out of 10 would NOT have refused to certify the marks, would NOT have gone to compliance, and upon departure would have aggressively sought their deferred compensation in exchange for a 'mutual non-disparagement agreement' with the firm."  (Ex. 3 at 2.)

### D.    Testimonials to Mr. Shor's Character

#### 1.    Mr. Shor's Character Generally

As demonstrated by the letters submitted on his behalf, Mr. Shor is a family-oriented, earnest person of integrity whose life has been marked by a willingness to put his own needs and interests aside for the benefit of others.  Mr. Shor's longtime friend, █████████ ██████, describes Mr. Shor as "a devoted husband and father; a loyal friend; and a compassionate man who takes responsibility for his life and commits to the well-being of others in his community."  (Ex. 7 at 1.)  Mr. Shor's sister, Elizabeth Shor, calls him "loving and generous to everyone lucky enough to call him a part of their life."  (Ex. 2 at 3.)

Others who have known him throughout his life express similar sentiments. Andrea Siegel, a longtime friend and neighbor of Mr. Shor's mother, who has known Mr. Shor since his youth, describes him as "a decent, honorable, hardworking and kind man" whom she has found to be "a respectful son, and grandson, a loving father and a devoted husband."  (Ex. 8 at 1.)  Her husband, Howard Siegel, relates that his "impression of Jeremy has always been of a man with strong character, a gifted mathematician, a hard worker and an extremely dedicated family man."  (Ex. 9.)  Mr. Shor's cousin, Eileen Schauer, regards Mr. Shor "as a modest, mild-mannered, respectful and respectable person of strong character, integrity and family devotion," and notes that she "ha[s] never heard him belittle or criticize anyone directly or behind their back" and that she has "never seen Jeremy treat anyone with anything but the utmost respect . . . . from his family to the wait staff at a restaurant."  (Ex. 10 at 1.)

Testaments from those who met Mr. Shor later in life likewise portray a modest individual with strong character.  Julie Proctor, a friend of Mr. Shor's father who met Mr. Shor in August 2004, writes how she "witnessed Jeremy living a life that demonstrated honesty, integrity, and a caring spirit during difficult times."  (Ex. 11 at 2.)  David Church, Mr. Shor's

stepfather, who joined Mr. Shor's extended family in recent years calls him "a good person with

great love and concern for his family, with a strong value system, and with an astute

intelligence," and describes Mr. Shor as "self-effacing, soft-spoken and humble," and "extremely

non-confrontational." (Ex. 6 at 1, 3.) And Saul Silverman, Mr. Shor's stepfather-in-law, writes

that Mr. Shor is "well mannered and readily assists without reservation, []regardless of the

situation or circumstance," and "has always been courteous, supportive, generous, and

conscientious with family, friends and strangers." (Ex. 12 at 1.)

### 2. The "Glue" of his Nuclear Family: Mr. Shor as a Devoted Parent

Mr. Shor's core qualities come across in his relationship with his three young

children. Unsurprisingly, almost every single person who wrote on Mr. Shor's behalf chose to

highlight the close bond that he has formed with his three young children. Members of his

family and extended family, who have seen firsthand Mr. Shor in action as a father, speak

glowingly of his relationship with his children. His wife Jennifer Pomeranz writes that Mr. Shor

"is at the center" of their "very close-knit family," and that he has always "put his children first."

(Ex. 13 at 1-2.) Cynthia Shor, Mr. Shor's mother, calls Mr. Shor "a devoted father to three

beautiful children." (Ex. 1.) She notes further that

> He takes an active role in their well-being, upbringing, and nurturing.
> He attends First Day of School and Open School nights; he takes them to
> medical appointments and soccer games, he cooks and BBQs full
> dinners. He participates in PTA activities. When they were infants, he
> bathed and fed them, napped with them, and was fully attentive to their
> toddler needs. He sang them to sleep as he played his guitar. Most of
> all, he is a teacher and role model for them – patient, calm, instructive,
> and playful. . . . He stresses kindness, honesty, respect for themselves
> and others, good sportsmanship and good manners. He does homework
> with them but does not place pressures on them in their schoolwork or
> sports activities. His children are the focal points in his life.

(*Id*. at 4.)

22

David Church, Mr. Shor's stepfather, writes how he has "observed the great attention that Jeremy gives his children when he participates in quality activities with them such as, educational board games, art projects, Lego building marathons, and outdoor games by the hour.  He never loses his patience and he takes great interest in their school activities."  (Ex. 6 at 3.)  Mr. Church adds that "[t]he well-being of his children is [Mr. Shor's] utmost priority."  (*Id.*)  Ellen Silverman, Mr. Shor's mother-in-law, writes that he "is an amazing father to his three children" who exhibits "a special talent of giving each 'one-on-one' time with their likes and needs in mind, . . . . challenges them, teaches them, entertains them[,] and provides for them."  (Ex. 14 at 1.)  In her view, Mr. Shor is "the glue" and "the rock" of the family and is "adore[d]" by his children.  (*Id.*)  Her husband, Saul, who is Mr. Shor's stepfather-in-law, writes that Mr. Shor "has always shown himself to be most nurturing and loving to [his] children," and that his "attention to them and manner of teaching them are to be admired, and maybe even envied."  (Ex. 12 at 1.)  He concludes that "[m]any fathers could learn from [Mr. Shor]."  (*Id.* at 1-2.)

Mr. Shor's aunt, Patricia Couch-Lynch, shares how she has "seen him display" qualities such as "honesty, truth and courage" in the course of "raising his own children"  She notes that "[t]he interaction that Jeremy has with his 3 children is exceptional.  He has always had a soft spoken voice, he loves explaining day to day experiences to them and it's always done in a very calm and knowledgeable manner."  (Ex. 15.)  In Ms. Couch-Lynch's view, Mr. Shor's "whole life is built around his children and their best interest."  (*Id.*)  Pat Snayd, Mr. Shor's mother's cousin, calls Mr. Shor "the most loving and kind father I have ever known" and calls his children "blessed" to have him as their father.  (Ex. 16.).  Mr. Shor's aunt, Patty Kulisky, notes that Mr. Shor has "put his heart and soul into raising [his children]."  (Ex. 17 at 2.)  To Mr. Shor's cousin, Eileen Schauer, Mr. Shor "is a loving, caring and devoted father who thoroughly

enjoys every minute he spends with ███████████.”  (Ex. 10 at 2.)  She laments that Mr.

Shor's "children would be devastated by an extended absence from their father," as "[a]ll three

of his children need the father they have always depended on for his love, security and support."

(*Id.*)  Another cousin, Laura Swezey, calls Mr. Shor "successful in his most important role as a

loving husband and father" and "a caring father who enjoys spending time with his children, as

well as . . . with his extended family."  (Ex. 18 at 1.)

    Friends have also remarked on the type of father Mr. Shor has dedicated his life to

being.  Mr. Shor's longtime friend, ███████████ relates that Mr. Shor "is a fierce protector of

his children," that "the primary focus of his life is clearly the happiness and well-being of his

family," and that Mr. Shor "takes great joy in spending time with them, creates exceptional

educational and social opportunities for them," and that "the results of [Mr. Shor's] devotion and

care are evident in each of his children."  (Ex. 7 at 1.)  Eleanor Wittrup, a friend of Mr. Shor's

mother, calls Mr. Shor "a very family-oriented man" who "adores his children" who, in turn,

"clearly adore him!"  (Ex. 19 at 2.)  She has "observe[d] his loving and nurturing relationship

with them" and deems him "a responsible parent who is completely devoted to his children."

(*Id.*)  Judy and Evan Novenstein note that Mr. Shor is "an integral part of his children's lives,"

and that he "has never wavered in his love and devotion to his children, wife and family."  (Ex.

20 at 2.)

    **3.  The "Rock" of his Extended Family: Mr. Shor's Selfless and Repeated Efforts to Care for Those in Need**

    Mr. Shor has also exhibited selflessness, integrity, and responsibility in being

there for his extended family members during times of need.  As his mother, Cynthia Shor puts

it, "Jeremy has been the mainstay of our whole family."  (Ex. 1 at 5.)  Mr. Shor's cousin, Eileen

Schauer, notes that "[s]ince early adulthood, Jeremy has been a rock for his family during

difficult times." (Ex. 10 at 2.)  Judy and Evan Novenstein describe how Jeremy "has been 'there' for his family, and has been extremely generous, thoughtful and helpful in any way he could, through some very difficult events and relationships." (Ex. 20 at 1.)  And Julie Proctor relates that "Jeremy was the person in the family that helped everyone." (Ex. 11 at 1.)

Several of the letters submitted on Mr. Shor's behalf discuss three particularly powerful illustrations of Mr. Shor's commitment to his extended family:  caring for his mother when she was ████████████████████, and serving as legal guardian for his father and grandmother in the latter parts of their respective lives.

Cynthia Shor describes how Mr. Shor cared for her when she "████████████ ████████████████████████████████████." (Ex. 1 at 4.)  She notes how Mr. Shor "insisted that [she] stay overnight in his apartment to reduce [her] commuting stress," to assist in her recovery.  (*Id.* at 4.)  She also recounts how Mr. Shor "helped pay [her] real estate taxes which enabled [her] to stay in [her] home." (*Id.*)  In all, she believes that Mr. Shor's "support, care and weekly visits to [her] home with his children contributed greatly to [her] healthy recovery." (*Id.*)  Eleanor Wittrup, who became friends with Mr. Shor's mother in 2004 when they met in a ██████████████, recalls that "Jeremy played a large role in his mother's medical care.  Cynthia was divorced at that time, and Jeremy became his mother's health care proxy.  He took her for medical visits, consulted with her doctors, and arranged for ██████████████.  But, more importantly, he provided emotional support which is so essential for ██████████ well being.  Cynthia often spoke of his love and caring presence.  She believes, as I do, that his active participation and attention were significant factors in her complete recovery." (Ex. 19 at 1-2.)  Mr. Shor's aunt, Patty Kulisky, writes of Mr. Shor's "care and concern" for his mother "██████████████████████████" (Ex. 17 at

2.)  She recalls that Mr. Shor "came out to her home, went food shopping for [her], and called his mother almost every day," which, according to Ms. Kulisky, reflected Mr. Shor's "caring and devoted nature."  (*Id.*)

    A few years after ██████████████████, Mr. Shor's father's health had deteriorated to the point that he required a court-appointed guardian to manage his affairs.  Mr. Shor stepped in to fill that role.  Recalling this time period, Mr. Shor's mother writes that he "handled this responsibility with love, care, time, and attention."  (Ex. 1 at 3.)  Mr. Shor's sister, Elizabeth Shor, expresses admiration for the manner in which Mr. Shor cared for their ailing father towards the end of his life as he dealt with ██████████████████████ ████████.  She notes that when she "asked Jeremy 'How can you put up with Dad'" in light of the fact that their father "█████████████████" and "███████████" which "made him a difficult patient," Mr. Shor "would say 'Dad's not angry, he's just ill, and I can't get mad at someone for being sick.'"  (Ex. 2 at 1.)  Ms. Shor relays how her brother "recognized and allowed for [their] father's condition and never blamed him, lost patience with him, or complained" and "never implied that [Ms. Shor] was shirking [her] own duties through [her] absence," even though Mr. Shor "spent many long nights on the hospital chair."  (Ex. 2 at 1.) She remarks on Mr. Shor's "endless kindness in caring for [their] dad (and eventually [their] grandmother)" as well as his "kindness to [her] on top of that," which "took the sharp edges off of [her] own emotional guilt."  (*Id.*)  Julie Proctor, a friend of Mr. Shor's father, notes that when Mr. Shor's father "██████████████████████ [Mr. Shor] flew down several times with his infant son to visit his dad."  She also recalls how Mr. Shor "often paid for groceries, health care, and services for his father . . . out of his own pocket."  (Ex. 11 at 1.)

In 2015, Mr. Shor's 92-year-old grandmother reached a point in her life where she, too, had need of someone to manage her affairs. Again, Mr. Shor "stepped up," as his sister, Elizbeth writes. She relates that "Jeremy cared for [their] grandmother with endless patience and generosity," and notes that "[a]lthough Jeremy was granted access to [their] grandmother's assets, he more often cared for her with his own funds. He paid for round the clock nursing care, grocery deliveries, housekeeping, and accessibility related minor renovations to her house." (Ex. 2 at 2.) Cynthia Shor, Mr. Shor's mother, noted that in his capacity as his grandmother's guardian, "Jeremy handled her medical and nursing care for over a year, making weekly visits to her home in Great Neck to spend time with her and to oversee the nursing staff which was there around the clock. He helped with food deliveries, and did tasks around her home. He also brought his children so that they could spend time with their grandmother." (Ex. 1 at 3.)

### 4. Not the Stereotypical Wall Street Type

The letters also paint a picture of a man who bears little resemblance to the money-hungry figure that the Government made Mr. Shor out to be at trial. Mr. Shor's aunt, Cecilia Quijano, relates that Mr. Shor "was always a down to earth type of guy" and that she "never saw Jeremy with expensive cars or take expensive vacations." (Ex. 21 at 1.) In her view, he is a "hardworking," "simple," "down to earth," "family oriented" man. (*Id.*) Max Holmes observes "that compared to many other Wall Street people, [he] never saw Jeremy as overly motivated by money." (Ex. 3 at 2.) A colleague of Mr. Shor's at Mr. Holmes' fund, Marc Sole, describes how his experience making numerous investors presentations with Mr. Shor during "unprecedented market turmoil": Mr. Shor "laid it out for investors in his direct, straightforward, honest manner." (Ex. 22 at 1-2.) Moreover, Mr. Sole, having spent a significant amount of time with Mr. Shor under stressful circumstances, observed that "money, ego, [and] any of the other things that draw people into finance were nonexistent" with Mr. Shor. (*Id.*)

27

Another co-worker, Rob Sherman, describes Mr. Shor as "an honest hard-working person" and an "exemplary colleague." (Ex. 23 at 1.) And Mr. Shor's mother-in-law, Ellen Silverman, notes that Mr. Shor and his family lead a modest life: they "live in student housing" at New York University (the employer of Mr. Shor's wife) and "[t]heir car is a beat up, old thing, that gets them out of the city." (Ex. 14 at 1.)

### 5.    Mr. Shor Works to Overcome Adversity in His Personal Life

The last several years have been marked by trying times for Mr. Shor personally. In 2011, he and his first wife separated. At the time, they had two children ages 2 and 4. Over the next several years, the divorce proceedings weighed tremendously on Mr. Shor. As his then-matrimonial attorney, Donald Wall, writes, Mr. Shor "was under tremendous pressure to support both his family and himself." (Ex. 24 at 1.) When Mr. Shor did leave his job at PPI, "in addition to finding it almost impossible to work in his industry, Jeremy was no longer able to maintain his child support payments to his ex-wife." (*Id.* at 2.) He could "no longer afford" matrimonial counsel and "was defending himself as best he could in court." (*Id.*) In Mr. Wall's estimation, "[j]uggling the pressures of his criminal prosecution, his inability to work in his industry and a contentious divorce while also trying to assist in supporting his new family with a new young child must have been extraordinarily difficult for Jeremy." (*Id.*) But throughout the entirety of his matrimonial proceedings, Mr. Shor "was completely forthcoming," "never sought to cut corners or play games," and "remained level-headed and above-all completely devoted to his . . . children." (*Id.* at 1-2.)

Mr. Shor has also navigated other difficult circumstances over the past few years. As noted above, he is on the neurodiversity spectrum and struggles in social situations. At various times over the last twenty years, ███████████████████████████ ███████. These conditions have been exacerbated by the immense stress of being subject to

an SEC investigation and then to indictment and criminal trial in the above-captioned action.  To

cope with this stress, ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████ .

        Mr. Shor's longtime friend, █████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████

                                   *   *   *

The letters make clear that the conduct Mr. Shor was convicted of engaging in at PPI was an aberration in an otherwise law-abiding and upstanding life.  To his family, friends and colleagues, it is "bewildering . . . that Jeremy has found himself in his current situation." (Ex. 5 at 1.)  They explain that the man they know would never "seek to gain advantages or play the system" or even suggest "mis-marking, obtaining improper broker quotes, or any other legal or ethical violation or even shortcut."  (Ex. 1 at 2; Ex. 3 at 1.)  Indeed, Mr. Shor had no criminal history prior to his involvement in the charged conspiracy and no run-ins with the law since that time.  The letters submitted to the Court demonstrate that Mr. Shor's involvement in the valuation practices at issue at PPI during the relevant period does not reflect the person he is or the life he has led.

## LEGAL CONSIDERATIONS IN IMPOSING A SENTENCE

### A.      Applicable Legal Standard

Under to the "parsimony" clause of 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute.  *See United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009). The four specific purposes of sentencing identified in § 3553(a)(2) are as follows:

> [T]he need for the sentence imposed –
>
> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

30

18 U.S.C. § 3553(a)(2).  The Court must impose the least severe sentence that will serve these purposes of sentencing.

In applying Section 3553(a)(2) and its parsimony clause, the Court also looks to the other § 3553(a) factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6).  The Court may fashion a sentence that complies with the purposes of these factors and should consider the facts presented in the particular case when reaching its decision.  *Rita v. United States*, 551 U.S. 338, 351-52 (2007); *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

**B.     Application of the Section 3553(a) Factors**

Application of the factors set forth in Section 3553(a) further warrants that the Court impose a minimal or non-custodial sentence on Mr. Shor under the circumstances of the case.

**1.     Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

Mr. Shor has no prior criminal history and has led a law-abiding and productive life before the offense and since he was charged.  The charged conduct represents an aberration in an otherwise exemplary life and career.  As the letters submitted on his behalf show, and as discussed above, Mr. Shor is a "a decent, honorable, hardworking and kind man" (Ex. 8 at 1), "a devoted father to three beautiful children" (Ex. 1 at 4), and the "rock," "glue," and "mainstay" of his nuclear and extended families (Ex. 4 at 15; Ex. 1 at 5.).  Mr. Shor agrees with Probation's "recommend[ation of] a large variance . . . to properly take into account the nature and circumstances of the offense and the history and characteristics of the defendant" (PSR at p. 38),

but respectfully submits that the 36-month sentence of incarceration recommended by Probation
is too harsh. A minimal (or no) custodial sentence is appropriate under the facts and
circumstances of this case.

    The relevant conduct of which Mr. Shor was convicted is serious, and he respects
the jury's adjudication of his guilt. However, an assessment of the nature and circumstances of
the offense requires a consideration of the steps Mr. Shor took to address the pricing practices at
PPI and an acknowledgment of the environment in which he took them. As outlined above, Mr.
Shor reported concerns to his supervisor and firm management when he perceived a disparity
between the price at which the securities in his portfolio were being marked and the price at
which they were trading on the street. He continued to raise this concern as that disparity
widened into a material difference in the fall of 2015. He marked his book of securities down
against his boss's instruction, and after his boss reversed that markdown, he reported his
concerns to PPI's Chief Compliance Officer. The concerns Mr. Shor laid out in that Compliance
meeting largely tracked with what would become the Government's allegations in this case, and
we submit that his good-faith efforts to report his concerns were not fully reflected in Probation's
recommendation. In the ensuing two months, Mr. Shor sent unsolicited analyses to individuals
working with the Chief Compliance Officer in yet further efforts to address his concerns. None
of this came easily to Mr. Shor given his disposition: his "extremely non-confrontational" nature
(Ex. 6 at 3.), his "placement on the neurodiversity spectrum" (Ex. 2 at 3), and the gap between
his "E.Q." and his "I.Q." (Ex. 3 at 1.) And the environment in which he was operating was
anything but pleasant and welcoming. As noted above, Mr. Shor's co-workers, including his
direct supervisor ridiculed him with cruel nicknames that belittled his unique personality. They
called him "Rainman," "Asperger Boy," and "F--k Boy." (DX 6776, DX 6763, DX 6773, DX

6774, DX 6790, DX 6792, DX 6796.)  As Majidi conceded at trial, these were not "endearing term[s]" said "to his face" (Trial Tr. 2372-73); these were mean-spirited barbs meant to embarrass and demean Mr. Shor.  But as Probation noted, Mr. Shor displayed a "conscience" through these actions (PSR at p. 38), even if his actions did not result in changes as he had hoped.

By mid-March 2016, when his concerns had still not been addressed and he was being asked again to leverage his relationships to help Majidi and others close PPI's books for February 2016 month-end prices, Mr. Shor quit his job, giving up a sizeable salary and nearly $200,000 in deferred compensation.  After he left PPI, he retained documents—including WhatsApp messaging chains that Dinucci had deleted—that would be used against him.  And he sat for two proffers, and directed his counsel to make additional proffers, which further assisted the Government in prosecuting this case.  Mr. Shor was forthcoming and truthful in his proffers, as demonstrated by the fact that the Government did not seek to introduce any of his proffer statements at trial.  Indeed, Mr. Shor's defense was consistent with representations made in those proffers.

We understand and accept that the jury considered and rejected Mr. Shor's defense that he did not intend to defraud PPI investors.  But we respectfully submit that the Court should consider the underlying facts and circumstances here, and should rely upon them as a basis for imposing a minimal or non-custodial sentence.

### 2.     The Need for the Sentence Imposed

A minimal custodial sentence will adequately reflect the seriousness of Mr. Shor's offense, promote respect for the law and provide more than just punishment for his offense.  It will also adequately deter criminal conduct.  It is already a matter of public knowledge that Mr. Shor has been convicted of serious federal crimes.  Those in the industry already know that Mr.

Shor's reputation has been crushed, his career destroyed, his assets completely depleted, and that he and his family have experienced substantial stress and embarrassment, as the case has garnered considerable media attention in industry publications and the mainstream press.[1]  Any reasonable person who would even contemplate mismarking securities would be strongly deterred from doing so simply by learning the facts about Mr. Shor's conviction, regardless of the sentence imposed.  To the extent any further deterrence would be gained from imposing a sentence of incarceration, we submit that such deterrence would be achieved by a minimal custodial sentence.

Apart from the conviction in this case, Mr. Shor has never been convicted of a crime.  Moreover, it is virtually certain that Mr. Shor will be banned from the securities industry as a result of the conviction against him—there is also an SEC proceeding against him with allegations mirroring the criminal case seeking, among other forms of relief, to permanently ban Mr. Shor from working in the securities industry.  As there is no risk that he will commit another crime, there is no need to protect the public from further crimes by Mr. Shor.  Any such need would be more than adequately served by a minimal custodial sentence.

Another relevant consideration in imposing sentence is to provide a defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  But this factor is not relevant to the determination of an appropriate sentence for Mr. Shor.

---

[1] *See, e.g.*, Chris Dolmetch, "'Greed and Lies on Wall Street' is Opening Argument in Bond-Marking Trial," *Bloomberg News* (June 5, 2019), https://www.bloomberg.com/news/articles/2019-06-05/-greed-and-lies-on-wall-street-is-opening-in-bond-marking-trial (last visited Nov. 4, 2019); Amanda Cantrell, "Hedge Fund Execs Convicted of Fraud," *Institutional Investor* (July 12, 2019), https://www.institutionalinvestor.com/article/b1g7p8c04t65r1/Hedge-Fund-Execs-Convicted-of-Fraud (last visited Nov. 4, 2019).

### 3.      The Kinds of Sentences Available

The Court has discretion to impose a minimal or even non-custodial sentence. Such a sentence is the most appropriate result in this case given circumstances in which Mr. Shor acted and the steps he took to stop the inflation of securities at PPI, as outline above.  Moreover, Mr. Shor was not among the senior level employees at PPI; he did not sit on the firm's Valuation Committee, and he was not a decision maker with respect to the use of sector spreads or "mid" level pricing.  Further, as Mr. Majidi freely admitted at trial, Mr. Shor was under relentless and substantial pressure for performance from his direct supervisor, Mr. Majidi, who was a Partner and Portfolio Manager with decades of industry experience, and who determined Mr. Shor's future and his job status at PPI.  These facts shed light on the degree of Mr. Shor's culpability and militate in favor of a minimal custodial sentence.

### 4.      Application of the Sentencing Guidelines

We respectfully submit that the Sentencing Guidelines should have little or no impact on the sentence imposed in this case.  As several courts in this Circuit have noted, a mechanistic application of a loss-amount driven Guidelines calculation can lead to exceedingly lengthy Guidelines ranges that are often "wildly off-base" and "patently absurd on their face" and that, "if not cabined by common sense," would visit tremendous unwarranted "harm." *United States v. Adelson*, 441 F. Supp. 2d 506, 512, 515 (S.D.N.Y. 2006).  As Judge Oetken recently noted in applying a sentence of 18 months' imprisonment in a securities fraud case where the Government alleged a loss amount of over $300 million and where the Government's Guidelines calculation called for a sentence of life imprisonment with a statutory maximum of over 100 years:

> The idea that this criminal conduct warrants life or 105 years is
> absurd and simply highlights how broken the guidelines are with
> respect to being arbitrarily driven by factors that happen to be

> quantifiable:  Loss amount in financial cases or drug amounts in
> narcotics cases, to the exclusion of considerations that actually go
> to a defendant's culpability.

(Ex. 36, (*United States v. Block*, 16 Cr. 595 (JPO) (S.D.N.Y. Dec. 4, 2017), Dkt. No. 169 at 71).

*See also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a

Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing

Commission effectively ignored the statutory requirement that federal sentencing take many

factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many

such sentences would be irrational on their face."); *United States v. Johnson*, 16 Cr. 457 (NGG),

2018 U.S. Dist. LEXIS 71257, at *11-12 (E.D.N.Y. Apr. 26, 2018) (declining to

"mechanistically impose such an illogical sentence" and lamenting fact that many offenders "do

not receive a sentence that makes any sense for the actual crime of conviction"), *aff'd*, 939 F.3d

82 (2d Cir. 2019).

Though a Guidelines' sentence is clearly not appropriate here, Mr. Shor

understands that a Guidelines' calculation must be done.  Mr. Shor principally objects to the

PSR's calculation of loss, based on a belatedly-served analysis by an undisclosed Government

expert, and which fails to estimate the losses "that resulted from the offense."  U.S.S.G. §

2B1.1(b)(1) n.3(A)(i).

"The Government bears the burden of proving the facts supporting the application

of a Guidelines provision, and it must do so by a preponderance of the evidence."  *United States*

*v. Kent*, 821 F.3d 362, 368 (2d Cir. 2016).  In its initial submission to Probation, the Government

argued that loss should be determined by subtracting the amount PPI's investors ultimately

recouped from PPI from the sums contributed to the fund.  (*See* Initial Presentence Investigation

Report, Sept. 13, 2019 (the "Draft PSR") ¶ 64.)  Mr. Shor objected to this calculation, noting that

this calculation failed to take into account the extent to which a market downturn caused PPI's

investors to suffer losses.  Therefore, this proposed loss figure consisted of impermissible speculation.  *See United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993).

        In response, the Government, relying on an undisclosed expert, prepared a new analysis, which it apparently provided to Probation but not to Mr. Shor.  Rather, Mr. Shor first learned about this expert analysis in the PSR, which explained that the Government retained an "economic consulting expert" who "put together a model that calculated the difference between PPI's restated returns [in the Mortgage Credit Fund] (during the September 2015 to March 2016 time period) and the returns of a set of benchmark funds over that same period."  (PSR ¶ 64.) When counsel for Mr. Shor requested the expert's analysis from the Government, we received an Excel file that contained almost twenty distinct sheets of analysis and data, but no report or document written by the expert, or even a clear citation to many of the documents used to create the model.  (Ex. 39.)  Mr. Shor lacks the time and the resources to fully respond to the Government's expert's opinions a week before the due date of his sentencing submission.[2]

        But in any event, the Government's new theory of loss fares no better than its earlier, abandoned calculation.  The purported expert's calculation still fails to reasonably approximate the harm "result[ing] from the offense."  U.S.S.G. § 2B1.1(b)(1) n.3(A)(i).  The Government appears to suggest that investors were fraudulently induced to keep their money in PPI, or subscribe greater sums, based on PPI's inflated returns, and therefore the scheme resulted in losses to the extent that PPI's losses were greater than its competitors.  But there is no reason to distinguish this case from one involving publicly traded securities, where the exact same dynamic is alleged: a misrepresentation causes a person to hold or purchase a security, and the revelation of this misrepresentation causes losses to the firm's investors.  Nonetheless, the

---

[2] Mr. Shor is *not* seeking an adjournment to respond to the Government's undisclosed expert or that expert's findings or conclusions.

defendant in a case involving public securities is responsible only for the loss caused by the

misrepresentation, *not* the entirety of the loss, or the loss as compared to market benchmarks.

The same reasoning applies here, and as the representations for which Mr. Shor was convicted

did not affect the value of the securities at issue, the Government's comparison of the value of

the securities held by other funds with the value of the securities held by PPI does not

demonstrate the losses caused by the charged conduct.

    Moreover, the Government's theory that Skybridge would have redeemed its

investment in PPI had it reported lower returns and invested those funds with PPI's competitors

is wholly speculative.[3]  As the Government's spreadsheet and the trial testimony demonstrates,

Skybridge invested in multiple funds with varying returns, and did not continually reallocate

funds from firms reporting low returns to those reporting better returns.  In fact, Troy Gayeski,

one of the Government's Skybridge witnesses at trial, testified that even though PPI was

performing less well than other hedge funds at certain times, Skybridge did not redeem its

investment because, in part, "just 'cause someone doesn't perform well the last three to six

months, doesn't mean they won't perform great the next twelve," and that "[o]ftentimes what's

performed worst last six to twelve months performs the best the next six to twelve."  (Trial Tr.

3029.)  Not only is it speculative to assume that Skybridge would have redeemed its investment

if PPI had reported its restated returns, but there is no way to know *how* Skybridge would have

allocated the funds it had had in PPI if it had withdrawn from the fund.  Investment decision are

guided by innumerable different factors, Gayeski agreed that Skybridge invested in many

different funds, (Trial Tr. 1430), and there is no reason to believe that Skybridge would have

---

[3] We also note that by comparing the performance of PPI and its competitors only from
September 2015 to March 2016, the Government implicitly concedes that PPI did not overvalue
its book before the restatement period.

invested in any of the firms considered in the Government expert's analysis as opposed to any other of the many asset managers in business and in what proportion. One simply cannot predict what investors would have done if not for the charged scheme. The Government's assumption that Skybridge would have done so here is speculative, and an impermissible basis on which to find loss. *See United States v. Cuti*, 2011 U.S. Dist. LEXIS 84791, at *13-14 (S.D.N.Y. July 29, 2011) (multiple factors affecting investment decision render loss speculative; holding that Government failed to prove loss).

We respectfully submit that the speculative nature of the Government's expert submission leaves the Court without the ability to reasonably estimate loss and the Court should undertake a Guidelines' calculation with a zero loss,[4] as Judge Oetken did in *United States v. Block*. (*See* Ex. 36 (*United States v. Block*, 16 Cr. 595 (JPO) (S.D.N.Y.), Dkt No. 169, Sentencing Tr. 39).) Using a zero loss, the Guidelines' calculation is as follows:

| | |
|---|---|
| Base Offense Level | 7 |
| Offense Involved 10 or More Victims | +2 |
| Investment Advisor Enhancement: | +4 |
| Total: | 13 |

In Criminal History Category I, this results in a Guidelines range of 12 to 18 months.

### 5.   Need to Avoid Unwarranted Sentence Disparities

A minimal sentence would also "avoid unwarranted sentence disparities" among Mr. Shor's sentence and the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In particular, we wish to draw the Court's attention to the sentences imposed by Judge Rakoff in *United States v. Lumiere*, 16 Cr. 483, and by Judge Oetken in *United States v. Block*, 16 Cr. 595.

---

[4] At the very least, Mr. Shor cannot be held liable for any losses incurred after he quit PPI.

*United States v. Lumiere* also involved allegations of bond mismarking by a hedge fund and its portfolio manager.  At sentencing, the Government initially argued for a Guidelines' range of 135 to 168 months and a loss amount of more than $23 million, and the court determined the Guidelines range to be 87 to 108 months.  (Ex. 34, (*Lumiere,* 16 Cr. 483 (JSR) (S.D.N.Y. June 27, 2017), Dkt. No. 115, Sentencing Tr. 2).)  Ultimately, the defendant received a below-Guidelines' sentence of 18 months' imprisonment.  (*Id.* at Sentencing Tr. 30.) A comparison of the conduct of the defendant in *Lumiere* to that of Mr. Shor suggests that Mr. Shor's conduct was less culpable that by the defendant in *Lumiere*.

In *Lumiere*, the defendant, Stefan Lumiere, was convicted of participating in a scheme to inflate an investment fund's NAV by procuring inflated marks from third party brokers.  Lumiere was far more responsible for the underlying scheme than Mr. Shor here: Lumiere was a portfolio manager who oversaw traders.  As the Government noted in its sentencing submission in that case, "Lumiere's criminal conduct was not . . . the result of following orders.  Lumiere came up with the idea to commit the fraud," and he directed his traders to carry out his plan.  (Ex. 33 (*Lumiere,* 16 Cr. 483 (JSR) (S.D.N.Y. May 16, 2017), Dkt. No. 98, Gov't Sent. Mem. at 9).)  Lumiere even tried to convince a former colleague to join him in blackmailing the head of the fund in exchange for a payment of $100 million.  (*Id.* at 4; *see* Ex. 35, *Lumiere,* 16 Cr. 483 (JSR) (S.D.N.Y. Jan. 13, 2017), Dkt. No. 70, Trial Tr., at 398-99.)

Conversely, Mr. Shor was a trader, not a portfolio manager, and his conduct *was* the result of following orders; Mr. Shor's direct boss, Amin Majidi, admitted that he relentlessly pressured him to hit unrealistic performance targets and to obtain marks and spreads that went beyond Mr. Shor's "comfort zone."  (*See, e.g.*, Trial Tr. 2617; GX 880-P.)  And while Lumiere "came up with the idea" to mismark his firm's portfolio, Mr. Shor took several steps to stop

mismarking at PPI, culminating with his marking his book down in the firm's internal profit-and-loss tracking software program and reporting his concerns to the Chief Compliance Officer.  (*See* Section C, *supra*.)

United States v. Block, 16 Cr. 595 (JPO) (S.D.N.Y.), is also instructive.  In *Block*, the defendant—the Chief Financial Officer of publicly traded real estate investment trust—was convicted of fraudulently manipulating his company's financial performance by fraudulently inflating a metric used by investors.  In the words of Judge Oetken at sentencing, the defendant "brazenly" inflated values "by simply making up numbers to plug a gap that resulted from what would have been a proper calculation of the company's numbers."  (Ex. 36, (*Block*, 16 Cr. 595 (JPO) (S.D.N.Y.), Dkt No. 169, Sentencing Tr. 68).)  The Government sought a loss amount of over $300 million and a sentence of 84 months against the backdrop of a Guidelines' range of life imprisonment, capped at the total statutory maximum of 105 years.  (*Id.* at Sentencing Tr. 71, 61, 31.)

Judge Oetken determined that the Government had failed to prove the loss amount by a preponderance of the evidence, and he declined to apply any loss enhancement.  Instead, he gave an 18-month sentence in light of, among other things, (a) the lack of the defendant's past criminal conduct and his status of a good father and otherwise model citizen; (b) the "ambiguous regulatory environment" and "lack of direct GAAP guidance on the particular metric [at issue]" which "may have led to an assumption on the defendant's part of more leeway in reporting numbers and may to some degree diminish the degree of culpability"; and (c) his view that in financial crimes cases, "a sentence of seven years versus two years versus three years does not make a huge difference in general deterrence."  (Ex. 36, (*Block*, 16 Cr. 595 (JPO) (S.D.N.Y.), Dkt No. 169, Sentencing Tr. 69-71.).)

A comparison of the facts again shows that a lesser sentence is warranted for Mr. Shor than was imposed on the defendant in *Block*.  Block was the Chief Financial Officer of his company and had unfettered discretion in choosing to commit fraud; Mr. Shor was a trader who was pressured to meet aggressive performance targets.  Whereas Block "brazenly" made up numbers, the testimony showed that Mr. Shor endeavored to challenge prices within reasonable ranges, that Mr. Shor justified the marks he requested from counterparties with data supporting those valuations, and that when the valuations exceeded Mr. Shor's comfort zone, he took steps to report his concerns regarding the pricing practices at issue.  And, similar to the "ambiguous regulatory environment" that diminished Block's culpability in the eyes of Judge Oetken, the market for the securities that Mr. Shor traded and marked was highly opaque and subjective and, during the relevant period, increasingly illiquid.  As such, Mr. Shor had less solid ground from which to push back on the performance levels Mr. Majidi sought and less confidence in drawing the line between aggressive, but reasonable, valuations and unreasonably inflated valuations.

To avoid an unwarranted sentencing disparity, the Court should impose a sentence below the 18-month sentences that were imposed in *Lumiere* and *Block*.

### 6.     Restitution

Under § 3664(h), a court may "make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  18 U.S.C. § 3664(h).  Mr. Shor's "economic circumstances" have been precarious since leaving PPI.  Although he has done some part-time work on an ad-hoc basis to try and make ends meet, he has not been able to find a job due to the cloud of the SEC investigation and subsequent indictment and trial.  Mr. Shor has substantial debt and no savings of which to speak.

███████████████████████████████████████████  Mr. Shor simply

does not have the financial ability to pay any restitution beyond a nominal amount, and he will

likely will be subject to a sizeable judgment as a result of the civil cases that have been filed

against him.  For these reasons, an order apportioning only a relatively small amount of loss to

Mr. Shor is appropriate under the circumstances here.

      **C.**      **Unresolved PSR Objections**

      There are several unresolved objections in the PSR, certain of which we address

in further detail below for the Court's consideration.

      **Paragraph 30**.   As indicated by Probation (*see* PSR at p. 29), the parties dispute

the time period of the scheme to mismark and defraud investors as set forth in Paragraph 40 of

the PSR.  The Government argues that this period began in January 2014, and that Mr. Shor

immediately joined such a scheme upon his arrival at PPI in March 2014.  But the record does

not support the Government's position.  As noted above, the evidence established that PPI's

marks were within the range of reasonable values until September 2015.

      PPI's independent auditor, E&Y, signed off on PPI's 2014 financials, concluded

that PPI's portfolio was valued within a reasonable range, and determined that there was no need

to restate any of PPI's valuations prior to September 2015.  (*See* Background Section C, *supra*.)

Recognizing this and analyzing the same set of facts and circumstances, the Securities and

Exchange Commission ("SEC"), in its parallel complaint, alleged the time period of the

securities fraud scheme as "September 2015 through March 2016."  *SEC v. Premium Point

Investments LP, et al*, 18 Civ. 4145 (AJN) (S.D.N.Y. May 9, 2018), Dkt. No. 1 ¶ 2.

      In support of an earlier start to the mismarking, the Government relies on two text

messages between Mr. Shor and Ashish Dole from 2014 in which they discuss working with

Frank Dinucci to obtain month-end marks and Dole's testimony that PPI worked with "friendly"

brokers around the time Mr. Shor joined PPI.  But that evidence only establishes that PPI relied upon Dinucci to obtain marks, not that the marks it obtained from him were inflated or that the NAV resulting from the month-end pricing process during those months was inflated.  (*See* DX 965A-A1 (analysis showing marks from Dinucci while at Auriga were generally in line with marks from non "friendly" sources); DX 965A-A2 (same); DX 5 (same); DX 6 (same).)   The Government also cites Dinucci's trial testimony that he engaged in a scheme to provide inflated marks from "2014 to 2016" and to James Nimberg's testimony echoing that time frame.  But the say-so of a cooperator and an immunized witness cannot undo the findings of E&Y, the independent auditing firm whose professionals actually reviewed PPI's valuations during this time period and concluded that its valuations during 2014 and the first eight months of 2015 were within reasonable ranges.  In fact, the Government's cooperator, Amin Majidi, went out of his way on cross examination to say that PPI's marks did not "become out of whack" in relation to their "fair value" until "July to September" of 2015.  (Trial. Tr. 2718.)  The latter end of that timeframe aligns with the period determined by E&Y.  For these reasons, we respectfully submit that the relevant time period in paragraph 30 of the PSR should begin as of September 2015.

**Paragraph 31**.  Relatedly, the parties dispute the relevant time period during which bid/ask sector spreads were used by PPI as a means of inflating the NAV, and whether Paragraph 31 of the PSR should be modified to reflect that time period.  (*See* PSR at p. 29.)  Mr. Shor submits that the record evidence shows that bid-ask spreads were not used by PPI to inflate the NAV until, at the very earliest, the second half of 2015, and that they were not used to materially inflate the NAV until September 2015.  The Government relies on Nimberg's speculation as to Majidi's state of mind in sending an email to Barclays about the use of spreads and two text messages suggesting that the firm was using a "widen[ed] bid ask" spread.  But the

record showed that PPI had used sector spreads since at least 2009 (Trial Tr. 1415-17), and

Majidi testified that it was not until the "late 2015" that it was determined "that . . . sector

bid/asks could be . . . used to hit some targets and maintain NAVs at what we wanted."  (Trial

Tr. 2717-19.)  Moreover, as noted above, because E&Y concluded that PPI's valuations were

within fair valuation ranges up until September 2015, sector spreads could not have been used to

materially inflate PPI's securities prior to this time period.

   **<u>Paragraph 42</u>**.  The parties disagree as to whether the portion of Paragraph 42

which refers to "the quid pro quo agreement" between Mr. Shor and Frank Dinucci should be

stricken.  (*See* PSR at p. 30.)   This is an apparent reference to a purported agreement whereby

Dinucci would provide Mr. Shor with inflated month-end marks in exchange for bond trades

which would earn Dinucci commissions.  While Dinucci initially testified that he had an

"understanding" with Mr. Shor to this effect, he was forced to admit that in reality it was merely

Dinucci's "hope[]" that by providing marks to PPI, it would "continue the business flow or even

increase the business flow with [Dinucci's] firm."  (Trial Tr. 3598, 3638-39; *see also id*. at 3639

(Dinucci conceding that in prior sworn testimony about marks provided to PPI he "never

mentioned an understanding" and "never mentioned an agreement").)

   In arguing otherwise, the Government cites principally to an exchange on direct in

which Dinucci ultimately answered "correct" to the leading question of whether he was seeking

increased trade flow "[i]n exchange for . . . month-end marks."  (Trial Tr. 3280.)  But before that

exchange, in response to the Government's proper, non-leading questions about why Dinucci

provided PPI with marks, he answered that he was "trying to keep [PPI] happy" and that he was

"looking for . . . [i]ncreased trade flow."  (Trial Tr. 3279-80.)  This answer was entirely

consistent with his testimony in a prior proceeding and with his answers on cross.  It also falls

short of establishing a quid pro quo.  For similar reasons, Dinucci's after-the-fact reinterpretation of a WhatsApp message from Mr. Shor in November 2015, in which Mr. Shor wrote that he "Got the boss involved understanding the relationship aspect" does not establish a quid pro quo.  (GX 880-R at 1.)

The Government also cites to Dole's testimony about a "quid pro quo" arrangement (Trial Tr. 276), but it ignores (i) Dole's testimony that neither he nor anyone at PPI ever referred to the Dinucci relationship in these terms (Trial Tr. 1122-23); (ii) evidence showing that instances Dole identified as examples of this "quid pro quo" in action did not in fact result in Dinucci giving PPI inflated marks (Trial Tr. 1123-26; DX 5); and (iii) Dole's earlier statement in proffers with the FBI—which was stipulated into evidence—that he could only "speculate" as to whether there was "quid pro quo between PPI and AOC."  (Trial Tr. 4626.)

For these reasons, we respectfully submit that the reference to "the quid pro quo agreement" be stricken from Paragraph 42.

**Paragraph 47**.  The parties dispute whether the language in Paragraph 47 of the PSR suggesting that the use of sector spreads to calculate an imputed mid price "violated the Valuation Policy" and that the Valuation Policy "did not permit" this mechanism.  Mr. Shor relies on the plain language of the Valuation Policy which does not mention, let alone prohibit, the use of sector spreads to calculate an imputed mid price.  (DX 844.)  Moreover, PPI's independent fund administrator, U.S. Bank, was aware that PPI used sector spreads for this purpose and repeatedly verified that PPI adhered to its Valuation Policy.  (DX 1414-25 (spreadsheets generated by U.S. Bank tracking the sector spreads that PPI applied for specific month-end marking periods).)  PPI's independent auditor, E&Y was also aware of PPI's use of sector spreads to calculate imputed mids.  (*See* Trial Tr. at 2930-31 (E&Y witness being walked

through a document showing "an example where E&Y was confirming in its audit that the bid-ask spread for this particular security was properly applied to compute the month-end pricing").)

The Government relies on an incident from 2011 in which Majidi agreed to remove from PPI's then-current valuation policy a reference to the use of sector spreads to calculate an imputed mid to placate a single investor.  (*See* Trial Tr. 1363-68, 1412, 2224-25.) While the use of sector spreads may have been inconsistent with what Majidi told Skybridge, that commitment was made three years before Mr. Shor joined PPI, and there is no evidence that Mr. Shor was aware of it.  The Government does not and cannot point to any testimony from Majidi or anyone else at PPI that the use of sector spreads in this manner violated the actual Valuation Policy or that Mr. Shor believed that it did.  Indeed, the U.S. Bank witness the Government was preparing to testify on this subject specifically told the Government and the FBI in a proffer that the use of sector spreads to calculate an imputed mid price "███████ ███████████████████."  (Ex. 37 at 9.)

Further, the Government's reference to James Nimberg's "Armageddon" comment misstates the context of that statement.  Nimberg testified that "it would have been Armageddon" to report to PPI's Chief Compliance Officer "that Premium Point was using *inflated* sector spreads *to push up the value of bonds*."  (Trial Tr. 1638 (emphasis added).)  The use of spreads to inflate the value of bonds is a separate matter from using spreads to calculate an imputed mid price.  Nimberg's testimony refers only to the former; Paragraph 47 refers to the latter.  For these reasons, this portion of Paragraph 47 should be stricken from the PSR.

**Paragraphs 54-55**.  The parties disagree as to whether the portions of Paragraphs 54 and 55 of the PSR that presuppose that in the second half of 2015, PPI's securities were already inflated beyond the range of fair values.  (*See* PSR at pp. 31-32.)  This dispute hinges on

the outcome of the dispute as to Paragraph 30 discussed above.  Mr. Shor respectfully requests

that Paragraph 54 be removed and that the words "further" and "the already inflated" be stricken

from the last sentence of Paragraph 55.

   **Paragraph 63**.  The parties dispute whether there is a sufficient factual basis for

the assertions in Paragraph 63 that "[i]n truth and in fact, the mismarking in the Hedge Fund was

even more significant than indicated in the Restatement," and that "[t]he mismarking also took

place over a greater period of time than the Restatement Period."  (*See* PSR at p. 33.)  The

Government offers no evidentiary or factual basis to buttress these claims, but simply declares

that "[t]he mismarking was taking place going back to early 2014."  But as noted above, the

evidence does not bear this out.  For the reasons explained above, the relevant period of

mismarking was limited to the Restatement Period—as verified by E&Y—and the contrary

assertions in Paragraph 63 of the PSR should be stricken.

  **D.**  **Other Matters for the Court's Consideration**

   In the event that the Court imposes a custodial sentence, we respectfully request

that the Court select January 6, 2019 as a surrender date.  This would allow sufficient time for

Probation to make a designation, and would also allow Mr. Shor to spend the holidays with his

family and afford him time to break the news to his children in a manner that is least disruptive

to their lives and well-being, likely with the assistance of a professional specializing in childhood

psychological and behavioral development.

## CONCLUSION

   As outlined above and at trial, Mr. Shor led an otherwise law-abiding life

dedicated to family, friends, and personal integrity.  When he received an offer to join PPI, he

thought it could be a tremendous opportunity to learn from some of the best minds in the

industry and grow professionally.  As it turned out, he joined a firm that relied on unfamiliar pricing practices that Majidi was able to manipulate, and he was soon pressured to achieve preordained targets that, over time, became increasingly aggressive.  Mr. Shor struggled in this situation and ultimately succumbed to the pressure he was under.  He accepts the jury's findings and understands that he could and should have done more.  But there can be no reasonable challenge to the fact that he did, in his own limited, non-confrontational manner, try to address his concerns.  Eventually, when it became clear that his concerns would not be addressed, he quit.  He later proffered with the SEC and SDNY, and he was forthright and honest throughout. Not a single comment of Mr. Shor or his counsel during any of these proffers was introduced by the Government as being inconsistent with any position or argument advanced by Mr. Shor's counsel at trial.  Mr. Shor acknowledges the role he played in the pricing process and that he should have done more, but under the § 3553(a) factors, we respectfully submit that a minimal or non-custodial sentence is appropriate.

Dated:        New York, New York
              November 6, 2019

                                  Respectfully submitted,

By:      _____
         Daniel S. Ruzumna
         Clinton W. Morrison
         Jeffrey Hughes
         PATTERSON BELKNAP WEBB & TYLER LLP
         1133 Avenue of the Americas
         New York, NY 10036
         druzumna@pbwt.com
         cmorrison@pbwt.com
         jhughes@pbwt.com
         (T) 212 336-2000
         (F) 212-336-1205

         *Counsel for Defendant Jeremy Shor*

49