**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 17, 2020

BY CM/ECF

The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

> Re:   United States v. Anilesh Ahuja et al.
>       S1 18 Cr. 328 (KPF)

Dear Judge Failla:

      The Government respectfully submits this letter in connection with the sentencing of the defendants Anilesh Ahuja and Jeremy Shor.  On November 19, 2019 and November 25, 2019, the Court sentenced Shor and Ahuja, respectively, but left open the question of restitution for ninety days.  *See* 18 U.S.C. § 3664(d)(5).  For the following reasons, the Government respectfully requests that the Court order restitution in the amount of $110,555,254.08 on a joint and several basis as detailed below.[1]

<u>Applicable Law</u>

      The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, provides for mandatory victim restitution, specifically that "the court shall order . . . that the defendant make restitution to the victim" of various offenses, including where the defendant has been convicted (a) of any Title 18 "offense against property . . . committed by fraud or deceit," and (B) "any offense . . . in which an identifiable victim or victims has suffered . . . a pecuniary loss" — which includes the four offenses of conviction.  *See* 18 U.S.C. § 3663A(c)(1)(A)(ii) & (c)(1)(B); *see United States* v. *Dupes*, 513 F.3d 338, 345 (2d Cir. 2008) ("[t]he MVRA makes full restitution mandatory for . . . securities fraud").  The Victim Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, provides for discretionary victim restitution, specifically that "[t]he court, when sentencing a defendant convicted of [a Title 18] offense . . . may order . . . that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a)(1)(A).  The VWPA requires sentencing courts to "consider [i] the amount of the loss sustained by each victim as a result of the offense," and "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors the court deems appropriate."  *Id.* § 3663(a)(1)(B)(i).

---

[1]    Consistent with the Court's Order, the Government and the defendants have had constructive conversations in an effort to reach agreement on a methodology to calculate restitution, but have been unable to do so at present.

Both the MVRA and the VWPA define a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2); *id.* § 3663A(a)(2). "[A] court's power to order restitution is limited to actual loss." *United States* v. *Carboni*, 204 F.3d 39, 47 (2d Cir. 2000); *see also United States* v. *Germosen*, 139 F.3d 120, 130 (2d Cir. 1998) (restitution statute "requires a showing of actual loss"). The Second Circuit has made clear "we have never used the word 'actual' in this context to mean 'mathematically precise.' Nor have we ever adopted a one-size-fits-all standard of precision for application in restitution cases." *United States* v. *Gushlak*, 728 F.3d 184, 195-96 (2d Cir. 2013). "To the contrary, [the Second Circuit's] case law reflects the settled understanding among courts of appeals that a 'reasonable approximation' will suffice, especially in cases in which an exact dollar amount is inherently incalculable." *Id.* (collecting cases). A co-conspirator is liable for losses caused by the acts of his co-conspirators. *See United States* v. *Bengis*, 783 F.3d 407, 413 (2d Cir. 2015) (Under MVRA, defendant is liable for restitution for the prior acts of his co-conspirators in furtherance of the conspiracy "if [his] understanding of the scope of the conspiracy he joined . . . was such that he knew or reasonably should have known about some or all of the conspiracy's past imports.").

Similarly under both restitution statutes, "necessary . . . expenses incurred [by a victim] related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense" are compensable. 18 U.S.C. § 3663(b)(4); *accord* 18 U.S.C. § 3663A(b)(4). The Supreme recently made led that "[t]he words 'investigation' and 'proceedings' in the [MVRA] refer to government investigations and criminal proceedings." *Lagos* v. *United States*, -- U.S. --, 138 S. Ct. 1684, 1690 (2018). *See also United States* v. *Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) (compensable expenses include attorneys' fees that a "victim was required to incur to advance the investigation or prosecution of the offense"); *United States* v. *Amato*, 540 F.3d 153, 159 (2d Cir. 2008) (attorneys' fees fall within scope of MVRA); *United States* v. *Battista*, 575 F.3d 226, 233 (2d Cir. 2009) (attorneys' fees fall within scope of the VWPA). Whether expenses, including attorneys' fees, are "necessary" depends on whether the "purpose" of the expense related to investigation or prosecution of the offense, or to something else. *Maynard*, 743 F.3d at 381-82. *See also United States* v. *Cuti*, 778 F.3d 83, 94 (2d Cir. 2015) ("where the record shows that a particular investigation was commenced, and its corresponding expenses incurred for another reason" besides investigation and prosecution of the criminal conduct, then restitution is inappropriate); *United States* v. *Cuti*, 708 F. App'x 21, 25 (2d Cir. Sept. 21, 2017) ("We have noted the crucial distinction between actions that merely 'helped' to the prosecution and actions deemed truly necessary. The latter are compensable, and the former are not.") (internal citation omitted); *United States* v. *Afriyie*, 929 F.3d 63, 74 (2d Cir. 2019) ("a private firm's legal fees as to a corporate victim's private investigation and related civil case were not compensable as 'necessary' restitution" (citing *Lagos*, 138 S. Ct. at 1688-89)).[2] The question of

---

[2]   In *Lagos*, the Supreme Court left open the question of whether "expenses incurred during a private investigation that was pursued at a government's invitation or request" was compensable. *Lagos*, 138 S. Ct. at 1690. Before *Lagos*, the Second Circuit had found that attorneys' fees paid in connection with an internal investigation that preceded or paralleled a governmental investigation may be compensable under this provision, *see*, *e.g.*, *United States* v. *Bahel*, 662 F.3d

necessity does not entail an inquiry into the victim's cost-efficiency, absent reason to question whether the fees incurred were standard for the sort of work performed. *See Bahel*, 662 F.3d at 648 (rejecting argument that U.N. should have relied on in-house counsel to conduct internal investigation into defendant's conduct).

The Government bears the burden of establishing the loss amount under the VWPA and MVRA, and any dispute as to the proper amount of restitution is resolved by the court by a preponderance of the evidence. *See* 18 U.S.C. § 3664(e); *United States* v. *Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013). A district court has "broad discretion to determine restitution" and must make a "reasonable estimate" of the actual loss "based on the evidence before it." *United States* v. *Milstein*, 481 F.3d 132, 137 (2d Cir. 2007); *see also Amato*, 540 F.3d at 160. The Second Circuit's review of restitution orders is "extremely deferential," *United States* v. *Giwah*, 84 F.3d 109, 114 (2d Cir. 1996), because ordering restitution "requires a delicate balancing of diverse, sometimes incomparable[,] factors, some of which not only lack certainty but may indeed be based on mere probabilities, expectations, guesswork, even a 'hunch,'" *United States* v. *Atkinson*, 788 F.2d 900, 902 (2d Cir. 1986).

<u>Restitution Claims</u>

Following the defendants' convictions at trial, the Government took reasonable steps to contact each of the investors in the three funds at issue at trial — the Mortgage Credit Fund (the "MCF"), the ERISA Fund, and the New Issue Opportunities Fund (the "NIOF") — the net asset values ("NAV") of which were inflated by the defendants during the charged scheme. The Government received requests for restitution from seven groups of investors or representatives of investors in these funds — SkyBridge, Gapstow, Crestline, Forth Worth Country Day School, Massey Quick Simon & Co., Russell Stern, and KPMG — for investment losses and other fees and expenses. The Government has provided the correspondence it received to both the defendants and the Court.

Below is a summary of the claims for restitution that the Government has received, which total $151,963,979.57:

---

610, 647-48 (2d Cir. 2011); *Cuti*, 778 F.3d at 93. Similarly, prior to *Lagos*, where the victim was compelled to pay attorneys to handle parallel governmental criminal and civil enforcement investigations into the same underlying conduct, the Second Circuit had affirmed a restitution order covering the entirety of the fees paid, without trying to "create an artificial and unrealistic distinction between [the] civil investigations and criminal prosecutions." *United States* v. *Skowron*, 839 F. Supp. 2d 740, 749 (S.D.N.Y. 2012), *aff'd*, 529 F. App'x 71, 74-75 (2d Cir. 2013); *see also United States* v. *Gupta*, 925 F. Supp. 2d 581, 586-87 (S.D.N.Y. 2013).

| Victim | Investment Losses | | Fees and Expenses |
|---|---|---|---|
| | MCF | NIOF | |
| **SkyBridge** | $ 69,715,029.00 | | $ 195,271.00 |
| SkyBridge Multi-Adviser Hedge Fund Portfolios LLC - Series G | | | |
| Legion Strategies, Ltd. | | | |
| The Coca-Cola Company Master Retirement Trust | | | |
| Dorvin Valley, Inc. | | | |
| Arther E. Angel Trust | | | |
| Nicol Investment Company, LLC | | | |
| Remarkable Insurange Group, Inc | | | |
| Cayville, Inc. | | | |
| Vaisya Limited | | | |
| WGA Acc Management LLC | | | |
| Youngstown State University Foundation | | | |
| | | | |
| **Gapstow** | | | $ 161,158.55 |
| Gaptow Opportunity Fund | $ 8,969,079.95 | | |
| Gapstow Credit & Special Situations Fund | $ 3,406,807.98 | $ 544,136.02 | |
| CJA Public-Private Multi Manager Fund | $ 3,215,752.00 | $ 870,618.00 | |
| Gapstow Real Estate Yield Fund | $ 5,736,297.09 | $ 1,632,408.65 | |
| | | | |
| **Crestline** | | | $ 1,074,916.21 |
| Crestline AK Permanent Fund, L.P.  (Fund 1) | | $ 4,091,862.74 | |
| Crestline CS Fund, L.P. (Fund 2) | $ 2,285,649.43 | $ 309,162.89 | |
| Crestline Partners, L.P. (Fund 3) | $ 816,973.36 | | |
| Crestline ERISA Fund, Ltd. (Fund 4) | $ 504,609.73 | | |
| Crestline Offshore Fund, Ltd. (Fund 5) | $ 1,650,686.99 | $ 762,481.20 | |
| Special Offshore Ltd. E (Fund 6) | $ 2,782,460.51 | $ 769,151.31 | |
| Blue Glacier Fund, L.P. (Class B) (Fund 7) | | $ 1,500,349.62 | |
| Crestline Forty Fund, L.P. (Fund 8) | | $ 1,022,965.81 | |
| Crestline Opportunity Fund II, L.P. Class A (Fund 9) | | $ 472,837.56 | |
| CL Opportunity Trading Fund, L.P. – Class A (Fund 10) | | $ 217,172.39 | |
| CL Opportunity Trading Fund, L.P. – Class B (ERISA) (Fund 11) | | $ 511,259.22 | |
| | | | |
| **Fort Worth Country Day School** | $ 414,915.05 | | |
| | | | |
| **Massey Quick Simon & Co.** | | | |
| George Johnson (IRA) | $ 190,026.31 | | |
| Kevin Young (IRA) | $ 212,967.14 | | |
| Leslie C. Quick (IRA) | $ 447,632.64 | | |
| Thomas C. Quick (IRA) | $ 431,881.49 | | |
| NFS/FMTC FBO Terry A. Sutter (IRA) | $ 256,198.00 | | |
| Nancy Gibson | $ 718,210.17 | | |
| Christopher & Lisa Skinner | $ 123,080.49 | | |
| Douglas & Susan Present | $ 210,831.08 | | |
| Leo & Joan Lorenzetti | $ 14,310.43 | | |
| Crown Global Life Ins. | $ 133,209.56 | | |
| Kathleen Treat | $ 229,276.00 | | |
| June Tamburro | $ 52,942.00 | | |
| Chapin Partners Master Fund LLC | $ 2,250,000.00 | | |
| | | | |
| **Russell Stern** | $ 269,427.00 | | |
| | | | |
| **KPMG** | | | $ 32,789,975.00 |
| | | | |
| **Sub-Total** | **$ 105,038,253.40** | **$ 12,704,405.41** | **$ 34,221,320.76** |
| | | | |
| **Grand Total** | **$** | | **151,963,979.57** |

<u>The Court Should Order the Defendants to Pay Restitution to</u>
<u>the Victims of Their Offenses of Conviction</u>

The Government respectfully submits that the Court should order Ahuja and Shor to pay restitution to the victims of their offenses on a joint and several basis with the other defendants as follows.

A.    <u>The Victims</u>

With the exception of KPMG, each of the other claimants was an investor in one of the inflated PPI funds or represents a group of such investors.  The Government believes that each of these investor claimants qualifies as "victim" under the MVRA and the VWPA.  The evidence at trial established that each of the three funds at issue was fraudulently inflated by the scheme that Ahuja led and that Shor played a key role in implementing.  Had the investors been told the truth, the investors would not have invested in PPI's fund and/or would have redeemed their investments.  Because the investors were not told the truth, they suffered losses.  Accordingly each of the investor claimants is a victim because each was "directly and proximately harmed as a result of" Ahuja's and Shor's scheme to inflate the NAV of the funds in which the victims invested. 18 U.S.C. § 3663(a)(2); *id.* § 3663A(a)(2); *see United States* v. *Marino*, 654 F.3d 310, 322 (2d Cir. 2011).

KPMG has filed claims in its capacity as the Joint Official Liquidator to PPI's Offshore Entities and as the Joint Liquidating Trustee to PPI's Onshore Entities.  The Government does not presently have sufficient information from which to assess whether KPMG and/or the entities its represents qualify as a "victim."   For example, while KPMG has advised the Government that PPI's funds have "obligations to indemnify several parties, including former employees and directors of the Funds as well as certain service providers (such as the Fund's investment manager and former administrator) (the 'Indemnitees.')," KPMG has declined to identify the names of each of the specific Indemnitees.  (*See*, *e.g.*, Jan. 6 & 13, 2020 KPMG Ltrs.).  Similarly, KPMG has declined to provide additional information about the various costs and expenses it and other entities have incurred to enable the Government to assess which costs and expenses relate to the criminal case, as opposed to other civil and liquidation proceedings.  (*See id.*).  Because the Government is unable to determine whether KPMG or these other entities qualify as "victims," the Government is not in a position to advocate for restitution on its behalf.

B.    <u>The Court Should Order Restitution With Respect to Investment Losses</u>

As noted, the victim investors have sought total restitution for claimed investment losses of $117,742,658.81 in two of three funds at issue, the MCF and the NIOF.  Each of the investor's claims generally follow a money-in-money-out approach to calculate losses in the MCF and NIOF under a fraudulent inducement theory.  In other words, each investor has generally claimed as losses the difference between its initial investment and the amount of money that has been returned.  There is authority for such a methodology.  *See, e.g., United States* v. *Marino*, 654 F.3d 310, 322 (2d Cir. 2011) (observing, in rejecting causation challenge to restitution on direct appeal, that "but for" defendant's affirmative concealment of falsity of certain representations, victims would not have invested in venture "as no reasonable investor would invest in a known

Ponzi scheme"); *see also, e.g., United States* v. *Cean*, 771 F. App'x 81, 83 (2d Cir. June 24, 2019) ("As to proximate cause, '[t]he basic question . . . is whether the harm alleged has a sufficiently close connection to the conduct at issue' — *i.e.*, whether it is 'foreseeable.'" (quoting *Robers* v. *United States*, 572 U.S. 69, 645 (2014)); *United States* v. *Rutigliano*, 887 F.3d 98, 109 (2d Cir. 2018) ("There is no question that if the [United States Railroad Retirement Board ("RRB")] had known the supporting medical documents were fraudulent, it would not have made these payments; thus, by making payments, the RRB sustained an actual loss.").

At sentencing, the Government proposed a conservative methodology for calculating loss for purposes of the Sentencing Guidelines that adjusted the money-in-money-out loss number that SkyBridge — by far the largest investor in the MCF — suffered for the then-existing economic conditions by comparing the restated returns relative to a select set of benchmarks over the restatement period (Q3 2015 through Q1 2016). The purpose of this exercise was to incorporate into the reasonable estimate of loss amount the fact that had SkyBridge not invested in PPI during the period of the fraud, it would most likely invested in other similar vehicles that would have lost money due to market conditions, thus arguably reducing the loss that should be attributed to the defendants' fraud. The Government retained an expert consulting firm, the Brattle Group, to conduct this analysis.[3] This result of this methodology was a reduction in SkyBridge's money-in-money-out losses from approximately $71 million to approximately $51.8 million.[4] The Court took this methodology into account at sentencing. (*See* Shor Sentencing Tr. 112-14 ("On the evidence that I saw at trial — the spreadsheets, the restatement information, the contemporaneous notes by members of this conspiracy — I am comfortable finding that a loss in excess of $25 million is supported, at least by a preponderance standard, and so that is what I'm finding to be the loss figure, that it is in excess of $25 million.").

For purposes of calculating a reasonable estimate of victims' losses for restitution purposes, the Government proposes to adjust the investors' claims using this same methodology. The Government thus asked Brattle to take the NAV of each investor's position in the MCF and/or NIOF as of August 31, 2015 and the restated returns of that investor's interest relative to the same benchmarks. As at sentencing, the Government is attempting to make a reasonable estimation of the investors' losses during the restatement period that resulted from the mismarking scheme and not from market conditions. The Government recognizes that many investor-claimants have sought restitution for the entire period of the conspiracy (2014 to 2016). However, given the information available, the Government is presently only able to make a reasonable estimate of investor losses during the restatement period. The Government submits that because the Court is required only to make a "reasonable approximation" of investor losses that need not be "mathematically precise," using this methodology arrives at an appropriate estimate of investor losses. *Gushlak*, 728 F.3d at 196 ("To quantify investor losses in this manner, one needs to

---

[3]   The Government provided the spreadsheet underlying Brattle's analysis to the Court and the parties in advance of sentencing.

[4]   The losses that Government used for purposes of calculating the Guidelines did not include the various managed accounts on whose behalf SkyBridge has requested restitution. Skybridge has claimed losses on behalf of these accounts, which have therefore been included in the restitution analysis.

determine what the aggregate price of the investor's shares would have been on a given date but for the fraud; this value can then be subtracted from the actual market price of the shares on that date.").

The Government also believes that both MCF and NIOF investors are entitled to restitution, despite the fact that the MCF had quarterly redemption and the NIOF had a three-year lock up. Of course, had MCF and NIOF investors been advised of the scheme they may never have invested or would have redeemed their investments. The fact that NIOF investors were locked up does not mean that they were not harmed; NIOF could have exercised their rights under the various investment management agreements, including an early redemption, because PPI had breached its obligations by engaging in this fraudulent mismarking scheme.

1.   NIOF

The below chart compares the results of the Government's proposed methodology with the NIOF victims' claims. The Government believes that restitution in the amount of **$10,256,627.23** is appropriate.

| Victim | | Claim | | Benchmark Funds v. Restated Value (March 2016) |
|---|---|---|---|---|
| **Gapstow** | | | | |
| Gapstow Credit & Special Situations Fund | $ | 544,136.02 | $ | 494,779.68 |
| CJA Public-Private Multi Manager Fund | $ | 870,618.00 | $ | 791,647.76 |
| Gapstow Real Estate Yield Fund | $ | 1,632,408.65 | $ | 1,484,339.51 |
| | | | | |
| **Crestline** | | | | |
| Crestline AK Permanent Fund, L.P. (Fund 1) | $ | 4,091,862.74 | $ | 3,189,784.84 |
| Crestline CS Fund, L.P. (Fund 2) | $ | 309,162.89 | $ | 241,005.80 |
| Crestline Offshore Fund, Ltd. (Fund 5) | $ | 762,481.20 | $ | 545,966.06 |
| Special Offshore Ltd. E (Fund 6) | $ | 769,151.31 | $ | 602,689.69 |
| Blue Glacier Fund, L.P. (Class B) (Fund 7) | $ | 1,500,349.62 | $ | 1,169,587.80 |
| Crestline Forty Fund, L.P. (Fund 8) | $ | 1,022,965.81 | $ | 797,446.29 |
| Crestline Opportunity Fund II, L.P. Class A (Fund 9) | $ | 472,837.56 | $ | 368,597.48 |
| CL Opportunity Trading Fund, L.P. – Class A (Fund 10) | $ | 217,172.39 | $ | 170,171.38 |
| CL Opportunity Trading Fund, L.P. – Class B (ERISA) (Fund 11) | $ | 511,259.22 | $ | 400,611.25 |
| | | | | |
| **Total** | **$** | **12,704,405.41** | **$** | **10,256,627.53** |

2.      MCF

The below chart compares the results of the Government's proposed methodology with the MCF victims' claims.  In certain instances, the Government's methodology resulted in larger loss numbers than those claimed by the victims.  In those cases, the Government proposes that the Court award restitution equal to the victim's claim. The Government believes that restitution in the amount of **$99,942,196.99** is appropriate.

| Victim | Claim | Benchmark Funds v. Restated Value (March 2016) | Gov't Position |
|---|---|---|---|
| **SkyBridge** | $  69,715,029.00 | | |
| SkyBridge | | $  51,823,353.80 | $  51,823,353.80 |
| Legion Strategies, Ltd. | | $  14,416,422.00 | $  14,416,422.00 |
| The Coca-Cola Company Master Retirement Trust | | $  2,870,130.30 | $  2,870,130.30 |
| Cayville, Inc. | | $  253,989.75 | $  253,989.75 |
| Dorvin Valley, Inc. | | $  231,267.17 | $  231,267.17 |
| Youngstown State University Foundation | | $  185,758.79 | $  185,758.79 |
| Vaisya Limited | | $  177,679.66 | $  177,679.66 |
| | | | |
| **Gapstow** | | | |
| Gapstow Opportunity Fund | $  8,969,079.95 | $  7,130,210.39 | $  7,130,210.39 |
| Gapstow Credit & Special Situations Fund | $  3,406,807.98 | $  3,514,990.95 | $  3,406,807.98 |
| CJA Public-Private Multi Manager Fund | $  3,215,752.00 | $  3,561,247.76 | $  3,215,752.00 |
| Gapstow Real Estate Yield Fund | $  5,736,297.09 | $  4,370,970.46 | $  4,370,970.46 |
| | | | |
| **Crestline** | | | |
| Crestline AK Permanent Fund, L.P. (Fund 1) | $  - | $  2,056,939.93 | $  - |
| Crestline CS Fund, L.P. (Fund 2) | $  2,285,649.43 | $  1,824,957.49 | $  1,824,957.49 |
| Crestline Partners, L.P. (Fund 3) | $  816,973.36 | $  697,612.02 | $  697,612.02 |
| Crestline ERISA Fund, Ltd. (Fund 4) | $  504,609.73 | $  538,389.83 | $  504,609.73 |
| Crestline Offshore Fund, Ltd. (Fund 5) | $  1,650,686.99 | $  2,660,475.97 | $  1,650,686.99 |
| Special Offshore Ltd. E (Fund 6) | $  2,782,460.51 | $  2,731,776.83 | $  2,731,776.83 |
| Blue Glacier Fund, L.P. (Class B) (Fund 7) | | | |
| Crestline Forty Fund, L.P. (Fund 8) | | | |
| Crestline Opportunity Fund II, L.P. Class A (Fund 9) | | | |
| CL Opportunity Trading Fund, L.P. – Class A (Fund 10) | | | |
| CL Opportunity Trading Fund, L.P. – Class B (ERISA) (Fund 11) | | | |
| | | | |
| **Fort Worth Country Day School** | $  414,915.05 | $  382,191.69 | $  382,191.69 |
| | | | |
| **Massey Quick Simon & Co.** | | | |
| George Johnston (IRA) | $  190,026.31 | $  164,261.83 | $  164,261.83 |
| Kevin Young (IRA) | $  212,967.14 | $  169,303.94 | $  169,303.94 |
| Leslie C. Quick (IRA) | $  447,632.64 | $  394,535.88 | $  394,535.88 |
| Thomas C. Quick (IRA) | $  431,881.49 | $  370,073.18 | $  370,073.18 |
| NFS/FMTC FBO Terry A. Sutter (IRA) | $  256,198.00 | $  178,235.90 | $  178,235.90 |
| Nancy Gibson | $  718,210.17 | $  558,609.38 | $  558,609.38 |
| Christopher & Thomas Skinner | $  123,080.49 | $  233,592.61 | $  123,080.49 |
| Douglas & Susan Present | $  210,831.08 | $  188,755.73 | $  188,755.73 |
| Leon & Joan Lorenzetti | $  14,310.43 | $  186,641.56 | $  14,310.43 |
| Crown Global Life Ins. | $  133,209.56 | $  119,176.14 | $  119,176.14 |
| Kathleen Treat | $  229,276.00 | $  193,439.31 | $  193,439.31 |
| June Tamburro | $  52,942.00 | $  - | $  - |
| Chapin Partners Master Fund LLC | $  2,250,000.00 | $  1,324,810.72 | $  1,324,810.72 |
| | | | |
| **Russell Stern** | $  269,427.00 | $  432,718.81 | $  269,427.00 |
| | | | |
| **Total** | **$  105,038,253.40** | **$  103,942,519.80** | **$  99,942,196.99** |

C.       The Court Should Order Restitution With Respect to Fees and Other Expenses

        As noted, certain of the victim investors — SkyBridge, Gapstow, Crestline, and KPMG — have sought total fees and expenses of $34,221,320.76, representing claims for legal fees, management and performance fees, and other expenses.  The Government submits that the Court should order restitution for fees and expenses totaling **$356,429.55** as follows:

    1.       SkyBridge and Gapstow

        SkyBridge and Gapstow each seek restitution for the legal fees they incurred as result of the Government's investigation and the trial of the defendants.  The Government believes that these fees were "necessary . . . expenses incurred [by the victims] related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense" are compensable.  18 U.S.C. § 3663(b)(4); *accord* 18 U.S.C. § 3663A(b)(4); *see also Lagos*, 138 S. Ct. at 1690; *Maynard*, 743 F.3d at 381; *Amato*, 540 F.3d at 159; *Battista*, 575 F.3d at 233.  The costs incurred as a result of producing documents to the Government, preparing for and attending proffer sessions, and preparing for and testifying at the defendants' trial were plainly "necessary."  To the extent that certain fees and expenses may relate to response to requests for documents from the SEC, the Government also believes that these were necessary because the Government was conducting a parallel investigation with the SEC and requested that SkyBridge and Gapstow produce the same documents to the Government.  Had the SEC not made its document requests, the Government would have independently requested them.  *See Skowron*, 839 F. Supp. 2d at 749, *aff'd*, 529 F. App'x at 74-75 (prior to *Lagos*, affirming restitution order covering the entirety of the fees paid, without trying to "create an artificial and unrealistic distinction between [the] civil investigations and criminal prosecutions").  Thus, the Court should order restitution to SkyBridge in the amount of **$195,271.00** and restitution to Gapstow in the amount of **$161,158.55.**

    2.       Crestline

        Crestline seeks restitution of $95,728.11 for claimed excess management fees for the MCF, $84,854.87 for claimed excess management fees for the NIOF, and $894,333.23 for claimed excess performance fees for the MCF incurred between January 2014 and March 2016.

        Crestline calculates the management and performance fees for the January 2014 through August 2015 time period by "assuming" that NAVs for that period were inflated by the same amount as during the restatement period.  The information available to the Government, including the evidence admitted at trial, does not support this assumption, including because the Government is not presently able to estimate the fraudulent inflation in PPI's funds during this time period.

        The Government's understanding is that PPI has already reimbursed its investors, including Crestline, for excess management fees charged during the restatement period of September 2015 through March 2016, and that there were no performance fees during that time period.  In light of this reimbursement and the information available to the Government, the Government does not believe it is in a position to seek further reimbursement of management fees during the restatement period on Crestline's behalf.

Accordingly, the Government does not believe that Crestline is entitled to restitution for claimed excess management and performance fees.

3.    KPMG

In its capacity as liquidator and liquidating trustee, KPMG seeks restitution totally $32,789,975 in three general categories. As set forth below, the Government does not believe that it presently has sufficient information to request restitution for KPMG or the entities it represents.

*First*, KPMG seeks $27,858,595 in "indemnity claims," claims from various individuals and entities for legal fees and other expenses related to the criminal case, as well as the SEC investigation and the SkyBridge litigation. As noted above, KPMG has declined to provide additional information about the identifies of the Indemnitees or the specific purposes of the indemnity claims, including to separate fees incurred in connection with the criminal case from fees incurred in connection with the SEC, SkyBridge, and Cayman litigations, or otherwise. (*See* Jan. 6, 2020 and Jan. 13, 2020 KPMG Ltrs.) Thus, the Government is not in a position to advocate for the indemnity claims. *See, e.g., Afriyie*, 929 F.3d at 74 ("a private firm's legal fees as to a corporate victim's private investigation and related civil case were not compensable as 'necessary' restitution" (citing *Lagos*, 138 S. Ct. at 1688-89)).

*Second*, KPMG seeks $4,009,700 in "costs associated with the Funds' liquidation proceedings." Based on the information available to the Government, the Government does not believe that these non-criminal costs are compensable as restitution. *See id.*

*Third*, KPMG seeks $921,680.33 in restitution for various "pre-liquidation expenses paid by the funds." The Government requested that KPMG provide further detail about these expenses, including to allow the Government to separate the expenses incurred in connection with the criminal case — which may be compensable — from those incurred in connection with the SEC, SkyBridge, and Cayman proceedings, among others — which likely are not compensable. *See id.* KPMG has declined to provide additional information, and thus the Government is not in a position to advocate for restitution for these expenses.

Conclusion

For the above reasons, the Government respectfully submits that the Court should order Ahuja and Shor to pay restitution to the victims of their offenses in the total amount of **$110,555,254.08** on a joint and several basis with the other defendants

Respectfully submitted,

AUDREY STRAUSS
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515


By:    /s/
Andrea M. Griswold
Joshua A. Naftalis
Max Nicholas
Assistant United States Attorneys
(212) 637-2310/2310/2357

cc:     Counsel of record (by CM/ECF)