K7OHAHUC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          18 Cr. 328 (KPF)

5    ANILESH AHUJA and JEREMY SHOR,

6                                          Conference
               Defendants.
7
     ------------------------------x
8
                                          New York, N.Y.
9                                         July 24, 2020
                                          2:05 p.m.
10

11   Before:

12              HON. KATHERINE POLK FAILLA,

13                                         District Judge

14                         APPEARANCES

15   AUDREY STRAUSS
          Acting United States Attorney for the
16        Southern District of New York
     ANDREA GRISWOLD
17   JOSHUA NAFTALIS
     MAX NICHOLAS
18        Assistant United States Attorneys

19   RICHARD CRAIG TARLOWE
     ROBERTO FINZI
20        Attorneys for Defendant Ahuja

21   JUSTIN S. WEDDLE
     JULIA CATANIA
22        Attorneys for Defendant Shor

23

24

25
```

K7OHAHUC

1              (The Court and all parties present remotely)

2              THE DEPUTY CLERK:  Your Honor, this is in the matter

3    of USA v. Ahuja, et al.

4              Counsel, please state your name for the record,

5    beginning with the government.

6              MS. GRISWOLD:  Good afternoon, your Honor.  Andrea

7    Griswold, Joshua Naftalis, and Max Nicholas.

8              THE COURT:  Good afternoon.  Thank you very much.

9              Representing Mr. Ahuja?

10             MR. TARLOWE:  Good afternoon, your Honor.  It's

11   Richard Tarlowe and Roberto Finzi on behalf of Mr. Ahuja, and

12   Mr. Ahuja is on as well.

13             THE COURT:  Yes, I see Mr. Ahuja.  Thank you very much

14   for participating.  I see you as well.  Thank you.

15             And representing Mr. Shor?

16             MR. WEDDLE:  Good afternoon, your Honor.  Justin

17   Weddle for Mr. Shor from the law firm of Weddle Law.  My

18   colleague, Julia Catania, is participating by phone, and

19   Mr. Shor is on by video.

20             THE COURT:  Mr. Weddle, I'm assuming I am to direct my

21   questions to you.  Is that correct?

22             MR. WEDDLE:  That's correct.

23             THE COURT:  Mr. Tarlowe, as between you and Mr. Finzi,

24   to whom should I be directing my questions?

25             MR. TARLOWE:  To me, your Honor.

K7OHAHUC

| | |
|---|---|
| 1 | THE COURT:  All right.  Thank you for letting me know. |
| 2 | Ms. Griswold, among your team, to whom should I be |
| 3 | directing my questions? |
| 4 | MS. GRISWOLD:  In the first instance, to me, your |
| 5 | Honor.  We may pass the baton depending on the nature of the |
| 6 | Court's inquiry. |
| 7 | THE COURT:  I appreciate that.  Thank you. |
| 8 | All right.  May I confirm as well that there's a court |
| 9 | reporter on the line.  I do believe I see her phone line. |
| 10 | Thank you. |
| 11 | All right.  Because there is a court reporter, I will |
| 12 | be asking folks to be mindful of that and to be as slow as you |
| 13 | possibly can in speaking. |
| 14 | I want to begin, please, with some housekeeping |
| 15 | matters.  I'm seeing, first of all, that I was unable to change |
| 16 | the name that is affiliated with my account.  So you see me in |
| 17 | my -- without the full Katherine Polk Failla.  You'll take no |
| 18 | offense at that. |
| 19 | It's been a while since we've seen each other, and a |
| 20 | lot has happened in the world and in this area.  So I begin by |
| 21 | hoping for each of you and for your families and those that you |
| 22 | hold dear that you have been safe and well during this period |
| 23 | of pandemic, and I continue to hope that for as long as this |
| 24 | lasts. |
| 25 | I do have a couple of housekeeping matters, and then I |

K7OHAHUC

1    wanted to give you my thoughts and then I wanted to hear your

2    thoughts.  So I think that's one way of explaining that is to

3    say that I'm not deciding many things finally today.  I just

4    want that to be clear.  But I want to tell you some things that

5    I have decided and some things that I want to do going forward.

6         Please excuse me.  Perhaps someone's phone is not on

7    mute because I'm hearing another conversation.  All right.

8    Hopefully that will end.

9         I wanted, since this is an issue -- yes, Mr. Finzi.

10        MR. FINZI:  I'm sorry, your Honor.  I'm really sorry

11   to interrupt.  I just noticed -- and I don't know if other

12   people are seeing this, too -- that there is a recording button

13   going on in my screen, and I haven't seen that in prior Zoom

14   calls, and I just want to make sure people are aware of it.  I

15   don't necessarily have an objection to it, but it's a little

16   unusual, and I wanted to make sure that other people saw it and

17   were aware of it.

18        THE COURT:  All right.  Thank you.

19        It may be coming from our end.  Let me ask my deputy

20   if she's aware of the recording.

21        MR. FINZI:  Yes, Judge, it's our backup recording.

22        THE COURT:  Mr. Finzi, it is ours.

23        MR. FINZI:  I apologize, then, your Honor.

24        THE COURT:  No, no, no need to apologize.  It's

25   absolutely right to address this issue.

K7OHAHUC

1        I also thank my deputy for changing my name.  Thank

2   you.

3        All right.  This particular issue that brings us

4   together today is an issue about disclosure, and so I wanted to

5   put on the record a disclosure of my own that may or may not

6   impact the proceedings in this matter.  After the trial in this

7   case, it should not surprise you to learn that I have

8   encountered some of you and had conversations with some of you

9   in other events.  For example, at what I believe was a cocktail

10  party that Preet Bharara and Joon Kim may have done, I saw

11  Mr. Nicholas and spoke with him.  I saw Mr. Tarlowe and spoke

12  with him.

13        About that time I understood from the trial team for

14  the government that one of their paralegals, Sarah Pyun, was

15  going to start law school.  I guess it just came up in

16  conversation, what happens after this, after this trial?  She's

17  going to begin law school.  She was recommended to me by the

18  trial team, or by members of the trial team, as someone who

19  might do well as an intern in my chambers.  And because of the

20  work that I saw her do during the trial, I did interview her

21  and I did hire her, and she is currently an intern of mine in

22  my chambers.

23        I can tell you that we've had no substantive

24  discussions about this trial.  I can also tell you she has not

25  set foot in my chambers because this whole internship

K7OHAHUC

experience, I'm sorry to say, has been virtual.  They've all

Zoomed in each day.  But I did want to make you aware that the

government -- one of the paralegal specialists for the

government team is now my intern.

Separately, and somewhat related to that, in February

of this year, I did have lunch with Mr. Nicholas, in part to

thank him for the recommendation and in part to talk about

things that I think prosecutors think about when they're

thinking about maybe what lies beyond the office.  Again, I

have had no substantive discussions about this trial.  And I

believe, finally, that I received an email from Mr. Nicholas

during this period of quarantine, in or about May, just saying

"hi," inquiring as to how I was.  I did answer it, and here too

there were no discussions about the trial.

So I wanted those of you who are representing the

defendants to be aware of that.  To my mind, I don't think any

of these events, either alone or together, amounts to something

warranting recusal, but I figured you should be aware.  You can

talk about it, and if you think otherwise, you'll let me know.

I also wanted to talk to -- I now understand

Mr. Weddle and Mr. Tarlowe, about the issue of my jurisdiction,

because I understand the case is to now be on appeal.  It was

my belief that I could conduct these proceedings in aid of the

appeal and that there wasn't -- I was not somehow divested of

jurisdiction to have any proceedings with respect to this

K7OHAHUC

1    issue, but I wanted to make sure you had thought through these

2    issues, and I'd like to understand your thoughts.

3             Mr. Weddle, simply because you are to my left and

4    Mr. Tarlowe's to my right, may I have your thoughts on this?

5             MR. WEDDLE:  Yes, your Honor.  The way that I've been

6    thinking about this is that our initial request is a request

7    for court-ordered discovery and a hearing, fact-finding.

8             THE COURT:  Yes.

9             MR. WEDDLE:  That fact-finding is in aid of a motion

10   for -- is likely in aid of a motion for a new trial.  Your

11   Honor has jurisdiction to deny a motion for a new trial

12   notwithstanding the appeal.  To the extent your Honor believes

13   that there's a substantial issue presented by the motion or is

14   inclined to grant the motion, then your Honor has the power and

15   authority to make an indicative ruling to the Court of Appeals

16   to that effect, and then the Court of Appeals has the

17   discretion, if it would like to, to return jurisdiction to your

18   Honor.

19            So the way I see this playing out is that what we're

20   doing right now is we're trying to find facts.  As soon as we

21   complete the process, the finding of facts, then I anticipate

22   the defense making motions.  Among other requests for relief,

23   there would be a request for a new trial, at a minimum.  And at

24   that point, your Honor would have it in your power to

25   essentially request jurisdiction back from the Court of

K7OHAHUC

Appeals, and they would have it, obviously, within their power
to return it to you.  Absent those events taking place in that
way, then the appeal would, of course, go forward.

        We are in a position right now where we have -- and
this is set forth in our papers, and I don't want to belabor
the answer to this relatively simple question -- but we're in a
position of having litigated fully bail pending appeal, both in
front of your Honor and in the Court of Appeals, and fully
briefed or filed our initial appellate briefs in the Court of
Appeals based on false facts.  So we're in a situation right
now where, depending on how your Honor intends to rule on the
requests that have been made so far and depending on how the
schedule looks for the future in terms of resolving these
issues, there is, let's say, a puzzling circumstance in the
Court of Appeals, which is that they have before them an
argument that's been briefed by Mr. Shor and joined in by
Mr. Ahuja that is based on an incomplete and incorrect record.
And I would add that the government's deadline to oppose that
argument that's based on inaccurate facts is coming up
relatively soon.  I believe it's August 3.

        THE COURT:  Mr. Weddle, to that point -- and certainly
I'll turn to Mr. Tarlowe momentarily -- but, Mr. Weddle, I had
the exact same thought; I had the exact same analysis.  One
might have thought we were in the same unit at one point.  But
what I'm wondering, and I'm just sort of wondering out loud on

K7OHAHUC

| | |
|---|---|
| 1 | this, is whether it makes sense to stay the appeal.  And I'm |
| 2 | not making any final -- obviously, that would be your motion to |
| 3 | make, but my concern here is, depending how long the |
| 4 | fact-finding component that you've outlined takes, I'm |
| 5 | concerned about the Second Circuit having or spending time on a |
| 6 | record that is incomplete, and I'm concerned about you writing |
| 7 | a reply brief where you're perhaps not able to put in other |
| 8 | information. |
| 9 | So I'm not telling anyone what to do.  I'm exploring |
| 10 | whether it makes sense to request a stay of the appeal pending |
| 11 | resolution of what will be, in the first instance, fact-finding |
| 12 | or fact-gathering and what may be, in the second instance, |
| 13 | motion practice and hearings thereon. |
| 14 | Have you discussed that with your codefendant counsel? |
| 15 | MR. WEDDLE:  I have, your Honor, and my thinking along |
| 16 | those lines is I think in line with your -- well, I don't want |
| 17 | to speak for how your Honor is thinking about things, but I had |
| 18 | gone through a similar path about considering whether it makes |
| 19 | sense to stay the appeal, and I hadn't -- we haven't reached a |
| 20 | final decision on it, and it's because there are a couple of |
| 21 | variables and moving parts here.  The main thing is that we |
| 22 | believe that we have a meritorious appeal and that the |
| 23 | convictions are going to be reversed.  To the extent that |
| 24 | that's correct, my client is due to surrender to serve sentence |
| 25 | in September.  So if that surrender date comes and he |

K7OHAHUC

```
1    surrenders to serve a prison sentence, then any day that the
2    appeal is extended is an extra day that he has to spend in
3    prison that he might not otherwise have to spend.  So we don't
4    want to delay the appeal if it means that my client is going to
5    be in prison.
6              THE COURT:  Mr. Weddle, may I pause you right there,
7    sir.  I actually thought of that as well, and while I'll make
8    no final determinations because I do want to hear from
9    Mr. Tarlowe and from the government on this, if I were staying
10   the appeal, I imagine that I would stay the surrender date
11   through the conclusion of the motion practice at this end, but
12   I'll hear from you on that point.
13             MR. WEDDLE:  I think that's one possibility, your
14   Honor.  I think that, actually, a cleaner way to accomplish the
15   same thing is for -- in light of the changed circumstances, I
16   think the analysis of the bail pending appeal motion should be
17   changed.  Indeed, we pointed out in the letters that one of the
18   sworn representations by the government submitted in opposition
19   to bail pending appeal is misleading and has not been
20   corrected, and in addition, the facts -- this was one of the
21   key arguments in the bail pending appeal motion -- but the
22   analysis of these disclosure issues and this line of argument
23   of cross-examination that relates to that is one of the issues
24   that was presented.  Based on the record before the Court of
25   Appeals back in February, I think it was, or March, the Court
```

K7OHAHUC

1    of Appeals found no substantial issue.  I think that the Court

2    of Appeals might revisit that decision, particularly if bail

3    pending appeal -- if an application to revisit that decision

4    was on consent of the government, that is, if the government

5    agreed that the facts have changed such that there is currently

6    a substantial issue presented by the appeal and so there should

7    be bail pending appeal and a stay of the appeal.

8              And then I think, depending on when your Honor would

9    prefer to do it, but I think organizationally what I would hope

10   to have happen in those circumstances is that your Honor would

11   make the indicative ruling to the Court of Appeals that there's

12   at least a substantial issue that should return jurisdiction to

13   you, and then we could all proceed in an orderly fashion.

14             THE COURT:  All right.  I had not thought about bail

15   pending appeal.  I had thought about extending the surrender

16   date, although I saw, I believe in the most recent submission

17   from Mr. Ahuja's counsel, a concern that Mr. Ahuja had about

18   wanting some finality.  I still suspect on these facts he might

19   be willing to have his surrender date extended further.  But

20   let me please turn to Mr. Tarlowe and get his views.  Thank you

21   very much for yours.

22             Mr. Tarlowe.

23             MR. TARLOWE:  Thank you, Judge.

24             First, on the legal analysis, we agree with what

25   Mr. Weddle and what your Honor have laid out in terms of the

K7OHAHUC

1    Court's jurisdiction, and we also envision the next step as a

2    fact-finding exercise that we believe will then result in the

3    filing of motions before this Court.

4            In terms of a potential stay of the appeal, we have

5    thought about that issue, and frankly, Judge, as Mr. Weddle

6    said, I think there are a number of variables that play into

7    that, a big significant one of which is what the Court intends

8    to do in connection with our request for fact-finding.  So I

9    think what we were planning to do was sort of see what happens

10   today, and then based on that confer with Mr. Weddle and with

11   the government and potentially move before the Court of Appeals

12   to stay the appeal.  Perhaps there would be a joint motion to

13   stay the appeal, but we wanted to have a better sense, first,

14   of what the Court intends to do.

15           THE COURT:  OK.  I appreciate that.

16           Ms. Griswold, the government's position?

17           MS. GRISWOLD:  We agree with the legal framework in

18   terms of your Honor's ability to conduct fact-finding and

19   consider any potential motion under Federal Rule of Criminal

20   Procedure 37.

21           In terms of the questions about staying the surrender

22   date and whether or not we would consent to revisit the bail

23   pending appeal, first of all, I would disagree with Mr. Weddle

24   that there was a misstatement made before the Second Circuit.

25   I believe the statement that was in our brief indicated that

K7OHAHUC

1     there had been no improper shaping of Mr. Majidi's allocution,

2     which remains the government's view.  We do not resist

3     additional fact-finding, as I said in our letter.  So I think

4     it's, at best, premature at this point to revisit the bail

5     pending appeal.  I think the government would consent to a stay

6     of the surrender date through the fact-finding, and then if our

7     position remains following the fact-finding that there was no

8     improper conduct, I think we would oppose any revisiting of the

9     bail pending appeal.

10          THE COURT:  I guess my concern, Ms. Griswold, is I'm

11    not going to get involved today in making a decision as to

12    whether something was misleading or false, but it was

13    incomplete, and I don't think you're even disputing that the

14    information that was presented to me and to defense counsel

15    during the trial and thereafter was incomplete.

16          First of all, do you disagree with what I've just

17    said?

18          MS. GRISWOLD:  Absolutely not, we agree 100 percent.

19    It was in complete.

20          THE COURT:  All right.  So my problem is -- and maybe

21    I'm just giving too much credit to the Second Circuit -- but it

22    seems to me the better thing is for them to have a complete

23    record, whatever it is.  And I'm a little bit concerned about,

24    for example, your office submitting something in early August

25    that is incomplete, and the defendants and their counsel being

K7OHAHUC

1    perhaps hamstrung in what they would be submitting in reply

2    simply because I haven't been able to complete the fact-finding

3    that I'll talk about a little bit later today.

4            Now, perhaps the answer is that that's what we need to

5    talk about, my thoughts as to fact-finding, and then maybe the

6    parties can have a conversation.  But without admitting a

7    defeat, Ms. Griswold, without admitting that there is a

8    problem, I think just the -- right now, today, the record is

9    incomplete, and that causes me concern.

10           MS. GRISWOLD:  I agree.  I'm sorry, your Honor.

11           THE COURT:  That's OK.  I'll let you finish your

12   thought, please.

13           MS. GRISWOLD:  We would not oppose a motion to stay

14   the appeal so that everything can be before -- the entire

15   record, whatever that ends up being, can be before the circuit

16   at the same time.  I was talking about order of operations in

17   terms of our view now of revisiting bail pending appeal versus

18   staying the surrender date.

19           THE COURT:  All right.  I'm thinking, and I'm thinking

20   out loud, that you might want to consider bail pending appeal,

21   but I'm going to stop thinking out loud and move from what were

22   the housekeeping issues to just the thoughts that I have right

23   now.  I'm going to beg your indulgence while I present them to

24   you, and then I'm going to ask for your own thoughts.

25           I want to begin by saying that I've been reading a lot

K7OHAHUC

of this case, and we're now just over a year since the verdict
came in.  What I've read has sparked a number of emotions in
me, and I've made a conscious effort this afternoon, and I've
made this effort -- only about an hour ago I made this
decision, that I was going to refrain from placing on the
record the entire explication of my emotions about this matter
and about my views as to what has happened.  I'm doing so in
part because there's one of you on this call who knows full
well what happens when a judge rushes to a conclusion about
government conduct or lets other or extraneous facts influence
that decision.  I'm not going to be that judge.

            You're asking me, fairly you're asking me, to make
some very, very serious factual conclusions about the conduct
of the government, and I had intuited the motion practice that
is to come.  I need to understand what happened, and the
biggest problem for me this afternoon is that I still don't
understand what happened.  And the issue for me is that the
government's response in this matter has been iterative.  I do
appreciate when folks quote my words back to me sometimes.  I
think I used the "death by a thousand cuts" expression in a
glib sense, but what I mean now is that I'm growing weary of
getting partial answers, especially when partial answers modify
or, worse yet, contradict prior answers.  I need, I believe
defense counsel and defendants need as well, a final answer, a
final response, a complete understanding of what happened.  I

feel, as the woman who's been reading all of this work and not

as the poor associates who've been writing all of this, that a

lot of time has been spent putting together arguments that

themselves are necessarily incomplete or simply tentative or

provisional because we don't know everything.

The government has committed to making production, to

again checking their records.  I'm underscoring the term

"again," and they've said to me that they need two weeks from

my order.  I'm telling the government, as plainly as I can,

take the time that you need and pick that amount of time, but

there can only be one more answer.  I can't get, you know,

today we produced this; next week we'll produce this.  We need

it all at once.  We should have had it last year, but we need

it all at once.  So I'm asking you to figure out -- and if you

tell me today, that's great, and if you need to convene with

each other about it and tell me today or Monday, that's great,

too -- I need to know what time you need to answer all of the

things that you have committed to answer.

At the moment I'm not, at the moment, requiring the

government to respond to the additional requests in

Mr. Tarlowe's letter.  I want to say that I understand exactly

where they're coming from, and I'm taking very seriously,

Mr. Tarlowe, your argument to me that all of this information

that's coming to me is coming to light because of work that you

did, very thoughtful approaches that you took involving

K7OHAHUC

1   Rule 17(c) and FOIA and not, perhaps, where it should have come

2   from, proactive, required, traditional disclosure by the

3   government.

4         So what I'm saying is, Mr. Tarlowe, I still have your

5   list of requests, and I'm denying them without prejudice

6   because I want to see what gets produced in whatever time the

7   government takes to get it produced.  I'm confident that you

8   and your team and Mr. Weddle and his team will respond when

9   they've reviewed these productions, and you'll tell me what it

10  is you believe has been missed.

11        But my concern is simply not only that the responses

12  may not be necessary or they may be overbroad.  I'm not opining

13  on that.  My issue, again, goes back to my initial point,

14  disliking or disfavoring the iterative nature of this.  My

15  suspicion, Mr. Tarlowe, is when new documents are produced,

16  you're going to have additional requests, and I'd just like to

17  have them all at once.  I don't want to be deciding now on an

18  iterative basis.

19        There's been some suggestion that once these documents

20  are produced, we're all good, and everything is resolved.  I'm

21  telling you -- I don't want to tell you to a certainty, but I

22  want to tell you to a near certainty -- that there is going to

23  be a hearing in this matter, and the hearing, we're not just

24  talking oral argument.  I have a very strong suspicion, at

25  least in my current way of thinking, that there will be witness

K7OHAHUC

testimony.  For me, as much as I'm trying to make do with this,

this Zoom conference, this videoconferencing, I believe that

hearing needs to be in person because, for my own preference,

I'd much rather make credibility determinations in person and

not by some video means.  Who is going to be at this hearing,

who is going to be conducting examinations, whether I will be

accepting sworn statements and to what degree they would

supplement or supplant the testimony, I will be determining

that in the future, but I just want a final answer as to what

other information is out there.  But when I get it, there will

be a hearing, and right now, today, in July, I would be

concerned about asking all of you to come down here to the

court, but as the fall takes place and as we're a little bit

further along in the protections in the courthouse, I think I

want you here.  Now, I'll listen to you if you can't for one

reason or another, but I think you can.

          Ms. Griswold, returning to you, I'm getting or

understanding from some of the submissions that there either is

or will be a team of prosecutors who are not involved in the

trial that are looking over the emails.  Is that correct?

          MS. GRISWOLD:  Yes, your Honor.  We are at the stage

now of centrally pulling all of the materials, which includes

through our IT department further requires going to EOUSA

because of the time period for the communications.  Some time

has passed.  Once all of those materials are gathered, which we

K7OHAHUC

```
 1    believe is going to be within the next week, members who are
 2    not members of the trial team will be reviewing them.  For
 3    example, some of the searches that we have committed to conduct
 4    are not key word focused.  We're going to go through every
 5    single email in this time period.  So we have to have AUSAs
 6    rather than paralegals or staff go through that.
 7         But the short answer is, yes, AUSAs other than the
 8    three of us will be going through the material, and that
 9    process has started with a central collection of the materials
10    that need to be reviewed.
11         THE COURT:  One of the things I noticed in looking at
12    some of your key words, especially the word "allocution," which
13    apparently gives some people difficulty, are you able to do
14    searches with roots of words rather than complete words?
15         MS. GRISWOLD:  We have not asked that question.  I
16    don't see why not, but I would need to confirm with the IT
17    folks about whether or not their capabilities would allow for
18    that.
19         THE COURT:  I was just noticing, for example, one of
20    the suggested terms was Rule 11.  I'm just wondering maybe it's
21    R11 or R.11 or FRCP 11.  What I'm noticing and what concerns me
22    is that some of the excuses -- some of the explanations that
23    have been given to me are that, for example, we put in the word
24    "allocution" and actually a misspelling of the term was used.
25    I mean, that's an explanation.  It's not necessarily something
```

K7OHAHUC

1    that I'm accepting at this point given the history in this

2    matter.  My hope would be that you'd try and find even

3    misspellings to see if that worked out.

4             If I call these other attorneys a taint team, will you

5    take offense at that?

6             MS. GRISWOLD:  No, your Honor.

7             THE COURT:  OK.  I don't know what else to call them.

8    A wall team?  A seconds team?  I don't know.  In my prior life,

9    I would have called them a taint team.

10            There's a suggestion from defense counsel that if

11   anyone were to interface with the cooperating witness and/or

12   their counsel, it should be folks other than you all.  Do you

13   agree?

14            MS. GRISWOLD:  On this issue, yes.  For example, we

15   received an email from one of -- from Mr. Dole's counsel asking

16   if we would consent to an adjournment of his sentencing because

17   Mr. Kehoe is in Florida.  Our request would be that anything

18   related to the ongoing motions, we would not be involved in.

19            THE COURT:  All right.  So what I believe you're

20   saying is your interactions with -- you wouldn't have

21   interactions with the cooperators themselves.  They would

22   simply be with their counsel, and that would be on the order of

23   adjournment, dates for sentencing, ministerial matters, nothing

24   substantive at this stage, correct?

25            MS. GRISWOLD:  Correct.

K7OHAHUC

1          THE COURT:  Ms. Griswold, it would be my

2     expectation -- and I think I don't want to have to order this,

3     but I will if you need me to -- there should be no sentencing

4     of Mr. Majidi, Mr. Dole, or Dinucci until this set of motions

5     is resolved.  Are we in agreement on that?

6          MS. GRISWOLD:  We are, your Honor.

7          THE COURT:  All right.  Mr. Tarlowe, I'll begin with

8     you.  I'll just go in reverse order this time.

9          That's my proposal, and that doesn't end the issue,

10    but it addresses the concerns that I have right now and it

11    leaves open a path for going forward.  May I hear from you on

12    that.

13         MR. TARLOWE:  Yes, your Honor.  I appreciate the Court

14    directing the government to take that initial step.  A couple

15    of issues that I just wanted to raise.  One, we think the

16    search terms that the government has proposed are not

17    sufficient, and we share the Court's frustration in the

18    iterative nature of this.  I certainly don't want to be in a

19    position again where we're briefing issues based on an

20    incomplete record.  My concern, for example, is they have

21    proposed search terms, I think three search terms: allocution,

22    plea, and Rule 11.  It's not just misspellings that those terms

23    may fail to capture, but there may be emails where people are

24    talking about, for example, just talked to Mr. Rosenberg.  He

25    says Amin is not going to say X or Y.  So I think there may

K7OHAHUC

1    very well be communications that are relevant that would not be

2    captured by those search terms.  So we would suggest --

3               THE COURT:  One moment, please, sir.  I thought I

4    understood as well that the government was proposing to look,

5    for example, at emails that were seven days before and seven

6    days after things and just go through all of the emails, which

7    might cover some of the issues that you're now raising.  But I

8    presume you're now going to tell me that you have search terms

9    of your own to propose?

10              MR. TARLOWE:  I don't.  We're happy to propose them.

11   I do think that the government should review all of the emails,

12   all of the internal chats, all of the different modes of

13   communication.  I don't think they should be limited by search

14   terms.  If they are limited, the search terms need to be

15   broader to capture all documents related to this case, and that

16   would include, for example, the first and last names of each of

17   the cooperating witnesses, the first and last names of each of

18   the lawyers of the cooperating witnesses, all emails to or from

19   any of the lawyers for the cooperating witnesses.  It's just

20   not sufficient to rely on those search terms.

21              THE COURT:  All right.  One moment, please.

22              Ms. Griswold, is it possible, and I think the answer

23   is yes, to run searches in the manner that Mr. Tarlowe just

24   most recently described?

25              MS. GRISWOLD:  Yes, your Honor, and our proposal is

K7OHAHUC

1    to, without limitation by key word or recipient, look through

2    all emails for the -- with the focus on cooperator allocutions

3    for the seven-day time period before and the seven-day time

4    period after -- every single one of the emails for the members

5    of the trial team.  So that would capture, I believe, not just

6    what is an allocution, what is a misspelling.

7          We want to get this right.  We recognize that our

8    searches were wholly insufficient, and so if there are specific

9    additional search terms, we are happy to use them, but we're

10   not limiting ourselves based on search terms.  We're looking at

11   the date of the plea.  If Mr. Tarlowe's asking us to go out

12   another week on either side, but this is -- to look at every

13   single email that's on Amin Majidi, we're going to get into

14   witness prep, we're going to go into that second bucket of

15   requests that, my understanding from the Court at this point,

16   we're not getting into.  So I think the --

17         THE COURT:  One moment, please.  My fear, and perhaps

18   Mr. Tarlowe's fear, is that there is something really

19   interesting on the eighth day.  So I don't mind the week

20   before, the week after, and looking at all emails during that

21   period, I agree with that, but I still think you should run all

22   emails through first name, last name of the cooperating witness

23   and the lawyer, and even if that is a lot of stuff that you

24   don't think is necessary to be produced, I think they ought to

25   be looked at.

K7OHAHUC

| 1 | MS. GRISWOLD:  OK, your Honor, we will do that.

| 2 | THE COURT:  All right.  Thank you.

| 3 | Mr. Tarlowe, you may continue.

| 4 | MR. TARLOWE:  Yeah.

| 5 | MR. WEDDLE:  May I interrupt on this issue of search

| 6 | terms, just very quickly?

| 7 | THE COURT:  Sure, Mr. Weddle.  I promise I was going

| 8 | to talk to you after I finished talking to Mr. Tarlowe.

| 9 | MR. WEDDLE:  I'll wait, then.

| 10 | THE COURT:  OK.  Thank you.

| 11 | Mr. Tarlowe.

| 12 | MR. TARLOWE:  Second request, Judge, is recognizing

| 13 | that there will be, to use the Court's term, a taint team that

| 14 | will be reviewing these documents, I just want to make sure

| 15 | it's clear that this is not just a subject matter review.  What

| 16 | I mean by that is when the taint team is reviewing documents,

| 17 | the objective should not be, is this document related to the

| 18 | allocution or not?  That, of course, should be part of the

| 19 | inquiry, but the taint team should be familiar with the facts

| 20 | of this case and the defenses so that if, in the course of that

| 21 | review, they come across a document that is even arguably

| 22 | *Giglio* or *Brady* but doesn't relate to the allocutions, that

| 23 | those documents will be disclosed.

| 24 | THE COURT:  Mr. Tarlowe, it would seem to me that if

| 25 | the members of the taint team reviewed Mr. Weddle's letter of

K7OHAHUC

the 19th of June and your letter to me of July 6, that they
would have an understanding of the issues that you now raise.
Do you agree?

          MR. TARLOWE:  I'm not sure, Judge, because it's
possible, for example, that in the review of all emails
referring to a cooperator's name, that there's a discussion of
something that a cooperator or his or her lawyer said that was
inconsistent with their trial testimony.  That would be *Giglio*
but has nothing to do with the allocution.  So I just want to
be sure that the prosecutors who are reviewing this material
have a sufficient understanding of the case and the nature of
the defenses independent of the allocution issues so that they
are in a position to spot potential *Brady* or *Giglio* that don't
relate to the allocutions.

          THE COURT:  Are you asking them as well to review your
closing arguments?

          MR. TARLOWE:  I think that would be a good idea.

          THE COURT:  Ms. Griswold, is that a possibility?

          MS. GRISWOLD:  Sure, your Honor.  Of course.

          THE COURT:  OK.  Mr. Tarlowe, yes.

          MR. TARLOWE:  Then the last thing on -- well, another
thing on the scope of the search, I heard the government say
that just a moment ago they would be reviewing all emails
without regard to search terms for a particular period of time,
but there are other modes of communication, including the

K7OHAHUC

1    internal chat system, which, I'll confess, I didn't know about

2    or just didn't remember from my time in the office.  As the

3    Court may be aware, in another matter before Judge Nathan, the

4    government recently disclosed some significant communications

5    among the AUSAs that were recovered from the internal chat

6    system.  So I'd like to make sure that that is also captured by

7    these searches.

8            THE COURT:  I understood that from the written

9    submission, but Ms. Griswold will confirm.

10           MS. GRISWOLD:  Yes, your Honor, we have chats, voice

11   mails, emails -- everything that we indicated in our submission

12   on July 16 is part of this review, and right now we're in the

13   stage of confirming what is there.  We believe that at least

14   one member of the trial team's chats are completely backed up,

15   so we're in the process of pulling everything.  But chats are

16   part of our review, and they will be reviewed consistent with

17   the representations that we made in our letter and following

18   from the additional guidance we get on this call.

19           THE COURT:  All right.  I guess I was understanding --

20   no, I think my question's been answered.  Never mind.  Thank

21   you.

22           Mr. Tarlowe, something else before I turn to

23   Mr. Weddle?

24           MR. TARLOWE:  Yes, your Honor, just two more things.

25   One is -- and I raise this for the Court's consideration.  I

K7OHAHUC

1    don't have a strong view on this.  But when the Court described

2    earlier how it's time for answers for the full picture, I

3    understand that the Court has said this is only the next step

4    and that there likely will be additional steps, so this may be

5    premature.  But I do have a concern that the documents are not

6    going to tell the entire story, and there are a number of

7    questions that we've laid out in our submissions that the

8    government is in a position, I would think, to answer.  So I

9    wonder whether it may make sense, in connection with the

10   production, in addition to producing the documents and the

11   government being able to say these are all the documents, we're

12   done searching, that perhaps they can also provide an

13   explanation of what happened and answer some of the outstanding

14   questions.

15          THE COURT:  I'm not going to do that at this time

16   because what I've been doing, and what I may stop doing at some

17   point, is I've been putting together my own list of questions

18   that I want answered, and whether they are answered in sworn

19   statements or in testimony is something that I'm currently

20   debating internally.  But I haven't -- I accept your

21   proposition that production of the documents doesn't end the

22   inquiry.  I'm just trying to figure out the best way to do it.

23   And to be candid with you, it's not until I have all of the

24   documents that I will know best what I want answered, and that

25   will be informed, I suspect, by letters of the type you've

K7OHAHUC

1  submitted to me outlining things that you believe are gaps or

2  inconsistencies.  So I'm deferring, not denying, sir.

3        MR. TARLOWE:  Thank you, Judge.

4        Then the last issue I wanted to address on this is I

5  understand the Court is not at this time inclined to direct the

6  government to conduct the broader searches that we've

7  requested.  On that issue, Judge, my concern is that the issue

8  of the allocutions is a very narrow, specific, targeted issue,

9  and on that issue, the government -- I won't belabor the facts

10 which I know the Court is familiar with -- but the government

11 obviously did not produce that material before trial.  There

12 were Rule 17 subpoenas and some incremental production.  There

13 was an order from the Court to review all communications with

14 lawyers for witnesses.  It wasn't limited to documents that

15 have the term "allocution."  It was all emails with lawyers for

16 the witnesses.  The Court certified they did that.  We did a

17 FOIA request.  It was an incremental production.  Then there

18 were additional searches and more productions.  And we're not

19 talking about a needle in a haystack.  We got within the last

20 two weeks a draft Dinucci allocution that was emailed to the

21 government.

22        So my concern, Judge, is that on an issue that is very

23 narrow and targeted, the government repeatedly missed key

24 documents, notwithstanding court orders, Rule 17 subpoenas,

25 FOIA requests.  So my concern is there are a host of other

K7OHAHUC

1    issues that came up where there was nothing more than the

2    government's representation that either something was not

3    *Giglio*, for example, the testimony of the agent before the

4    grand jury, or there were representations that there is no

5    *Giglio* within a certain category, that there is no *Giglio* about

6    discussions with Dinucci's -- sorry, with Nimberg's lawyer

7    about immunity.  Those representations, we cannot have any

8    reasonable degree of confidence that those are right because

9    whether what has happened here was purely inadvertent or

10    whether it was intentional, either way the government's

11    representations about having complied with its disclosure

12    obligations, having conducted adequate searches have been wrong

13    over and over again.

14         So we are in a position where, obviously, the way --

15    we all know the way that *Brady* and *Giglio* disclosures normally

16    work, and the government gets to make its own determinations

17    about whether documents are subject to disclosure or not.  In

18    this case, based on this record, it's clear that we just can't

19    rely on those representations.  So we do believe that it is

20    appropriate and warranted at this stage for the government to

21    go back and review the entire file, which your Honor asked them

22    to do when this came up at trial, but to go back, look at the

23    shared drive, look at the entire file for any *Brady* or *Giglio*.

24    It is not enough to just take their representation that

25    something was not *Giglio* and not subject to disclosure.

K7OHAHUC

1        So we really would urge the Court to reconsider that
2    part of your decision today because we are entitled to know
3    what else is out there, and we and our client and, I think
4    fairly, the judge, your Honor, cannot possibly have any comfort
5    that we have all the *Brady* and *Giglio* in this case.
6        And related to that, I do want to just talk briefly
7    about this issue of not memorializing oral communications, but
8    I think it's relevant to what I just discussed.  The government
9    has said there is nothing sinister, nefarious about having
10   in-person or oral communication.  Obviously, that is the case.
11   Nobody disputes that.  But the emails do quite clearly, in our
12   view, show that there was a deliberate effort taken to avoid
13   putting things in email in order to avoid having to disclose
14   it, and that is very troubling because the government's
15   disclosure obligation applies to communications, to facts.  The
16   substance of the communication is what is subject to
17   disclosure, or not, but by asking somebody not to send an email
18   and to do it over the phone instead, that has no impact as a
19   legal matter on the disclosure obligation, but that appears to
20   be exactly what happened.
21       In connection with all three cooperators' allocutions,
22   there's no dispute that the government played some part in
23   shaping, and I don't use that word pejoratively, but
24   influencing the substance of the allocution.  There's no --
25   there's nothing memorialized about any of those communications.

K7OHAHUC

They all were in person and over the phone, and I don't think
that's a coincidence.  And the starkest example, and I imagine
this will be among the issues covered in the Court's
fact-finding, but the day before Majidi's plea, we have this
redline created by the government.  There appears to be a
meeting of the AUSAs from 3 o'clock to 4 o'clock, and then
within minutes of that meeting concluding, I think the email is
at 4:03, Mr. Naftalis sends an email to Mr. Rosenberg saying,
"Can we speak at 4:30?" and the document is not transmitted.

        Now, I work a lot with redlines.  It's hard for me to
think of an example where an edited document is created and
then, rather than just emailing it and saying, perhaps let's
discuss, there's just a phone call in which the changes are
read orally.  It's hard to understand why that happened, Judge.
So the reason that I'm raising this is because I think there
may very well be, outside of the allocution context, other oral
communications with lawyers for witnesses for which there is no
record.  And the internal emails, the internal chats may be the
only way that we are able to discover what those communications
were.  So I do think where the government has failed
repeatedly, whether inadvertent or not, to satisfy its
disclosure obligations it is appropriate for them to be
directed to go back and review the whole file for *Brady* or
*Giglio*.

        THE COURT:  All right.  Ms. Griswold.

K7OHAHUC

1          MS. GRISWOLD:  Your Honor, with respect to the

2     cooperator allocution and the issue that is raised at trial, we

3     acknowledge that our searches –– and it wasn't intentional, to

4     be clear –– our searches were not sufficient to identify when

5     you said to us:  Go back to your office and see if there are

6     any more like this.  Tell me how we got from point A to point

7     B.  The work that we did to figure that out was not sufficient,

8     and we acknowledge that.

9          But to paint with a broad brush that we don't

10    understand what *Giglio* and *Brady* is and that we haven't made

11    significant disclosures in this case that demonstrate our

12    knowledge of what it is, I think, is unwarranted.  We made

13    significant *Brady* and *Giglio* productions in this case that

14    reflected a careful review of our file.  We disclosed, for

15    example, communications with counsel for witnesses, witnesses

16    that were called to the trial, at trial, or that were not, and

17    those were oral communications.  For example, we had a

18    January 2019 letter in which we disclosed a memorialization of

19    a conversation we had with counsel for Mr. Noorali at AOC.  We

20    were attuned as we did our investigation and as we made our

21    disclosures to obligations of that nature, meaning *Triumph*

22    *Capital*-type obligations, *Giglio* obligations.

23         So while we fully recognize and acknowledge the

24    mistakes that were made with respect to searching for the

25    cooperator allocutions and how we got from point A to point B,

K7OHAHUC

1    and we want to do the work to make sure that we give full

2    comfort to the parties and the Court about exactly what

3    happened there.  We don't think that Mr. Tarlowe's points about

4    not having reviewed the rest of our file sufficiently well are

5    warranted.

6            THE COURT:  But I believe what he's saying -- and it's

7    something I don't necessarily disagree with -- is that it's a

8    shame to find out a year after the verdict that this material,

9    which seems so obviously called for by the discussions we were

10   having, was not produced.  I take Mr. Tarlowe's point that at

11   some point one loses confidence in the representations that are

12   made.  I think my own view at the moment is, with respect to

13   the issue of oral communications, I again need to see what else

14   is out there before I can make a final decision on this.  So

15   I'm keeping that particular door open.  To Mr. Tarlowe's

16   broader issue about the government conducting another *Brady* or

17   *Giglio* search, again, I think I want to see what else comes to

18   me in this matter before making that determination.  Thank you.

19           Mr. Weddle, I'm now turning to you, and I appreciate

20   your patience.

21           MR. WEDDLE:  Thank you, your Honor, if I could just

22   have one second?

23           THE COURT:  Of course.  Take whatever time you need.

24           MR. WEDDLE:  Of course I agree with all the points

25   made by Mr. Tarlowe, and I think, just not to beat a dead

K7OHAHUC

1   horse, because your Honor already spoke to the government about

2   the issue and indicated that you weren't going to rule on it

3   right now, but I think that all of these things are connected

4   together.  And where you have indications of efforts to conduct

5   communications orally or in person such that there is no

6   memorialization about what happened, then going -- even doing

7   what Mr. Tarlowe says, which is they should go back and review

8   the entirety of the file, in whatever format, to make sure that

9   they've produced the *Giglio* and *Brady* that they're obligated to

10  produce, that comes in the context where some of that file,

11  including documents recently produced, shows that the file will

12  be incomplete.  The file --

13          THE COURT:  Sir, isn't that the tension in

14  Mr. Tarlowe's argument?  Not to beat up on Mr. Tarlowe, of

15  course.  But isn't there a tension in saying, have the

16  government review its *Brady* and *Giglio* productions, make sure

17  it got it right, when his other argument, his subsidiary

18  argument, perhaps his stronger one, is the government, if

19  they're not memorializing oral communications, as *Triumph*

20  *Capital* requires them to do, that review is not going to

21  produce anything else?

22          MR. WEDDLE:  Well, your Honor, I would flip it around.

23  I think that there's a tension in the government's argument.

24          THE COURT:  OK.

25          MR. WEDDLE:  The government -- the concrete evidence

K7OHAHUC

1    has been that uncovered here through a FOIA request, that

2    should have been voluntarily turned over because of the

3    government's constitutional obligations, should have been

4    turned over because your Honor specifically ordered the

5    government to do it and told them how to do it, they said that

6    they did it that way, and they said they turned everything

7    over, and none of that was true, so now we have documents that

8    we otherwise wouldn't have had.  So the government -- and we

9    also have documents that have this indication repeatedly of an

10   effort to avoid memorialization.

11            So for the government to say we don't have to search

12   everything, we just have to search on the topic area in which

13   it's been demonstrated that the representations were

14   diametrically opposed from the truth, that's the only area we

15   need to re-search, that is a tension, your Honor.  And I think

16   that the difficulty is that the searches that they're offering

17   to do, if ordered by the Court, are searches that are much more

18   limited, and we're faced with a situation now, years after the

19   events in question and a year after the trial, where the

20   government says:  Well, here's some documents.  We're sorry we

21   didn't produce them.  We're sorry that we didn't accurately

22   respond to your Honor's questions, but nobody remembers

23   anything else about it, and it must have happened in good

24   faith.

25            There are routinely fact-finding methods that courts

K7OHAHUC

1      use to fill in the gaps when people claim a failure of

2      recollection.  Just to take a very small example, we asked for

3      all documents that reflect oral communications, including phone

4      records.  The government puts phone records in as evidence in

5      almost every trial to indicate what happened and to fill in the

6      gaps and complete the picture of what the communications are.

7      How many phone calls were there between AUSAs on the government

8      team and counsel for Mr. Majidi on October 30 and October 31?

9      Maybe the answer in the phone records is zero.  That would tell

10     us something.  Maybe the answer in the phone records is 20.

11     That would tell us something.  But the government's position is

12     because the records don't show the substance, they shouldn't

13     even search them.

14          The problem is that the searches that they're offering

15     to do are relying entirely for satisfaction of their

16     obligations on the contents of the paper record in a limited

17     topic area where it's already been demonstrated that the

18     representations made were not accurate.  So that seems to be in

19     strong tension with the government's affirmative obligation to

20     produce these materials.

21          I just wanted to make a couple other points, your

22     Honor.  There was a mention of *Triumph Capital*, and of course,

23     *Triumph Capital* was the case that was raised by your Honor at

24     the beginning of this dispute which was in the midst of trial.

25     I think *Triumph Capital* is relevant but is a little bit of the

K7OHAHUC

wrong way to analyze the issue completely, because *Triumph Capital* has to do with when is a statement an inconsistent statement of a witness even if not made personally by the witness?

There's a broader point here that we've raised, that Mr. Ruzumna raised during trial and in the application that has been appealed and the Court's order that was most directly impacted by this allocution issue. We -- the defense, we submit, would have wanted to present evidence, both through cross-examination of cooperators and otherwise, to show that cooperators or witnesses were willing to adopt language or ideas propounded to them by the government. They were malleable, OK? That is *Giglio* material, for sure. It's probably also easily *Brady* material.

The government in saying it's OK to have these communications. And to talk about *Triumph Capital* is missing the *Giglio* point. When they had a communication, when a prosecutor had a communication with a cooperator's lawyer and said, in words or substance or by handing him a printed out clean copy of an allocution text to read, they should have memorialized that and disclosed it. They should have said: You know, the cooperator was going to say X. We intervened in the following way, and the cooperator said Y.

The government -- so this is just a very stark example. They should have memorialized that. There's lots of

K7OHAHUC

1    ways to memorialize it.  They could have written a letter to

2    describe oral communications that took place at 4:30 on that

3    afternoon.  They could have described the importance of this

4    issue that caused the prosecutors to convene a team meeting to

5    discuss the proposed allocution.  They could have written that

6    into a letter and disclosed it to the defense.  They could have

7    conducted all these communications in writing and disclosed the

8    writings to the defense, but they did neither.  So to say we're

9    going to search three search terms, which we know fail to

10   capture everything that is required and that we're only going

11   to search this very narrow issue of shaping allocutions, falls

12   flat or falls short of the government's affirmative *Giglio* and

13   *Brady* obligations.

14          And just to give a quick related example, the

15   government sent a letter to the Court in the context of

16   apologizing for misrepresentations, and the government produced

17   the allocution written by Mr. Naftalis and read nearly verbatim

18   into the record by Majidi.  They produced it on, I think it

19   was, June 19.  Should have been produced before trial.  Should

20   have been produced, you know, well before Second Circuit

21   arguments on bail pending appeal, which was after the FOIA

22   request was delivered to the Southern District of New York.

23   Should have been produced in March.  Should have been produced

24   lots of other times.  And in that letter apologizing for the

25   mistake, the government said that the changes were completely

K7OHAHUC

1    consistent with the 3500 material.  A statement like that, your

2    Honor, shows a callous disregard for the resources and rights

3    of the defense, because the 47 pieces of 3500 material for

4    Majidi, many of them are handwritten, someone on the defense

5    side has to read them, me, and see, is that accurate?  Are they

6    completely consistent?  And as we set forth in the letter of

7    July 7, they are absolutely not completely consistent.

8            Your Honor, I don't want to repeat your Honor's use of

9    a potentially glib phrase that came from way back when during

10   trial, but the number of statements that the defense and the

11   Court has to chase down and the time that's required to do

12   that, I think, is very problematic and warrants, certainly,

13   relief and I think it may be ultimate relief, your Honor.

14           And I don't say that lightly.  Your Honor referenced

15   at the beginning of this case an experience that I was

16   personally involved in as a prosecutor in which I was singled

17   out -- not singled out.  I, among other people, was

18   specifically mentioned as having engaged in wrongdoing by a

19   judge.  It's not pleasant.  I understand how bad that can be

20   for a prosecutor who's trying hard, but it's not clear to me

21   that the government understands how bad this can be for

22   defendants and for the Court.  The Court took the time to

23   engage in an extensive factual inquiry regarding this

24   particular issue.  The Court took the time to tell the

25   government how to make sure that they were complying with their

K7OHAHUC

 1   obligations, namely, by reviewing their communications with

 2   counsel.  The government took time to discuss this and get

 3   representations from defense counsel, and the Court issued a

 4   ruling specifically based on those facts, conducted a trial,

 5   the defense conducted a trial without a line of argument and

 6   cross-examination and evidence that we submit we should have

 7   had.  Then we litigated bail and appeal in these very issues,

 8   both before your Honor and in the Second Circuit, wrote an

 9   appeal brief.  So just from my own perspective, personal

10   perspective -- and I do this as a job, so it pales in

11   comparison to the perspective of a defendant like Mr. Shor,

12   right -- my law firm has spent more than 700 hours as appellate

13   counsel on this matter.  Virtually all of that has to be

14   redone, and it has to be redone because of the government's

15   actions.  Your Honor conducted, what, a six-week trial with

16   jurors, witnesses, counsel, all those people.  I submit that

17   that's going to have to be redone unless other relief is

18   granted.  The same thing for Mr. Ahuja's counsel.  He had to

19   file a FOIA request to get documents that clearly should have

20   been given to him.

21           And just to circle back to the very beginning, your

22   Honor, and I don't want to make this too much of an argument

23   about the merits, but I do think when we start talking about

24   search terms and can we add this search term and this search

25   term or should it just be allocutions or should it also relate

K7OHAHUC

1    to proffer statements as well, which is one of the requests

2    made in the July 6 letter in which the government is expressly

3    avoiding conducting a search on that, my review of the proffer

4    statements in response to their statement that they were

5    completely consistent with the changes to the allocution

6    drafted by the government, my review shows that there are areas

7    where they're consistent; there are many areas where they're

8    not consistent; there are many areas where they're ambiguous.

9    The areas where they're consistent speak to me of

10   cross-examination in a conference room by prosecutors and

11   agents.  That is, you see date range and then you see later in

12   the same 3500 material the witness purportedly says:  Yeah, it

13   is possible that it was in 2014.  That looks to me like an

14   agent or a prosecutor saying:  Hey, you said it was 2015.

15   Don't you think it was possible it was 2014?  And the witness

16   said yes.  That statement --

17            THE COURT:  Mr. Weddle, Mr. Weddle, I'm stopping you.

18   Don't speculate.  We're not at the point of speculating.

19            MR. WEDDLE:  My point, your Honor, is that statement,

20   that activity, if it took place, is of the same character as

21   writing the allocution because it's the same *Giglio* theory,

22   which is we wanted to argue that the witnesses were malleable

23   and they would say what the government indicated they should

24   say or that they personally designed they should say to please

25   the government.  So the searches that they're offering or

K7OHAHUC

1    proposing, I think, are too small.

2              And then to just come full circle, when I started to

3    talk about the results of these mistakes, if they are mistakes,

4    falls heavily on both the Court and the defendants.  I admit it

5    falls heavily on the government, too, to have to conduct a

6    review like this, but to circle back to, you know, we talked a

7    little bit about a stay of the surrender date and the

8    government's position was, well, we would consent to adjourning

9    a stay of the surrender date until the fact-finding is

10   complete.  There is an extraordinary psychic cost, your Honor,

11   for a defendant to prepare to surrender to jail, to prison.

12   This issue has not caused that to --

13             THE COURT:  One moment, please.  I lost Mr. Shore.

14   He's coming -- he's back now.  Thank you.  I did not want to

15   lose him in this conference.

16             Thank you, Mr. Weddle.

17             MR. WEDDLE:  Just to give your Honor an example,

18   Mr. Shor asked me to apologize on his behalf.  He doesn't have

19   a suit coat to wear today.  He packed his dress clothes based

20   on the last surrender date, which was adjourned.  So I don't

21   think that short-term adjournments ameliorate the heavy weight

22   that he has to carry, and he has to carry it now because the

23   government failed to produce documents that they should have

24   found and produced and made disclosures they should have made

25   well prior to trial.

K7OHAHUC

1    THE COURT:  Well, I don't want to push back on that,

2    Mr. Weddle, because I don't want to minimize the emotional

3    turmoil of preparing to surrender, which is something you and

4    I, we can talk about, we can feel about, but we have no

5    personal experience on the issue.

6         I guess I just turn to the point of I'm trying to

7    figure out what is the best way of giving me and you and your

8    clients the opportunity to get the information and make best

9    arguments from that information.  So I'm not interested in

10   tormenting Mr. Shor or Mr. Ahuja by having a series of

11   adjournments of the surrender date, but I also don't want to be

12   rushed in the investigation that I intend to do and in the work

13   that I intend to do, which is why I was suggesting an

14   adjournment of the surrender date until I decide the motions

15   you have yet to file.

16        MR. WEDDLE:  And that is, obviously, much preferable

17   your Honor.  I know that we're not deciding the issue now, but

18   since there were multiple proposals that had been said back and

19   forth and because my client had asked me to apologize on his

20   behalf in this respect, I did want to mention it.  And I think

21   that the idea that I had at the beginning, which is bail

22   pending appeal, is obviously a broader scope than your Honor's

23   proposal too.

24        THE COURT:  I think that is something that would

25   benefit from discussion with you, with Mr. Ahuja's counsel,

K7OHAHUC

1    with the government and, if necessary, with me.  But my own

2    view is that if I don't have a complete record, the circuit

3    doesn't have a complete record, and right now we don't.  But I

4    understand.

5            With respect to your larger points about proffer

6    statements and being of the same piece, I would hope that you

7    would accept my representation, and I hope Mr. Tarlowe would as

8    well, that I am still considering this.  My issue is that I

9    need to see -- I may not need to get to the proffer statement.

10           One moment.  Who's speaking?  There we go.  That

11   stopped.  OK.  That was delightful, and now that's ended.  All

12   right.

13           So the issue is I may see these documents and I may

14   have a reaction that doesn't require you to get into proffer

15   statements.  I may see these documents and have a reaction that

16   calls for the proffer statements and other things.  What I

17   hoped I had communicated at the beginning and what I will

18   therefore return to now is I just wish I understood the issue,

19   and today I don't and at some point I will, even if that means

20   having to piece together and interpolate things myself.  But

21   I've read and considered very seriously and I've considered

22   very seriously today what you're saying, and the fact that I

23   deny it today doesn't mean I deny it for all time.  I just need

24   to see more.

25           But I appreciate you recapitulating the arguments that

K7OHAHUC

1    you and Mr. Ahuja's counsel have made, and I take absolutely --

2    you all should know me enough by now that I take no offense at

3    Mr. Shor's lack of suit jacket.  Mr. Shor was always -- during

4    the trial he was always very agreeable, very cordial, very

5    proper, and I take no offense at all.  Actually, Mr. Weddle, I

6    appreciate what you said to me, which is the reasons why it's

7    taking place over the reasons that you articulated.

8             Mr. Weddle, I don't wish to cut you off, but I think I

9    understand your arguments.  Is there more you wish to tell me?

10            MR. WEDDLE:  No, your Honor.  Thank you.

11            THE COURT:  All right.  Thank you.

12            Ms. Griswold, I sort of said my piece, and so I think

13   the parties understand it.  And to the extent that that piece

14   has been modified slightly by my conversations with defense

15   counsel as you now understand it, if there's something you want

16   to tell me, you are certainly invited to do so.  If you're just

17   going to recapitulate what's in the written submissions, I

18   commit to you that I've read them and all the attachments to

19   them, and I think the real issue is you speaking with your

20   colleagues about when I can get, when defense counsel can

21   get -- of course, they need it perhaps as much, perhaps more,

22   than I.  I was going to say as much as I do -- when I can get

23   these document, when I can have the final tally of the

24   documents that are responsive.  So, please, you can either tell

25   me now or tell me that you'll let me know by Monday.

K7OHAHUC

1          MS. GRISWOLD:  Your Honor, can we have a month from
2      today?  The two-week period we were on track to meet, but both
3      because we expanded on this call, to a certain degree, what
4      we're going to be going through and because we take your
5      Honor's direction that there's one shot, that we'd like to ask
6      for a month from today as opposed to the two weeks.
7          THE COURT:  That's fine.  Barring natural disaster,
8      you will not get beyond the month, but, yes, you will have the
9      month.  Thank you.
10          All right.  Ms. Griswold, anything else?
11          MS. GRISWOLD:  No, your Honor.  Thank you.
12          THE COURT:  OK.  From my perspective, I've said what I
13      wanted to say.  I heard what I wanted to hear.  These are
14      strange circumstances having these proceedings by video.  Were
15      we in the same room, you would understand the seriousness with
16      which I'm approaching this.  I hope I'm able to communicate
17      that seriousness through this conversation.  If not, then I can
18      simply tell you in my words that everything here, everything
19      that is said, causes me concern.
20          With that, there's nothing else I wish to address in
21      this proceeding.
22          Mr. Tarlowe, is there anything else?
23          MR. TARLOWE:  No, your Honor.
24          THE COURT:  Thank you.
25          Mr. Finzi I'm happy to have you on the proceedings.

K7OHAHUC

1    Is there anything you want to add?

2              MR. FINZI:  No, your Honor.  Thank you.

3              THE COURT:  Thank you.

4              Mr. Weddle, anything else?

5              MR. WEDDLE:  No, your Honor.  Thank you.

6              THE COURT:  All right.  So the natural question is

7    what happens next?  In one month we're getting this production.

8    I'm imagining within a week or two of that one month I'm

9    getting something from defense counsel.  Please, again, I want

10   your best.  If that means it takes a couple of weeks, that's

11   fine.  If you'd like to write to me when you receive the

12   production and give me a sense of the time that you need,

13   that's fine.  We'll be reading these productions together, and

14   then with your thoughts and with my review of the production,

15   I'll be putting out further orders and having further

16   conferences of the type to further discuss the specifics of the

17   hearing I would like to have.

18             With that, for the month that I will not see you, I

19   wish you all well.  I wish you safety and good health, and I

20   thank you again for participating on this call on a Friday

21   afternoon.

22             We're adjourned.  Thank you.

23             (Adjourned)

24

25